# EITF ABSTRACTS

**Issue No. 01-9**

**Title:**   Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)

**Dates Discussed:**   May 17–18, 2000; July 19–20, 2000; September 20–21, 2000; November 15–16, 2000; January 17–18, 2001; April 18–19, 2001; July 19, 2001; November 14–15, 2001; June 15–16, 2005

**References:**   FASB Statement No. 3, *Reporting Accounting Changes in Interim Financial Statements*
FASB Statement No. 5, *Accounting for Contingencies*
FASB Statement No. 13, *Accounting for Leases*
FASB Statement No. 48, *Revenue Recognition When Right of Return Exists*
FASB Statement No. 131*, Disclosures about Segments of an Enterprise and Related Information*
FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*
FASB Interpretation No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans*
FASB Technical Bulletin No. 88-1, *Issues Relating to Accounting for Leases*
FASB Technical Bulletin No. 90-1, *Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts*
FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*
FASB Concepts Statement No. 6, *Elements of Financial Statements*
*AICPA Accounting Research Bulletin No. 43, Chapter 4, Inventory Pricing*
APB Opinion No. 20, *Accounting Changes*
APB Opinion No. 22, *Disclosure of Accounting Policies*
AICPA Statement of Position No. 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*
AICPA Statement of Position 93-7, *Reporting on Advertising Costs*
AICPA Statement of Position 97-2, *Software Revenue Recognition*
AICPA Statement of Position 98-5, *Reporting on the Costs of Start-Up Activities*
AICPA Statement of Position No. 98-9, *Modification of SOP 97-2,* Software Revenue Recognition, *With Respect to Certain Transactions*
AICPA Technical Practice Aids, Section 5100.7, "Revenue Recognition-One-Cent Sales"
AICPA Technical Practice Aids, Section 3400.04, "Contingent Liabilities—Accounting for Issuance of Cents Off Coupons"

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

SEC Staff Accounting Bulletin, Topic 11M, *Disclosure of the Impact that Recently Issued Accounting Standards Will Have on the Financial Statements of a Registrant When Adopted in a Future Period*
SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*

**ISSUE**

1.     The purpose of Issue 01-9 is to codify and reconcile the following Issues, which address the accounting for **consideration**[1] given by a **vendor** to a **customer** (including both a **reseller** of the vendor's products and an entity that purchases the vendor's products from a reseller):

- Issue No. 00-14, "Accounting for Certain Sales Incentives" (Paragraphs 10, 16, 22–25, 27, and 28)
- Issue 3 of Issue No. 00-22, "Accounting for 'Points' and Certain Other Time-Based or Volume-Based Sales Incentive Offers, and Offers for Free Products or Services to be Delivered in the Future" (Paragraphs 30–33)
- Issue No. 00-25, "Vendor Income Statement Characterization of Consideration Paid to a Reseller of the Vendor's Products" (Paragraphs 9–14 and 16–21)

Issue 01-9 applies to vendors that derive their revenue from sales of services as well as those that derive their revenue from sales of products.

2.     Consideration (including sales incentives) offered by a company (vendor) on either a limited or a continuous basis to a customer may take various forms including discounts, coupons, rebates, and "free" products or services. Issue 01-9 contemplates that vendor consideration may be given to direct or indirect customers of the vendor. For example, a vendor may sell its products to a distributor who in turn resells the products to a retailer. Consideration paid by the vendor to the retailer in that example is within the scope of this

---

[1] Terms defined in Exhibit 01-9E, the glossary, are set forth in **boldface type** the first time they appear.

Copyright © 2010, Financial Accounting Standards Board               Not for redistribution

Issue. Issue 01-9 also addresses sales incentives offered by manufacturers to customers of retailers or other distributors. Thus, the scope of Issue 01-9 includes vendor consideration to any purchasers of the vendor's products at any point along the distribution chain, regardless of whether the purchaser receiving the consideration is a direct customer of the vendor. Examples of arrangements within the scope of Issue 01-9 include, but are not limited to, sales incentive offers labeled as discounts, coupons, rebates, and "free" products or services as well as arrangements labeled as **slotting fees, cooperative advertising,** and **buydowns.**

3.     Issues 1 and 2, below, address the income statement characterization of consideration given by a vendor to a customer, specifically whether that consideration should be presented in the vendor's income statement as a reduction of revenue or as a cost or expense. That part of Issue 01-9 applies to all consideration given by a vendor to a customer, except as indicated in paragraph 7, below.

4.     Issue 3 addresses whether a vendor should recognize consideration given to a customer as an asset in certain circumstances rather than as an immediate charge in the income statement. Issue 3 applies only to up-front, nonrefundable consideration given by a vendor to a customer, except as indicated in paragraph 7, below. (No consensus was reached on Issue 3.)

5.     Issues 4, 5, and 6 address when to recognize the "cost" of a sales incentive and how to measure it. The guidance in Issues 4 and 5 applies only to arrangements in which (a) the incentive is linked to a single sales transaction (that is, multiple sales transactions are not required in order for the customer to exercise the incentive) and (b) the vendor does

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

not receive an identifiable benefit from the customer in exchange for the sales incentive. In addition, if the vendor does receive an identifiable benefit from the customer in exchange for the sales incentive and the fair value of the sales incentive exceeds the fair value of the identifiable benefit, the guidance in Issues 4 and 5 is applicable to that excess. The guidance regarding loss recognition in Issue 5 (refer to paragraph 27) does not apply to arrangements that require delivery of a minimum amount of vendor goods or services during a contractually specified time period. For example, recognition of a probable loss as the result of up-front consideration given in connection with future sales of products or services (as described in paragraph 18) is not addressed in Issue 01-9. Issue No. 00-26, "Recognition by a Seller of Losses on Firmly Committed Executory Contracts," has been added to the Task Force's agenda to address loss recognition and measurement issues with respect to those and other similar types of arrangements.

6.    The guidance in Issue 6 applies only to vendor offers to rebate or refund a specified amount of **cash consideration** that (a) are redeemable only if a customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period, and (b) do not provide the vendor with an identifiable benefit. In addition, if the vendor does receive an identifiable benefit from the customer in exchange for the offer and the fair value of the offer exceeds the fair value of the identifiable benefit, the guidance in Issue 6 is applicable to that excess.

7.    Issue 01-9 does not address coupons, rebates, and other forms of rights for free or significantly discounted products or services received by a customer in a prior exchange transaction that were accounted for by the vendor as a separate deliverable in that prior

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

exchange. Issue 01-9 also does not address the accounting for an offer to a customer, in connection with a current revenue transaction, for free or discounted products or services from the vendor that is redeemable by the customer at a future date without a further exchange transaction with the vendor. The Task Force reached a consensus that those arrangements are multiple deliverable transactions that are within the scope of Issue No. 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables." This Issue also does not address the accounting for offers of free or discounted products or services that are exercisable after a customer has  completed a specified cumulative level of revenue transactions or remained a customer for a specified time period (for example, "point" and loyalty programs). Issue 00-22 addresses a vendor's accounting for those volume-based incentive arrangements. Finally, Issue 01-9 does not apply to the amortization of intangible assets that arise in connection with consideration given to a customer by a vendor that are acquired and separately recognized in a business combination. [Note: See STATUS section.]  Refer to Exhibit 01-9F for a decision tree to assist in the application of the guidance in Issue 01-9.

8.    The issues are:

*Income Statement Characterization Issues*

Issue 1—A vendor may give a customer a sales incentive or other consideration. Under

        what circumstances is that consideration (a) an adjustment of the selling prices

        of the vendor's products or services and therefore characterized as a reduction

        of revenue when recognized in the vendor's income statement or (b) a cost

        incurred by the vendor for assets or services received from the customer and

Copyright © 2010, Financial Accounting Standards Board              Not for redistribution

therefore characterized as a cost or expense when recognized in the vendor's income statement?

Issue 2—If cash consideration given by a vendor to a customer is characterized as a reduction of revenue when recognized in the vendor's income statement based on the guidance for Issue 1 and that reduction results in "negative revenue," should the negative revenue amount be recharacterized as an expense in the vendor's income statement?

*Recognition and Measurement Issues*

Issue 3—Under what circumstances should up-front nonrefundable consideration given by a vendor to a customer be recognized as an asset of the vendor rather than an immediate charge in the vendor's income statement?

Issue 4—If a vendor offers a sales incentive voluntarily and without charge to customers that is exercisable by a customer as a result of a single exchange transaction, when should the vendor recognize and how should the vendor measure the cost of the sales incentive if it will not result in a loss on the sale of a product or service?

Issue 5—For the sales incentive described in Issue 4, when should the vendor recognize and how should the vendor measure the cost of the sales incentive if it will result in a loss on the sale of a product or service?

Issue 6—If a vendor offers a customer a rebate or refund of a specified amount of cash consideration that is redeemable only if the customer completes a specified

Copyright © 2010, Financial Accounting Standards Board          Not for redistribution

cumulative level of revenue transactions or remains a customer for a specified time period, when should the vendor recognize and how should the vendor measure the cost of the offer?

## EITF DISCUSSION

### Income Statement Characterization Issues

*Issue 1—A vendor may give a customer a sales incentive or other consideration. Under what circumstances is that consideration (a) an adjustment of the selling prices of the vendor's products or services and therefore characterized as a reduction of revenue when recognized in the vendor's income statement or (b) a cost incurred by the vendor for assets or services received from the customer and therefore characterized as a cost or expense when recognized in the vendor's income statement?*

9.    The Task Force reached a consensus that cash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, should be characterized as a reduction of revenue when recognized in the vendor's income statement. That presumption is overcome and the consideration should be characterized as a cost incurred if, and to the extent that, *both* of the following conditions are met:

- a. The vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration. In order to meet this condition, the identified benefit must be sufficiently separable from the recipient's purchase of the vendor's products such that the vendor could have entered

Copyright © 2010, Financial Accounting Standards Board                                    Not for redistribution

into an exchange transaction with a party other than a purchaser of its products or services in order to receive that benefit.

- b. The vendor can reasonably estimate the fair value of the benefit identified under condition (a). If the amount of consideration paid by the vendor exceeds the estimated fair value of the benefit received, that excess amount should be characterized as a reduction of revenue when recognized in the vendor's income statement.

10. If the consideration consists of a "free" product or service (for example, a gift certificate from the vendor or a free airline ticket that will be honored by another, unrelated entity), or anything other than cash (including "credits" that the customer can apply against trade amounts owed to the vendor) or equity instruments (see Exhibit 01-9A, Example 11b), the Task Force reached a consensus that the cost of the consideration should be characterized as an expense (as opposed to a reduction of revenue) when recognized in the vendor's income statement. That is, the "free" item is a deliverable in the exchange transaction and not a refund or rebate of a portion of the amount charged to the customer. (Issue 00-21 addresses how to determine the units of accounting and the allocation of arrangement consideration for purposes of revenue recognition in multiple deliverable arrangements.) While the Task Force did not reach a consensus on the income statement classification of the expense associated with "free" products or services, the SEC Observer indicated that the SEC staff believes that the expense associated with a "free" product or service delivered at the time of sale of another product or service should be classified as cost of sales.

11. The Task Force observed that the separability aspect of condition 9(a) above will generally require slotting fees and similar product development or placement fees to be characterized as a reduction of revenue. Buydowns could never meet the separability aspect of condition 9(a) and, therefore, should always be characterized as a reduction of

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

revenue. The Task Force also observed that the guidance in Issue 1 above applies to consideration from a vendor to an entity that purchases the vendor's products for resale, regardless of whether those purchasers resell the vendor's products without altering them or use the vendor's products as a component in products or services that the purchasers sell. For example, a cooperative advertising payment made by a computer component manufacturer to a customer that manufactures or assembles computers would be subject to Issue 1 above.

**Transition Guidance**

12.    The Task Force reached a consensus that the consensuses on Issues 1 and 2 should be applied no later than in financial statements for annual or interim periods beginning after December 15, 2001. Earlier adoption is encouraged. Upon application of the consensuses, financial statements for prior periods presented for comparative purposes should be reclassified to comply with the income statement display requirements under Issues 1 and 2. If it is impracticable to reclassify prior-period financial statements, disclosure should be made of the reasons why reclassification was not made and the effect of the reclassification on the current period.

13.    The SEC Observer stated that registrants that would have been required under the original transition guidance (which required adoption in annual financial statements for the fiscal year beginning after December 15, 1999) to adopt the provisions of Issue 1 in an earlier period than is required under the revised transition guidance should make the disclosures required by the following sentence in financial statements filed with the Commission for the intervening periods.  If consideration from a vendor to a customer

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

that is subject to the guidance in Issue 1 has not been classified in the income statement consistent with the consensus reached on Issue 1, the amounts of such consideration for the current period and, if practicable, all other periods presented, and the line item in the statement of operations on which they are classified should be disclosed.

14.   The SEC Observer reminded registrants to consider carefully whether any disclosures related to the incentives addressed in Issues 1 and 2 are necessary in "Management's Discussion and Analysis of Financial Condition and Results of Operations," required by Item 303 of Regulation S-K.

15.   Examples that illustrate the application of the consensus on Issue 1 are presented in Exhibits 01-9A and 01-9C.

*Issue 2—If cash consideration given by a vendor to a customer is characterized as a reduction of revenue when recognized in the vendor's income statement based on the guidance for Issue 1 and that reduction results in "negative revenue," should the negative revenue amount be recharacterized as an expense in the vendor's income statement?*

16.   The Task Force observed that negative revenue may arise from the application of the consensus guidance for Issue 1 or from transactions or changes in estimates that are required to be characterized as a reduction of revenue by other authoritative literature. The examples in Exhibit 01-9B discuss some of the literature and underlying circumstances that could result in negative revenue.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

17.   The Task Force reached a consensus that if amounts are required to be characterized as a reduction of revenue under Issue 1 or any other authoritative accounting literature, a presumption exists that no portion of those amounts should be recharacterized as an expense. However, if a vendor demonstrates that characterization of those amounts as a reduction of revenue results in negative revenue for a specific customer on a cumulative basis (that is, since the inception of the overall relationship between the vendor and the customer), then the amount of the cumulative shortfall may be recharacterized as an expense. If the vendor's revenue arises from sales to resellers that are direct customers of the vendor (for example, distributors) that in turn sell the vendor's products to other resellers further down the distribution chain (for example, retailers that are customers of the distributors) and the consideration paid by the vendor that results in negative revenue is paid to those resellers further down the distribution chain (that is, the retailers), the vendor must be able to identify the distributor from whom the retailer acquired the vendor's products in order to perform the specific customer analysis referred to above.

18.   The Task Force observed that under the consensus in the previous paragraph, if a vendor remits or is obligated to remit cash consideration at the inception of the overall relationship with a customer before the customer orders, commits to order, or purchases any vendor products or services, the resulting negative revenue may be recharacterized as an expense if, at the time the consideration is recognized in the income statement, it exceeds cumulative revenue from the customer. However, recharacterization as an expense would not be appropriate if a supply arrangement exists that either (a) provides the vendor with the right to be the provider of a certain type or class of products or

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

services for a specified period of time and it is probable that the customer will order the vendor's products or services or (b) requires the customer to order a minimum amount of vendor products or services in the future, except to the extent that the consideration given exceeds probable future revenue from the customer under the arrangement.

19.   The Task Force reached a consensus that in determining whether cumulative negative revenue exists for a specific customer, revenues recognized by all entities within the consolidated group that includes the vendor from transactions with that customer should be considered. The Task Force reached a consensus that the *inception of the overall relationship* could include the reestablishment (after a significant period of time) of a relationship between a vendor and a customer that had previously been terminated. Finally, the Task Force reached a consensus that for purposes of applying the guidance in paragraphs 16–18, each financial reporting period should stand on its own. If an amount is classified as an expense in one period, amounts presented in the income statement for that period should not later be reclassified even if that approach results in a credit to expense in a later period. If changes in estimates or other factors cause a reduction in the measured fair value of recognized consideration, the income statement credit should be characterized as a reduction of expense to the extent of any previously recognized expense under the guidance in paragraphs 16–18. Any remaining income statement credit should be characterized as an increase in revenue. (See Example 4 in Exhibit 01-9B for additional guidance.)

**Transition Guidance**

Copyright © 2010, Financial Accounting Standards Board          Not for redistribution

20.   The transition guidance for Issue 2 above is the same as that provided in paragraphs 12 and 14 of Issue 1 above.

**Recognition and Measurement Issues**

*Issue 3—Under what circumstances should up-front nonrefundable consideration given by a vendor to a customer be recognized as an asset of the vendor rather than an immediate charge in the vendor's income statement?*

21.   The Task Force agreed with the Working Group recommendation to discontinue consideration of Issue 3 regarding whether up-front nonrefundable consideration given by a vendor to a customer results in an asset or should be recognized immediately in the vendor's income statement. (The situation specifically considered by the Task Force related to consideration given by a vendor to a reseller to obtain "shelf space" for the vendor's products.) Accordingly, this Issue does not address how to measure and when to recognize up-front nonrefundable consideration given by a vendor to a customer in the vendor's income statement. The Task Force observed that if consideration given by a vendor to a reseller initially is recognized as an asset by the vendor, subsequent income statement characterization of that consideration would be determined in accordance with the guidance in Issues 1 and 2.

*Issue 4—If a vendor offers a sales incentive voluntarily and without charge to customers that is exercisable by a customer as a result of a single exchange transaction, when should the vendor recognize and how should the vendor measure the cost*

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

*of the sales incentive if it will not result in a loss on the sale of a product or service?*[2]

22.   The Task Force reached a consensus that for a sales incentive offered voluntarily by a vendor and without charge to customers that can be used or that becomes exercisable by a customer as a result of a single exchange transaction, and that will not result in a loss on the sale of a product or service, a vendor should recognize the "cost" of the sales incentive at the later of the following:

    a.    The date at which the related revenue is recognized by the vendor
    b.    The date at which the sales incentive is offered (which would be the case when the sales incentive offer is made after the vendor has recognized revenue; for example, when a manufacturer issues coupons offering discounts on a product that it already has sold to retailers).

23.   Certain sales incentives entitle a customer to receive a reduction in the price of a product or service by submitting a form or claim for a refund or rebate of a specified amount of a prior purchase price charged to the customer at the point of sale (for example, mail-in rebates and certain manufacturer coupons). The Task Force reached a consensus that a vendor should recognize a liability (or "deferred revenue") for those sales incentives at the later of (a) or (b) above, based on the estimated amount of refunds or rebates that will be claimed by customers. However, if the amount of future rebates or refunds cannot be reasonably and reliably estimated, a liability (or "deferred revenue") should be recognized for the maximum potential amount of the refund or rebate (that is, no reduction for **breakage** should be made).   The ability to make a reasonable and

---

[2]As indicated in paragraph 7, this Issue does not address the accounting for an offer to a customer, in connection with a current revenue transaction, for free or discounted products or services from the vendor that is redeemable by the customer at a future date without a further exchange transaction with the vendor.  [Note:  See paragraph 36 of the STATUS section.]

Copyright © 2010, Financial Accounting Standards Board      Not for redistribution

reliable estimate of the amount of future rebates or refunds depends on many factors and circumstances that will vary from case to case. However, the Task Force reached a consensus that the following factors may impair a vendor's ability to make a reasonable and reliable estimate:

a.  Relatively long periods in which a particular rebate or refund may be claimed
b.  The absence of historical experience with similar types of sales incentive programs with similar products or the inability to apply such experience because of changing circumstances
c.  The absence of a large volume of relatively homogeneous transactions.

**Transition Guidance**

24.   Companies should apply the consensuses on Issues 4 and 5 no later than in financial statements for annual or interim periods beginning after December 15, 2001. Earlier adoption is encouraged. The effect of the adoption of the consensuses on Issues 4 and 5 should be reported as a cumulative effect of a change in accounting principle under Opinion 20 or applied prospectively to new sales incentives offered on or after the effective date. If cumulative-effect accounting is used, financial information for prior fiscal quarters in the year of adoption should be restated (consistent with the requirements of paragraph 10 of Statement 3) by applying the consensuses on Issues 4 and 5. Further, the pro forma disclosures required by paragraph 21 of Opinion 20 and Statement 3 must be provided. If prospective application is used, the accounting for sales incentives offered before the effective date should not be revised to reflect the consensuses.

25.   The SEC Observer stated that registrants that would have been required under the original transition guidance (which required adoption in annual financial statements for the fiscal year beginning after December 15, 1999) to adopt the provisions of this Issue in

Copyright © 2010, Financial Accounting Standards Board                Not for redistribution

an earlier period than is required under the revised transition guidance should make the following disclosures in financial statements filed with the Commission for the intervening periods:

a.  All disclosures required by SAB Topic 11M, including the anticipated effects of any reclassifications of prior period financial statements presented. If application of the consensuses will require a reduction of previously reported revenue, an explicit statement to that effect should be included in the Topic 11M disclosures.

b.  If a registrant's historical accounting policy for the recognition of incentives (that is, when incentives are recognized and in what amount) subject to this Issue is different from that provided for by the consensuses on Issues 4 and 5, disclosure of the recognition policy followed and, for all fiscal periods of fiscal years beginning after December 15, 1999, (1) the liability (or deferred revenue) reported as of the beginning of the period, (2) the amount of additional revenue deferred or liability accrued during the period, (3) the amount refunded to customers during the period, (4) the adjustments made during the period for changes in estimates and any other adjustments, and (5) the liability (or deferred revenue) balance at the end of the period.

The SEC Observer also reminded registrants to carefully consider whether any disclosures related to the incentives addressed in this Issue are necessary in "Management's Discussion and Analysis of Financial Condition and Results of Operations" required by Item 303 of Regulation S-K.

26.  Examples that illustrate the application of the consensuses on Issue 4 are presented in Exhibit 01-9C.

*Issue 5—For the sales incentive described in Issue 4, when should the vendor recognize and how should the vendor measure the cost of the sales incentive if it will result in a loss on the sale of a product or service?*

27.  For sales incentives offered voluntarily by a vendor and without charge to customers that can be used or that become exercisable by a customer as a result of a

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

single exchange transaction, and that will result in a loss on the sale of a product or service, the Task Force reached a consensus that a vendor should not recognize a liability for the sales incentive prior to the date at which the related revenue is recognized by the vendor. However, the Task Force observed that the offer of a sales incentive that will result in a loss on the sale of a product may indicate an impairment of existing inventory under ARB 43.

**Transition Guidance**

28.   The transition guidance for Issue 5 above is the same as that provided in Issue 4 above.

29.   Examples that illustrate the application of the consensus on Issue 5 are presented in Exhibit 01-9C.

*Issue 6—If a vendor offers a customer a rebate or refund of a specified amount of cash consideration that is redeemable only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period, when should the vendor recognize and how should the vendor measure the cost of the offer?*

30.   The Task Force reached a consensus that the vendor should recognize the rebate or refund obligation as a reduction of revenue based on a systematic and rational allocation of the cost of honoring rebates or refunds earned and claimed to each of the underlying revenue transactions that result in progress by the customer toward earning the rebate or refund. Measurement of the total rebate or refund obligation should be based on the estimated number of customers that will ultimately earn and claim rebates or refunds

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

under the offer (that is, breakage should be considered if it can be reasonably estimated). However, if the amount of future rebates or refunds cannot be reasonably estimated, a liability should be recognized for the maximum potential amount of the refund or rebate (that is, no reduction for breakage should be made). The ability to make a reasonable estimate of the amount of future rebates or refunds depends on many factors and circumstances that will vary from case to case. However, the following factors may impair a vendor's ability to make a reasonable estimate:

    a.    Relatively long periods in which a particular rebate or refund may be claimed
    b.    The absence of historical experience with similar types of sales incentive programs with similar products or the inability to apply such experience because of changing circumstances
    c.    The absence of a large volume of relatively homogeneous transactions.

31.   In some cases, the relative size of the rebate or refund changes based on the volume of purchases. For example, the rebate may be 10 percent of total consideration if more than 100 units are purchased but may increase to 20 percent if more than 200 units are purchased. If the volume of a customer's future purchases cannot be reasonably estimated, the maximum potential rebate or refund factor should be used to record a liability (20 percent in the example). In contrast, if the volume of a customer's future purchases can be reasonably estimated, the estimated amount to be rebated or refunded should be recognized as a liability.

32.   The Task Force reached a consensus that changes in the estimated amount of rebates or refunds and retroactive changes by a vendor to a previous offer (an increase or a decrease in the rebate amount that is applied retroactively) should be recognized using a cumulative catch-up adjustment.  That is, the vendor would adjust the balance of its

Copyright © 2010, Financial Accounting Standards Board          Not for redistribution

rebate obligation to the revised estimate immediately. The vendor would then reduce revenue on future sales based on the revised refund obligation rate as computed.

**Transition Guidance**

33.    The Task Force reached a consensus that the guidance on Issue 6 should be applied no later than in quarters ending after February 15, 2001. The effect of application should be reported on a cumulative basis as an adjustment of revenue. Upon application of this consensus, rebate or refund amounts reported as an expense in prior-period financial statements presented for comparative purposes should be reclassified to comply with the income statement display requirements under Issue 6 (that is, presented as a reduction of revenue). If it is impracticable to reclassify prior-period financial statements, disclosure should be made of the reasons why reclassification was not made and the effect on the current period of classifying rebates and refunds as a reduction of revenue.

34.    Examples that illustrate the application of the consensuses on Issue 6 are presented in Exhibit 01-9D.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**STATUS**

35.   At the March 20–21, 2002 meeting, the Task Force discussed the issue of whether amortization of an exclusivity arrangement that was acquired and recognized as an intangible asset in a business combination should be recognized as an expense or as a reduction of revenue as part of its discussion of Issue No. 01-3, "Accounting in  a Business Combination for Deferred Revenue of an Acquiree." The Task Force reached a consensus in Issue 01-3 that the Issue 01-9 income statement characterization model *does* apply to the amortization of an exclusivity arrangement acquired in a business combination only if the exclusivity arrangement negotiated by the acquiree was not negotiated independently of the acquirer.

36.   At the June 15–16, 2005 meeting, the Task Force agreed to revise the decision tree in Exhibit 01-9F to clarify that if consideration is cash and it is payable to the customer as a result of a single exchange transaction, then Issue 01-9 applies, regardless of when the customer receives the cash. Additionally, the Task Force agreed to add a footnote to Issue 4 to clarify the interaction between the consensus in Issue 4 and the scope of Issue 01-9. At its June 29, 2005 meeting, the Board ratified these modifications to the consensus in this Issue.

37.   No further EITF discussion is planned.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Exhibit 01-9A**

## EXAMPLES OF THE APPLICATION OF THE EITF CONSENSUSES
## ON ISSUE 1 OF ISSUE 01-9

**Example 1—Pricing Adjustments to Major Customers**

Company P is a large manufacturer of plastic housewares (such as trash cans and clothes baskets) sold to retail chains. Company P prices its products based on a standard list price for each item that is adjusted downward for customers in different classes. Its largest customers receive a 25 percent adjustment shown on each invoice as an "off-invoice" reduction of the sales price. The next lowest pricing tier is for smaller retail chains that are important to Company P but that do not provide the concentrated exposure in the form of entire shelves and rows in stores filled solely with Company P's products.

In its pricing decisions, Company P considers competitive pressures but justifies the price adjustments based on the promotional exposure that a particular retailer provides, as well as on perceived consumer loyalty built over many years. Company P does not want its presence at any major retailer diminished because of pricing disputes. Therefore, Company P views its pricing adjustments as a cost of enhancing its customer relationships.

**Evaluation:** The first condition of the model is not met because Company P does not receive an identifiable benefit in return for the consideration (the pricing adjustments) that is sufficiently separable from Company P's sale of products to the retailers that receive the consideration. In other words, Company P would not transfer consideration equal to the pricing adjustments in an exchange transaction with a party that is not a

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

reseller of Company P's products. Therefore, pricing adjustments to customers should be characterized as a reduction of revenue when recognized in Company P's income statement. Because Company P receives no identifiable benefit and the consideration can be used or is exercisable by the customer as a result of a single revenue transaction, Company P should apply the recognition and measurement guidance in Issues 4 and 5.

**Example 2—Advertising Allowance with No Evidence of Benefit to Vendor**

Company M is a wireless telecommunications company. It sells its services through retailers that sell phones and initiate service on Company M's wireless network. Retailers sell phones purchased from Company M and receive an advertising allowance of $45 for each phone sold and activated. That allowance is shown as an "off-invoice" deduction on the invoice for that phone. The retailers are expected to include Company M's products and service in local advertisements. However, retailers are not required to and, therefore, do not provide any documentation to Company M on how the advertising allowance was used to promote Company M's products.

**Evaluation:** The first condition of the model is not met because Company M does not receive an identifiable benefit in return for the allowance. In other words, Company M cannot identify the benefit, if any, that has been received because retailers do not provide documentation of any advertising that has been run. Therefore, the allowances should be characterized as a reduction of revenue when recognized in Company M's income statement. Because Company M receives no identifiable benefit and the consideration can be used or is exercisable by the customer as a result of a single revenue transaction, Company M should apply the recognition and measurement guidance in Issues 4 and 5.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Example 3—Advertising Allowance with Evidence of Benefit to Vendor**

Company Q is a wireless telecommunications company. It sells its services through retailers that sell phones and initiate service on Company Q's wireless network. Retailers sell phones purchased from Company Q and receive an advertising allowance of $45 for each phone sold and activated. That allowance is shown as an "off-invoice" deduction on the invoice for that phone.

Retailers are required by contract with Company Q to use the advertising allowance to advertise Company Q's phones and to maintain documentation of that advertising (to be provided to Company Q upon request). If a retailer fails to maintain adequate documentation or to incur advertising costs at least equal to the allowance provided by Company Q, future invoice allowances to that retailer are reduced until Company Q recovers the excess of allowances made over the documented advertising costs incurred.

**Evaluation:** Company Q is receiving from the retailer an identifiable benefit (advertising) in return for the allowance. That benefit is sufficiently separable from the retailer's purchase of Company Q's phones because Company Q could have purchased that advertising from another party that does not purchase Company Q's phones. Therefore, the first condition of the model is met. Assuming that the fair value of that benefit can be reasonably estimated and that amount equals or exceeds the amount of the advertising allowance, the advertising allowance would be characterized as a cost incurred when recognized in Company Q's income statement. If the amount of the advertising allowance exceeds the fair value of the benefit, that excess consideration would be characterized as a reduction of revenue when recognized in Company Q's

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

income statement.  In addition, if the amount of the advertising allowance exceeds the fair value of the benefit, Company Q should apply the recognition and measurement guidance in Issues 4 and 5 to that excess because the consideration can be used or is exercisable by the customer as a result of a single revenue transaction.

**Example 4—Cooperative Advertising Program**

Company S manufactures a well-known line of toys carried by many retailers. Cooperative advertising arrangements exist through which retailers receive an allowance of up to 2 percent of the total purchases from Company S if certain qualitative advertising criteria are met and if specified amounts are spent on the advertisements.  For example, if a retailer advertises in a local newspaper, those qualitative criteria specified by Company S include (a) that a minimum percentage of an advertisement's linear space must be devoted to Company S's products, (b) that devoted space must be in the upper left quadrant of the published ad, and (c) that pictures of Company S's products and descriptions must be of a certain size. Other advertising media (television and radio, among others) have similarly restrictive criteria. A retailer must maintain documentation of all advertising performed that includes Company S's products, including documentation that the allocated cost of the ad space devoted to Company S's products equals or exceeds the 2 percent advertising allowance, and provide that documentation to Company S upon request.

**Evaluation:** Company S is receiving from the retailer an identifiable benefit (advertising) in return for the 2 percent allowance. That benefit is sufficiently separable from the retailer's purchase of Company S's products because Company S could have

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

purchased that advertising from another party that does not purchase Company S's products. Therefore, the first condition of the model is met. The second condition of the model is also met because an estimate of the fair value of the advertising benefit is made through an allocation of the cost incurred by a retailer for the advertising on the basis of the portion of an advertisement that includes Company S's products. As a result, as long as that fair value is equal to or greater than the 2 percent allowance, the allowance should be characterized as a cost incurred when recognized in Company S's income statement.

**Example 5—Exclusive Beverage Supply Contract That Includes an Advertising Benefit**

Company N is a major beverage producer with contracts to supply the beverages at several major venues. One of those contracts provides Company N with a three-year right to be the exclusive beverage vendor at an arena. Company N receives a specified percentage of retail beverage revenues based on a per-cup price set by the arena.

Under the contract, Company N also pays an annual fee for a banner ad displayed in the arena at each event held during that year. This aspect of the contract was not a condition of the exclusive beverage supply arrangement and was added to the contract at the request of Company N after the terms of the beverage supply arrangement were agreed to. For the first year of the 3-year contract, that banner ad fee is $40,000, the price that anyone wishing to place a comparable banner ad would pay. The prices for the second and third years will be based on the prices for banner ads set prior to those event seasons. The venue sells banner ads at those prices to others that are not vendors to the venue. In other words, the cost of the banner advertising for Company N equals the amount that any other company would pay for the same banner ad.

Copyright © 2010, Financial Accounting Standards Board                              Not for redistribution

**Evaluation:** Company N is receiving from the arena an identifiable benefit (banner advertising) in return for the $40,000 fee. That benefit is sufficiently separable from the arena's purchase of Company N's beverages because Company N could have purchased similar advertising from a different arena that does not purchase Company N's beverages. Therefore, the first condition of the model is met. The second condition of the model is also met because similar banner ads are sold to other parties (some of which do not provide other products or services to the arena) at the same stated rates, thus providing evidence that $40,000 is the fair value of the banner ad. As a result, the $40,000 should be characterized as a cost incurred when recognized in Company N's income statement.

### Example 6—Modification of Exclusive Beverage Supply Contract to Obtain an Advertising Benefit

Company Z is a major beverage producer with a contract to supply beverages at a major venue. The contract provides Company Z with a three-year right to be the exclusive beverage supplier to the arena. That contract requires Company Z to sell beverages to the arena at a specified fixed price for the entire term of the contract and includes contractual minimums that must be purchased by the venue. That pricing is comparable to what Company Z would charge any high-volume customer.

The original contract did not provide for banner advertising within the arena, and the arena does not sell banner ads to parties other than its vendors. One year into the three-year contract term, Company Z desires to have banner advertising marketing exposure in the arena in addition to earning revenue from selling beverages. To obtain banner advertising rights, Company Z approaches arena management and proposes that in exchange for a large banner ad in a prominent location, Company Z will reduce the per-

Copyright © 2010, Financial Accounting Standards Board

Not for redistribution

unit beverage price by 8 percent for the minimum required purchases for the remaining contract term. Company Z estimates that the 8 percent reduction on a present value basis approximates the amount Company Z would pay for a similar banner in a similar venue with an unrelated party that is not a beverage customer. In making that estimate, Company Z considered what it would cost to have similar banner ads at other similar venues, the historical amount of beverages sold, and the projected future sales.

Arena management agreed to this modification of the original contract. There was no other reason for modifying the contract beyond Company Z's desire to have its banner in the arena, and no other contract change (for example, a term extension) was included in the modification. Further, no service issues (that is, customer dissatisfaction) exist with respect to Company Z's performance under the arrangement.

**Evaluation:** Company Z is receiving from the arena an identifiable benefit (banner advertising) in return for the price reduction. That benefit is sufficiently separable from the arena's purchase of Company Z's beverages because Company Z could have purchased similar advertising from another party that does not purchase Company Z's beverages. Therefore, the first condition of the model is met. The assessment of whether the second condition is met requires a high degree of judgment and must be evaluated based on all of the underlying facts and circumstances. In this example, the facts may support the present value of the 8 percent price reduction to be an objective, reasonable estimate of the fair value of the advertising benefit received. However, other changes to the contract, such as an extension or curtailment of the term, or issues with respect to either party's performance would affect the assessment of whether sufficient evidence

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

exists to indicate that the negotiated price reduction is the fair value of the advertising. If the amount of the consideration given exceeds the fair value of the advertising benefit, that excess consideration would be characterized as a reduction of revenue when recognized in Company Z's income statement. In addition, if the amount of the consideration given exceeds the fair value of the advertising benefit, Company Z should apply the recognition and measurement guidance in Issues 4 and 5 to that excess because the consideration can be used or is exercisable by the customer as a result of, a single revenue transaction (that is, the 8 percent price reduction is applied to each purchase from Company Z by the arena and there is no requirement for the arena to complete a specified cumulative level of revenue transactions or remain a customer of Company Z for a specified time period in order to receive the 8 percent price reduction).

**Example 7—Nonrefundable Slotting Fees with Exclusivity Arrangement**

Company U sells a line of canned meats to retail grocery store chains. One of its retailers demands slotting fees from Company U totaling $100,000 per year or that retailer will discontinue selling Company U's products. Through negotiations, Company U agrees to pay those fees provided that Company U serves as the exclusive provider of canned meats, although the retailer is not required to make a minimum level of purchases.

**Evaluation:** The first condition of the model is not met because Company U receives no identifiable benefit that is sufficiently separable from the sale of products to the retailer. That conclusion is based on two facts: (1) any benefit received by Company U cannot be separated from the arrangement to sell goods to the retailer and (2) Company U would not enter into such an arrangement with a party other than a reseller of its products.  Even

Copyright © 2010, Financial Accounting Standards Board

Not for redistribution

the exclusivity right is solely related to the arrangement to sell goods to the retailer, and, therefore, the slotting fees, including the portion paid for exclusivity, should be characterized as a reduction of revenue when recognized in Company U's income statement. Although Company U receives no identifiable benefit in exchange for the consideration given, Company U would not apply the guidance in Issues 4–6 because the consideration given is not exercisable by the customer (a) as a result of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

**Example 8—Seasonal Promotion Buydown**

Company X is a regional beverage distributor that announces its annual "Summer Vacation Value Sale" in a local resort area and advertises prices of 50 percent off the regular retail prices throughout the period at participating retailers. Company X provides a participating retailer with credits toward future purchases equal to the retail margin lost because of the promotion. If a participating retailer stops carrying Company X's products prior to using the credits received from the summer promotion, Company X is not obligated to reimburse that retailer for those lost profits, and the retailer has no claim to apply the credits against any outstanding amounts due to Company X.

**Evaluation:** The first condition of the model is not met because Company X receives no identifiable benefit that is sufficiently separable from Company X's sale of products to the retailers. That conclusion is based on two facts: (1) any benefit received by Company X cannot be separated from the arrangement to sell goods to the retailer and (2) Company X could not enter into such an arrangement with a party other than a reseller of

Copyright © 2010, Financial Accounting Standards Board          Not for redistribution

its products. The amount of the credits earned by the retailers should be characterized as a reduction of revenue when recognized in Company X's income statement. Because Company X receives no identifiable benefit and the consideration can be used or is exercisable by the customer as a result of, a single revenue transaction (that is, the credits are applied to each purchase from Company X by the retailers and there is no requirement for the retailers to complete a specified cumulative level of revenue transactions or remain a customer of Company X for a specified time period in order to receive the credits), Company X should apply the recognition and measurement guidance in Issues 4 and 5.

**Example 9—Payment for Product Placement**

Company Y produces a line of dolls sold to major toy retailers. Those dolls have been on the market for years and compete with certain other dolls that are currently in greater demand by children. As a result, retailers are not displaying Company Y's dolls as prominently as those other dolls. In order to increase demand for its dolls, Company Y negotiates with one toy retailer for end-cap placement during the next holiday shopping season. The retailer demanded a rack payment of $500,000 for end caps in all of its stores. The agreement between Company Y and the retailer for end-cap placement does not require the retailer to purchase a minimum quantity of dolls from Company Y. In addition, the end caps will not be specially modified for purposes of displaying Company Y's products.

**Evaluation:** The first condition of the model is not met because Company Y receives no identifiable benefit in return for the payment that is sufficiently separable from the

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

arrangement to sell products to the retailer. That conclusion is based on two facts: (1) any benefit received by Company Y cannot be separated from the arrangement to sell goods to the retailer and (2) Company Y could not enter into such an arrangement with a party other than a reseller of its products. The end-cap payment therefore should be characterized as a reduction of revenue when recognized in Company Y's income statement. Although Company Y receives no identifiable benefit in exchange for the consideration given, Company Y would not apply the recognition and measurement guidance in Issues 4–6 because the consideration given is not exercisable by the customer (a) as a result of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

### Example 10—Beverage Company Pays for Minor League Stadium Scoreboard

Company O is a major beverage distributor. Minor League Baseball Team's previous scoreboard was destroyed by a storm. Minor League Baseball Team offers to allow Company O to be the exclusive beverage supplier for at least 5 years if Company O pays for a new scoreboard that will cost $100,000. Other aspects of the arrangement are that the scoreboard will have Company O's logo, slogan, and colors. Company O sells its products to the stadium at the same prices it charges other stadiums of comparable size whether or not Company O pays for signage or receives other benefits from any stadium. When the sign contractor completed the construction of the scoreboard, Minor League Baseball Team submitted the contractor's invoice and received a check from Company O for $100,000, the amount of the invoice. Minor League Baseball Team then paid the contractor's bill in due course.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Evaluation:** Company O is receiving an identifiable benefit (promotion and advertising in the form of a scoreboard displaying Company O's logo, slogan, and colors) in return for the $100,000. That benefit is sufficiently separable from Minor League Baseball Team's purchase of Company O's products because Company O could have purchased similar promotion and advertising from another party that does not purchase Company O's products. Therefore, the first condition of the model is met for the promotion and advertising benefit.

Company O also receives a secondary benefit from Minor League Baseball Team for the $100,000 payment in the form of a right to be the exclusive beverage supplier. The consideration allocable to that right, however, does not meet the first condition because the exclusivity benefit is directly related to (that is, not sufficiently separable from) Company O's arrangement to sell beverages to Minor League Baseball Team and a similar benefit could not be purchased from another party that does not purchase Company O's products.

In order to meet the second condition of the model for the promotion and advertising benefit, Company O must be able to reasonably estimate the fair value of the benefit it receives from having its logo, slogan, and colors on the scoreboard. Reliance on the amount charged by the contractor would not be sufficient evidence of fair value because the fair value of promotion and advertising may be substantially different from the cost of scoreboard construction. That is, the fair value of the advertising benefit received by Company O as a result of its logo, slogan, and colors being on the scoreboard may be less than the fair value of the scoreboard.  (This can be further illustrated by an additional

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

example in which Company O pays for a much larger, more technologically sophisticated scoreboard for $500,000, yet the logo, slogan, and colors are the same size as those of the $100,000 scoreboard. Presumably, in both examples, the advertising benefits received have equivalent fair values.) If Company O is unable to make a sufficiently reasonable, objective estimate of the fair value of the promotion and advertising benefit, the second condition of the model is not met and the $100,000 amount of consideration should be characterized as a reduction of revenue when recognized in Company O's income statement.

If Company O is able to estimate the fair value of the promotion and advertising benefit, that amount is a cost incurred when recognized in Company O's income statement up to the $100,000 of consideration given. If that fair value is less than the $100,000 consideration, then the difference between that fair value and $100,000 should be characterized as a reduction of revenue when recognized in Company O's income statement. Company O would not apply the guidance in Issues 4–6 (even to the excess of the consideration given [if any] over the fair value of the benefit received by Company O) because the consideration given is not exercisable by the customer (a) as a result of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

**Example 11a—Payment for Custom Fixtures**

Company I is a world-renowned designer of domestics products such as bed linens, bath towels, and accessories. After presenting its newest line of products to buyers from National Department Store Chain (Chain), Company I and Chain agree that Company I

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

will pay for the remodeling of a 1,600 square foot alcove in each of 30 of the retailer's stores for Company I's products. The design, layout, and signage in the alcoves will be based on Company I's specifications (within specified boundaries) and will have a look and feel consistent with Company I's displays in other stores that many consumers uniquely identify with Company I's products. Chain will engage an external, unrelated contractor to construct the alcoves. Company I is responsible for reimbursing Chain for all remodeling and fixture costs that Chain incurs, but has no ownership in those improvements and fixtures (Chain is the primary obligor to the contractor selected to construct the improvements). Further, no store has an obligation to make that space available to Company I for a minimum period of time, although both parties understand that the new product line will receive a reasonable period of time to gain market share. Regardless of that understanding, a store has the right to redirect the use of that space in whatever manner it chooses. Company I has maintained a presence in Chain's stores for over 40 years.

**Evaluation:** The first condition of the model is not met because Company I does not receive an identifiable benefit that is sufficiently separable from the arrangement to sell goods to the retailer. Company I could not enter into such an arrangement with a party other than a reseller of its products. Vendor consideration to a reseller related to how that reseller displays or features the vendor's products is not a benefit that meets the first condition of the model. The consideration therefore should be characterized as a reduction of revenue when recognized in Company I's income statement. Company I would not apply the guidance in Issues 4–6 (even though it did not receive an identifiable benefit) because the consideration given is not exercisable by the customer (a) as a result

Copyright © 2010, Financial Accounting Standards Board

Not for redistribution

of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

**Example 11b—Installment of Custom Fixtures**

Assume the same facts as those in Example 11a above, except that Company I engages an unrelated third-party contractor to construct the alcoves. Company I is the primary obligor to the contractor and therefore is directly responsible for the cost of all remodeling and improvements rather than being obligated to reimburse Chain.

**Evaluation:**   The consideration that Company I gives to Chain consists of "free" property because Company I is directly obligated to the contractor for the cost of constructing all improvements. Therefore, the "free" item is a deliverable in the transaction rather than a refund or rebate of the amounts charged to Chain. The consideration therefore should be characterized as an expense when recognized in Company I's income statement.

**Example 12—Payment for Generic Fixtures**

Company A is a supplier of automobile filters and has been a nonexclusive supplier for Auto Parts Chain for over 20 years. Auto Parts Chain continues to build new stores, and when a location for a new store is identified, all of Auto Parts Chain's major suppliers, including Company A, are required to make a payment for fixtures in the new store based on the total estimated cost of fixtures and the relative amount of shelf space expected to be allocated to Company A's products. The fixtures to be built in the new stores are not unique and are not customized in any way to a specific supplier's products.  If a supplier

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

fails to make the required payment, the supplier's products will not be carried in the new location, and it is expected that the supplier's products eventually would be removed from all Auto Parts Chain's stores.

**Evaluation:** The first condition of the model is not met because Company A receives no identifiable benefit that is sufficiently separable from the sale of products in Auto Part Chain's stores. That conclusion is based on two facts: (1) any benefit received by Company A cannot be separated from the arrangement to sell goods to the retailer and (2) Company A could not enter into such an arrangement with a party other than a reseller of its products. The payments therefore should be characterized as a reduction of revenue when recognized in Company A's income statement. Company A would not apply the guidance in Issues 4–6 (even though it did not receive an identifiable benefit) because the consideration given is not exercisable by the customer (a) as a result of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

### Example 13—Reimbursement of Promotion-Related Payroll Costs

Company B is a major producer of snack foods. Company B plans to issue coupons good for a two-week period that will represent a significant discount on all of its products and that are expected to result in a dramatic increase in demand for its products during the promotional period. It has negotiated an arrangement with its largest grocery store customer that during the promotional period it will reimburse the grocery store customer for all promotion-related payroll costs, to be determined by comparing payroll costs

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

during the promotional period to average payroll costs during the three months preceding the promotion.

**Evaluation:** The first condition of the model is not met because Company B is simply paying some of the grocer's operating costs, and is doing so only because the grocer is a customer—not because there is an identifiable benefit that is sufficiently separable from Company B's sale of products to the grocer. The payroll reimbursements therefore should be characterized as a reduction of revenue when recognized in Company B's income statement. Company B would not apply the guidance in Issues 4–6 (even though it did not receive an identifiable benefit) because the consideration given is not exercisable by the customer (a) as a result of a single revenue transaction or (b) only if the customer completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

**Example 14—Reimbursement of Floor Plan Interest**

Auto Manufacturer F has an ongoing dealer assistance program under which auto dealers are reimbursed at the end of each month for a portion of their floor plan interest costs incurred in connection with purchases of Manufacturer F's automobiles. The amount of interest cost to be reimbursed each month is determined using a contractually specified formula based on purchases from Manufacturer F during the most recent three-month period (including the current month). If a dealer ceases doing business with Manufacturer F during the month, that dealer is not eligible to receive the floor plan interest subsidy for that month.

Copyright © 2010, Financial Accounting Standards Board

Not for redistribution

**Evaluation:** The first condition of the model is not met because Manufacturer F simply is paying some of the dealers' operating costs, and is doing so only because the dealers are customers—not because there is an identifiable benefit that is sufficiently separable from Manufacturer F's sale of automobiles to the dealers. Therefore, the reimbursements of floor plan interest are a reduction of revenue when recognized in Manufacturer F's income statement. Because Manufacturer F receives no identifiable benefit and the consideration can be used or is exercisable by the dealers only if they remain customers of Manufacturer F for at least a month, Manufacturer F should apply the recognition and measurement guidance in Issue 6.

### Example 15—Consideration Given by a Service Provider to a Customer

Media Company (Media) enters into an agreement with Cable Company (Cable) under which Cable agrees to carry Media's television channel. Cable agrees to pay Media a specified amount per subscriber per month during the term of the agreement. Media agrees to pay certain specified amounts to Cable as compensation for carrying Media's television channel. Consideration to be paid by Media is described in the agreement as a reimbursement of costs incurred by Cable to add Media's television channel to  its system. Cable is not required to commit to a minimum level of purchases in order to receive the consideration from Media. Over the term of the arrangement, Media expects total revenues from Cable to exceed the amounts it is required to pay to Cable.

**Evaluation:** The first condition of the model is not met because Media receives no identifiable benefit that is sufficiently separable from the sale of its services to Cable. That conclusion is based on two facts:  (1) any benefit received by Media cannot be

Copyright © 2010, Financial Accounting Standards Board
Not for redistribution

separated from the arrangement to sell services to Cable and (2) Media could not enter into such an arrangement with a party other than a purchaser of its television services, and would not change if Cable was required to commit to a minimum level of purchases in order to receive the consideration from Media. The payments therefore should be characterized as a reduction of revenue when recognized in Media's income statement. Media would not apply the guidance in Issues 4–6 (even though it did not receive an identifiable benefit) because the consideration given is not exercisable by Cable (a) as a result of a single revenue transaction or (b) only if Cable completes a specified cumulative level of revenue transactions or remains a customer for a specified time period.

Copyright © 2010, Financial Accounting Standards Board                     Not for redistribution

**Exhibit 01-9B**

**EXAMPLES OF THE LITERATURE AND UNDERLYING CIRCUMSTANCES
THAT COULD RESULT IN NEGATIVE REVENUE (ISSUE 2 OF ISSUE 01-9)**

**Sales Returns within the Scope of Statement 48**

Statement 48 provides that revenue should be recognized for products sold with a right of
return (net of estimated returns) if all of the conditions in paragraph 6 of that Statement
are met. If actual returns differ from estimated returns, revenues are adjusted to reflect
the actual returns. If the actual returns significantly exceed estimated returns and the
adjustment is recorded in a period in which sales are low (for example, a retailer's sales
in January combined with a change in estimate for holiday returns), it is possible that
negative revenue could result.

**Sales Incentives Accounted for in Accordance with Issue 4**

Issue 4 addresses the recognition and measurement of the cost of offers by a vendor to
customers that are exercisable after a single exchange transaction in the form of price
reductions, coupons, rebate offers, or free products or services delivered on the same date
as the underlying exchange transaction. The Task Force reached a consensus that a
vendor should recognize the cost of the offer at the later of (a) the date at which the
related revenue is recognized by the vendor or (b) the date at which the sales incentive is
offered. An example of a circumstance in which the application of Issue 4 could result in
negative revenue follows:

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

*Example 1*

An automobile manufacturer, AutoCo, plans to introduce the 20X2 model of its mid-sized sport-utility vehicle (the 'X2 SUV) in April 20X1. AutoCo has a December 31 year-end. As of January 1, 20X1, AutoCo has ceased production of the 20X1 model of its mid-sized sport-utility vehicle (the 'X1 SUV). However, based on current sales volumes, the 12,000 'X1 SUVs that AutoCo has sold to its independent dealer network that remain unsold by dealers represent a 6-month supply of vehicles. In order to clear the supply of 'X1 SUVs before the introduction of the 'X2 SUV, AutoCo announces on January 1, 20X1 that it is offering rebates of $3,000 on all 'X1 SUVs purchased from its independent dealers until March 31, 20X1 (the end of AutoCo's first fiscal quarter). Based on AutoCo's past history of rebate offers, it expects that all 12,000 remaining 'X1 SUVs will be sold subject to the rebate. Accordingly, on January 1, 20X1, AutoCo recognizes a liability of $36 million for the rebate offer relating to the remaining 12,000 cars it previously sold to its dealers for an aggregate price of $312 million.

Due in part to a strike that delayed the production of the 'X2 SUVs, AutoCo sold and delivered only 1,000 'X2 SUVs to its dealer network during the quarter ended March 31, 20X1, for total sales proceeds of $28 million. Assume that AutoCo sells no other automobile models and that its parts sales and other revenues for the quarter ended March 31, 20X1 were $4 million, for total revenues (before the rebate) of $32 million. However, because the $36 million rebate liability is

Copyright © 2010, Financial Accounting Standards Board   Not for redistribution

required to be characterized as a reduction of revenues, AutoCo reports negative revenues of $4 million for the quarter ended March 31, 20X1.

Although AutoCo's revenues are negative for the quarter ended March 31, 20X1, its net revenue after rebate on the 12,000 'X1 SUVs sold is $276 million (revenues previously recognized of $312 million less rebates of $36 million). However, the initial revenue recognized when those vehicles were delivered to dealers occurred in earlier reporting periods than the sales incentive. AutoCo has cumulative net positive revenue for each vehicle and for each dealer customer. Accordingly, AutoCo does not meet the conditions in Issue 2 that permit reclassification of negative revenue as an expense.

**Volume Discounts Accounted for in Accordance with Issue 6**

Issue 6 addresses vendor offers to a customer for a rebate or refund of a specified cash amount if the customer completes a specified cumulative level of revenue transactions with the vendor or remains a customer of the vendor for a specified time period. The Task Force reached a consensus on that Issue that the vendor should recognize the rebate or refund obligation as a reduction of revenue based on a systematic and rational allocation of the cost of honoring rebates or refunds earned and claimed to each of the underlying revenue transactions that results in progress by the customer toward earning the rebate or refund. Measurement of the total rebate or refund obligation is based on the estimated number of customers that will ultimately earn and claim rebates or refunds under the offer. An example of a circumstance in which the application of Issue 6 could result in negative revenue follows:

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

*Example 2*

HeaterCo manufactures portable space heaters and has a December 31 year-end. HeaterCo sells substantially all of its products to two distributors, who in turn sell the portable heaters and other products to several dozen retailers. HeaterCo sells its space heaters to its distributors for $20 per unit. However, if a distributor purchases more than 200,000 units in the 12-month period ended December 31, 20X1, the sales price is retroactively reduced to $18 per unit. In order to build inventory for the heavy winter selling season, HeaterCo's distributors complete the majority of their purchases (and HeaterCo ships the corresponding products) during HeaterCo's fiscal quarter ended September 30, 20X1. As a result, HeaterCo's revenues during the quarter ended December 31 typically represent less than 5 percent of annual revenues, and HeaterCo's efforts during this quarter typically are devoted to maintaining and upgrading its production facilities, as well as retooling its production facilities for new models of its space heater.

Because HeaterCo estimated that none of the distributors' purchases would exceed the 200,000 unit threshold required for a price reduction, HeaterCo did not record a liability for potential refunds of sales price for the 370,000 units sold (185,000 to each distributor) through September 30, 20X1. However, average temperatures in the Northeast during November and December were much colder than normal causing HeaterCo's distributors' inventories to be drawn down to unusually low levels. As a result, HeaterCo sold an additional 35,000 units in the quarter ended December 31, 20X1.  The additional sales pushed sales to each distributor over the

Copyright © 2010, Financial Accounting Standards Board                Not for redistribution

200,000 unit mark and, therefore, HeaterCo retroactively adjusted the sales price for all units sold during the year from $20 to $18. This change in estimate resulted in a reduction of revenue of $740,000, while revenues from the sale of space heaters during the quarter ended December 31, 20X1 were only $630,000. As a result, HeaterCo has negative revenue of $110,000 during the quarter ended December 31, 20X1. However, HeaterCo's total revenues at the transaction and customer levels, as well as for the year ended December 31, 20X1, are positive. Accordingly, HeaterCo does not meet the conditions in Issue 2 that permit reclassification of negative revenue as an expense.

### Consideration Paid by a Vendor Accounted for in Accordance with Issue 1

An example of a circumstance in which the application of Issue 1 could result in negative revenue follows:

*Example 3*

IceCreamCo manufactures a line of frozen desserts that are sold directly to GroceryCo, a national chain of grocery stores. After several years of buying frozen desserts from IceCreamCo, GroceryCo offers to significantly expand the freezer shelf space allocated to IceCreamCo products in each of its stores and provide a special freezer display for certain products at the end of the frozen dessert aisle in each of its stores. To obtain this improved allocation of shelf space, IceCreamCo pays $1 million to GroceryCo on January 1, 20X1. IceCreamCo expects the improved placement to significantly increase sales to GroceryCo; however, GroceryCo does not commit to a minimum level of purchases in exchange for the

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

payment. Further, if GroceryCo deems the change unsuccessful, it can return IceCreamCo's products to their original shelf placement at any time or discontinue stocking IceCreamCo's products altogether without returning the payment. IceCreamCo concludes that the benefit expected from the payment is not sufficiently separable from the sale of ice cream to GroceryCo and, therefore, will characterize the payment to GroceryCo as a reduction of revenue. IceCreamCo also concludes that the payment should be recognized in the income statement when incurred.

While IceCreamCo's revenues for the year ended March 31, 20X1, are $9 million, winter is typically a slow season for IceCreamCo's products and, therefore, revenues for the quarter ended March 31, 20X1, are only $800,000. After characterizing the payment of $1 million to GroceryCo as a reduction of revenue, IceCreamCo has negative revenue of $200,000 for the quarter ended March 31, 20X1. However, it has positive revenue at the customer level for the year. Accordingly, IceCreamCo does not meet the conditions in Issue 2 that permit reclassification of negative revenue as an expense.

**Equity Securities Issued or Granted in Certain Transactions Addressed by  Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services"**

The payments that were characterized as reductions of revenue in each of the examples described above were made with cash. However, each of those payments could have been made with equity securities of the company making the payment. Issue 96-18 addresses the accounting for equity instruments issued to other than employees for

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

acquiring, or in conjunction with selling, goods or services and applies to the issuance or grant of equity securities in each of the above examples if equity securities had been issued in lieu of the cash payments described and if the fair value of those equity instruments was more readily determinable than the benefits received. Arguably, in all of the above fact patterns, the absence of a benefit in the form of received or promised goods or services would result in a measurement being based on the fair value of the equity instruments.

If a fixed number of equity securities were offered in each of the above examples instead of cash and if the value of those securities increased between the date that the terms of the arrangement were negotiated and the date that the grantee performed and earned the securities (assuming a sufficiently large disincentive for nonperformance does not exist), the negative revenue amounts quantified in the examples would increase. For example, assume that in Example 2 instead of offering a $2 price reduction on each unit sold, HeaterCo offered 80,000 shares of its common stock to each distributor that purchased over 200,000 units during the specified 12-month period. Assume that at the beginning of that period when the offer was made, the fair value of HeaterCo's common stock was $5 per share and that at the time of the offer, the shares that each distributor could have received had a fair value of $400,000. Also assume that the fair value of HeaterCo's common stock was $10 per share at the date the distributors achieved the performance conditions. As a result, the amount recognized as a reduction of revenue would be $1.6 million (160,000 shares × $10 per share). A more detailed example of an arrangement accounted for in accordance with Issue 96-18  that could result in negative revenue follows:

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

*Example 4*

Company I is a well-known manufacturer of domestics products such as bed linens, bath towels, and accessories. On January 1, 20X2, after presenting its newest line of products to National Department Store Chain (Chain), a reseller with whom Company I has an established business relationship, Company I agrees to pay Chain a $1 million up-front fee in cash and issue 3,000 shares of its stock to Chain. In return, Chain agrees to remodel a 1,600 square foot alcove for Company I's products in each of Chain's 30 retail stores. The design, layout, and signage in the alcoves will be based on Company I's specifications (within specified boundaries) and will have a look and feel consistent with Company I's displays in other stores that many consumers uniquely identify with Company I's products. Chain will engage an external, unrelated contractor to construct the alcoves. Company I has no ownership in those improvements and fixtures. No store has an obligation to make that space available to Company I for a minimum period of time, although both parties understand that Company I's new product line will receive a reasonable period of time to gain market share. Regardless of that understanding, a store has the right to redirect the use of that space in whatever manner it chooses.

The agreement between Company I and Chain specifies that the 3,000 shares of Company I stock to be provided to Chain vest upon completion of the remodeling of Chain's 30 stores. If Chain completes the remodeling of at least 15 stores within 90 days, vesting is accelerated for 1,500 shares. The contract between Company I and Chain does not require Chain to purchase products from Company I.   The

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

transaction does not contain a performance commitment by Chain under Issue 96-18 with respect to the shares of stock until the remodeling for each store is complete because there is not a sufficient disincentive for nonperformance.

Company I's cumulative and period revenue from Chain, the measured fair value of the total recognized consideration (cumulative and for the period) given by Company I to Chain (including the shares of stock accounted for in accordance with Issue 96-18), and the excess (deficit) of Company I's cumulative revenue from Chain over the measured fair value of the total recognized consideration given by Company I to Chain (including the shares of stock accounted for in accordance with Issue 96-18) for each quarter of Company I's fiscal year ended December 31, 20X2, are as follows:

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| | | $ in thousands | | |
| Revenue for the period | $ 275 | $ 250 | $ 350 | $ 400 |
| Cumulative revenue | 1,000 | 1,250 | 1,600 | 2,000 |
| Measured FV of total recognized consideration: | | | | |
| For the period | 1,500 | (300) | 450 | 150 |
| Cumulative | 1,500 | 1,200 | 1,650 | 1,800 |
| Excess (deficit) of cumulative revenue over measured FV of total recognized consideration | (500) | 50 | (50) | 200 |

Company I would record the arrangement consideration (and adjustments for fluctuations in negative revenue) as follows:

| | Q2 | Q3 | Q4 | 20X2 |
|---|---|---|---|---|
| | | $ in thousands | | |
| Revenue for the period | $  275 | $  250 | $  350 | $  400 | $ 1,275 |
| Revenue deductions for the period | (1,000)[a] | 0 | (450)[b] | (150)[c] | (1,600) |
| Net revenue (shown on income statement) | (725) | 250 | (100) | 250 | (325) |
| Expense for the period | 500 | (300)[d] | 0 | 0 | 200 |
| Net P&L impact for the period [credit | (1,225) | 550 | (100) | 250 | (525) |

---

[a]Calculated as: $1,500,000 measured fair value of recognized consideration, limited to cumulative revenue of $1,000,000. The excess of the measured fair value of recognized consideration over revenue deductions of $500,000 is charged to expense.

[b]Calculated as: net increase in measured fair value of recognized consideration of $450,000, not limited because cumulative revenue is $600,000 ($350,000 in Q3 plus $250,000 from Q2).

[c]Calculated as: net increase in measured fair value of recognized consideration of $150,000, not limited because cumulative revenue is $550,000 ($400,000 in Q4 plus $150,000 [$600,000 – $450,000] from Q3).

[d]Calculated as: $300,000 net decrease in measured fair value of recognized consideration ($1,200,000 – $1,500,000). Because $500,000 of the measured fair value of recognized consideration to date has been characterized as an expense, the $300,000 is credited entirely to expense.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Exhibit 01-9C**

## EXAMPLES OF THE APPLICATION OF THE EITF CONSENSUSES
## ON ISSUES 1, 4, AND 5 OF ISSUE 01-9

Unless otherwise noted, the sales incentive examples are based on the sale of Model R personal computers by Computer Manufacturer X (Manufacturer X) and Personal Computer Retailer A (Retailer A). The list price of Model R is $2,000 and the cost to Retailer A is $1,400.

### Example 1—Manufacturer Coupons

Manufacturer X distributes coupons in a computer magazine offering $300 off the price of Model R computers. Manufacturer X will reimburse any retailer for the reduction in the selling price resulting from coupons redeemed by customers for Model R computers. The cost of Model R computers to Manufacturer X is $1,000.

**Issue 1—How the Sales Incentive Should Be Characterized in the Income Statement**

Manufacturer X

| | | |
|---|---|---|
| Cash or A/R | 1,400 | |
| Cost of Goods Sold | 1,000 | |
| Sales | | 1,100 |
| Liability for Incentive Claims | | 300 |
| Inventory | | 1,000 |

Copyright © 2010, Financial Accounting Standards Board   Not for redistribution

**Issue 4—When to Recognize and How to Measure the Cost of the Sales Incentive**

Retailer A                                          N/A

Manufacturer X                                     Recognize at the time of sale of Model R computers to Retailer A (or at the time of the offer if the sale to Retailer A occurs before the offer). Measure based on estimated number of coupons to be used if that number can be reasonably and reliably estimated.

**Issue 5—When to Recognize the Cost of Sales Incentives That Will Result in a Loss on the Product**

Manufacturer X                                     N/A—Sale will not result in a loss.

## Example 2—Retailer Coupons

Retailer A distributes coupons in the local Sunday paper offering $300 off the price of Model R computers. Retailer A will not be reimbursed by the manufacturer for the reduction in selling price resulting from customers' use of coupons.

**Issue 1—How the Sales Incentive Should Be Characterized in the Income Statement**

Retailer A

| | | |
|---|---|---|
| Cash or A/R | 1,700 | |
| Cost of Goods Sold | 1,400 | |
| Sales | | 1,700 |
| Inventory | | 1,400 |

**Issue 4—When to Recognize and How to Measure the Cost of the Sales Incentive**

Retailer A                                          Recognize at the time of sale of Model R computers to customers. Measure based on actual coupon usage.

**Issue 5—When to Recognize the Cost of Sales Incentives That Will Result in a Loss on the Product**

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

Retailer A                                    N/A—Sale will not result in a loss.

## Example 3—Retailer Rebate

Retailer A advertises that it is offering an $800 cash rebate for any Model R computer purchased from Retailer A. In order to receive the cash rebate, the customer must complete a mail-in rebate certificate after purchasing the computer from Retailer A. Retailer A is a relatively new company and has stated that it is running the rebate promotion in order to increase its customer base. Retailer A will not be reimbursed by the manufacturer for the reduction in selling price resulting from customers' use of coupons.

**Issue 1—How the Sales Incentive Should Be Characterized in the Income Statement**

Retailer A

| | | |
|---|---|---|
| Cash or A/R | 2,000 | |
| Cost of Goods Sold | 1,400 | |
| Sales | | 1,200 |
| Liability for Incentive Claims[a] | | 800 |
| Inventory | | 1,400 |

**Issue 4—When to Recognize and How to Measure the Cost of the Sales Incentive**

Retailer A                          Recognize at the time of sale of Model R computers to customers. Measure based on estimated use of the rebate offer if that use can be reasonably and reliably estimated. However, Retailer A is a relatively new company and may lack sufficient historical experience with similar types of sales incentive programs.

---

[a]Because of Retailer A's lack of historical experience with similar types of sales incentive programs, it is assumed that Retailer A cannot reliably estimate the amount of payments for submitted rebate claims and, therefore, Retailer A records the full amount of the eligible rebate for each sale.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Issue 5—When to Recognize the Cost of Sales Incentives That Will Result in a Loss on the Product**

Retailer A                                    The offer to sell computers at a loss may indicate an impairment of existing inventory.  In this example, the journal entry under Issue 1 above assumes that no inventory impairment is recorded.

## Example 4—"Free" Product Incentive

Retailer A advertises on the radio that for each Model R computer purchased, customers

will receive at the time of purchase a 27" television. The cost of the television to Retailer

A is $300.

**Issue 1—How the Sales Incentive Should Be Characterized in the Income Statement**

Retailer A

| | | |
|---|---|---|
| Cash or A/R | 2,000 | |
| Cost of Goods Sold[b] | 1,700 | |
|     Sales | | 2,000 |
|     Inventory | | 1,700 |

**Issue 4—When to Recognize and How to Measure the Cost of the Sales Incentive**

Retailer A                                    Recognize the cost of the incentive at the time of sale of Model R computers to customers.

---

[b]Although the Task Force did not reach a consensus on the classification of expense associated with a free product ($300 in this example), that expense has been classified as cost of goods sold in this example consistent with the comments of the SEC Observer in paragraph 10 of this Issue.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Issue 5—When to Recognize the Cost of Sales Incentives That Will Result in a Loss on the Product**

Retailer A                                      N/A—Sale will not result in a loss.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

**Exhibit 01-9D**

## EXAMPLES OF THE APPLICATION OF THE EITF CONSENSUSES
## ON ISSUE 6 OF ISSUE 01-9

**Example 1—Incentives in the Form of Equity Consideration**

The following example illustrates the allocation of consideration in the form of equity instruments (for which a measurement date has not been reached based on the guidance in Issue 96-18) given by a vendor to a customer that is redeemable only if the customer completes a specified cumulative level of revenue transactions to each of the underlying revenue transactions that result in progress by the customer toward earning the consideration. The example is not intended to illustrate the only approach to allocating that consideration.

On January 1, 20X2, HeaterCo, a calendar-year company, enters into an agreement to be the exclusive provider of portable space heaters to Customer A. (All of the various models of space heaters sold by HeaterCo sell for substantially the same price.) HeaterCo has never previously done business with Customer A. As part of the agreement, HeaterCo agrees to issue Customer A 80,000 warrants to purchase HeaterCo stock (physical settlement only) that vest only if Customer A purchases at least 200,000 units during the year ended December 31, 20X2 (that is, the warrants vest upon Customer A's purchasing 200,000 units prior to January 1, 20X3). On January 1, 20X2, the fair value of each warrant is $5. The agreement does not contain a sufficiently large disincentive for nonperformance; thus, a measurement date for the warrants will not be

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

reached until the vesting date. HeaterCo concludes that it is probable that Customer A will purchase at least 200,000 units during the year ended December 31, 20X2.

As of March 31, 20X2, Customer A has purchased 70,000 units from HeaterCo at a total price of $1,400,000. HeaterCo concludes that it is still probable that Customer A will purchase at least 200,000 units during the year ended December 31, 20X2. On March 31, 20X2, the fair value of each warrant is $10.

HeaterCo records a reduction in its revenues for the quarter ended March 31, 20X2 of $280,000 ($800,000 total fair value of warrants × 70,000 units sold to Customer A ÷ 200,000 units needed to vest) based on its sales to Customer A.

**Example 2—Changes in Estimates**

The following example illustrates the calculation of the effect of a change in estimate of future rebates that will be earned. The example is not intended to illustrate the only approach to formulating the estimate of the cash rebate obligation, nor does the example consider whether the company in the example can reasonably estimate the amount of rebates given the large change in estimate described in the example.

Company A, a calendar-year company, offers a 10 percent rebate to all customers who purchase at least 500 units during any calendar year (this 10 percent rebate is retroactive in that it applies to the sale of units 1 through 499 after the 500-unit level has been reached and to all units sold thereafter). Each unit's list price is $100. Company A estimates that 650 of its 2,000 customers will purchase the number of units necessary to earn the volume rebate ("high-volume" customers).

Copyright © 2010, Financial Accounting Standards Board          Not for redistribution

Based on that estimate, Company A records $90 of each unit sale to a customer in the group of 650 high-volume customers as revenue and $10 as a rebate obligation. For sales to its customers that are not expected to earn the rebate, Company A records $100 of each unit sale as revenue and does not recognize any amount as a liability under the rebate offer.

On September 30, Company A's data indicate that a higher proportion of customers are now expected to earn the rebate than previously estimated. Company A now estimates that 850 customers will earn the rebate. Assume that as of September 30, 400,000 units have been sold to the group of customers that Company A originally estimated would earn the rebate and 80,000 units have been sold to the group of customers that Company A originally estimated would not earn the rebate but now are expected to purchase the required 500 units necessary to earn the rebate. To account for this change in estimate, as of September 30, Company A increases its refund obligation and reduces revenue by $800,000 (80,000 units × $10).

As of September 30, Company A records the following journal entry:

| | | |
|---|---|---|
| Revenues | 800,000 | |
|    Rebate obligation | | 800,000 |

After the adjustment, Company A continues to record $90 of each unit sale to customers in the group of 850 high-volume customers as revenue and $10 as a rebate obligation. For sales to its customers not expected to earn the rebate, Company A records $100 of each unit sale as revenue and does not recognize any amount as a liability under the rebate offer.

Copyright © 2010, Financial Accounting Standards Board Not for redistribution

**Exhibit 01-9E**

# GLOSSARY

This exhibit contains definitions of certain terms used in this Issue.

**Breakage**

For purposes of this Issue, *breakage* refers to the portion or percentage of customers eligible to qualify for an offer who ultimately will not earn and/or claim an incentive award or consideration (such as rebates or refunds) from a vendor.

**Buydowns**

A vendor agrees to reimburse a reseller or retailer up to a specified amount for shortfalls in the sales price received by the retailer for the vendor's products over a specified period of time.

Buydown programs generally involve a vendor agreeing to reimburse, compensate, or issue credit memos to a reseller or retailer for the retailer's decreased revenue per unit for specific products during a specified promotion period. In contrast to cooperative advertising, buydown programs generally require no expenditures by the retailer for advertising or promotion. Other related forms of vendor consideration to a retailer include, but are not limited to, shortfalls, factory incentives, dealer holdbacks, price protection, and factory-to-dealer incentives.

**Cash consideration**

For purposes of this Issue, *cash consideration* includes "credits" that the customer can apply against trade amounts owed to the vendor.  In addition, under the consensus on Issue 2 of Issue 96-18, consideration in the form of equity instruments is

Copyright © 2010, Financial Accounting Standards Board
Not for redistribution

recognized "in the same period(s) and in the same manner (that is, capitalize versus expense) as if the enterprise had paid cash for the goods or services or used cash rebates as a sales discount instead of paying with or using the equity instruments." Accordingly, for purposes of this Issue, guidance with respect to cash consideration is applicable to consideration that consists of equity instruments (regardless of whether a measurement date has been reached).

**Consideration**

For purposes of this Issue, *consideration* may take a variety of different forms including cash **payments** by a vendor to a customer, "credits" that the customer can apply against trade amounts owed to the vendor, equity instruments of the vendor (regardless of whether a measurement date has been reached), and "free" products or services given to the customer by the vendor. Consideration may be referred to by terms such as *sales incentives, discounts, coupons, rebates, price reductions,* and so forth.

**Cooperative advertising**

A vendor agrees to reimburse a reseller for a portion of the advertising costs incurred by the reseller.

Cooperative advertising programs generally provide that a vendor will participate in the cost of a reseller's advertising. The amount reimbursed to the reseller typically is limited to a specified percentage of that reseller's purchases from the vendor. The program may or may not require the reseller to provide documentation of the actual costs incurred to advertise the vendor's products.

Copyright © 2010, Financial Accounting Standards Board
Not for redistribution

**Customer**

A reseller or a consumer (either an individual or a business that purchases a vendor's products or services for end use rather than for resale). The Task Force reached a consensus that *customer* should be defined consistent with paragraph 39 of Statement 131, which states that "a group of entities known to a reporting enterprise to be under common control shall be considered as a single customer, and the federal government, a state government, a local government (for example, a county or municipality), or a foreign government each shall be considered as a single customer." For purposes of this Issue, *customer* includes any purchaser of the vendor's products at any point along the distribution chain, regardless of whether the purchaser acquires the vendor's products directly or indirectly (for example, from a distributor) from the vendor. For example, a vendor may sell its products to a distributor who in turn resells the products to a retailer. The retailer in that example is a *customer* of the vendor as that term is used in this Issue.

**Reseller**

Any entity that purchases another vendor's products for resale, regardless of whether that entity is a distributor or wholesaler, a retailer, or other type of reseller.

**Slotting fees**

Consideration from a vendor to a reseller to "obtain space" for the vendor's products on the reseller's store shelves, whether those shelves are physical (that is, in an actual building in which the store is located) or virtual (that is, they represent space in an Internet reseller's on-line catalog). The term *slotting fees* also includes vendor consideration for other types of product placement arrangements between a vendor

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

and a reseller such as *brand development* or *new product introduction* arrangements. Brand development fees and new product introduction fees involve consideration from a vendor to a reseller for that reseller to display the vendor's products in a number of ways—for example, favorable in-store positioning, end-cap placement (placement at the end of an aisle), or additional shelf space. Those arrangements are the same as slotting arrangements in that the vendor incurs a fee with the reseller in return for the reseller displaying or offering that vendor's products in the store.

Slotting fees may be incurred by a vendor (1) before the vendor sells any of the related products to the reseller, (2) on a regular schedule (for example, monthly) to maintain shelf space allocation or to be a continuing vendor of the reseller, or (3) periodically as negotiated (for example, each payment is separately negotiated and is not based on a schedule). In return for those fees, the vendor may or may not receive stated rights, such as the display of the vendor's products on a specified amount of linear shelf space for a specified period of time or in a specified physical location within the reseller's store.

**Vendor**

For purposes of this Issue, the term *vendor* is used to represent a service provider or product seller, such as a manufacturer, distributor, or reseller.

Copyright © 2010, Financial Accounting Standards Board

Not for redistribution

**Exhibit 01-9F**

## DECISION TREE FOR USE IN THE APPLICATION OF THE GUIDANCE
## IN ISSUE 01-9



See Footnotes on the following page.

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

---

\*For purposes of this Issue, cash consideration includes "credits" that the customer can apply against trade amounts owed to the vendor. In addition, under the consensus on Issue 2 of Issue 96-18, consideration in the form of equity instruments is recognized "in the same period(s) and in the same manner (that is, capitalize versus expense) as if the enterprise had paid cash for the goods or services or used cash rebates as a sales discount instead of paying with or using the equity instruments." Accordingly, for purposes of this Issue, guidance with respect to cash consideration is applicable to consideration that consists of equity instruments (regardless of whether a measurement date has been reached).

[†]The Task Force agreed to revise this cell at its June 15–16, 2005 meeting.  It previously stated the following: "Is consideration delivered at point of sale?"

[‡]The Task Force agreed to revise this cell at its June 15–16, 2005 meeting. It previously stated the following: "Issue 01-9 does not provide recognition and measurement guidance."

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution

Suggested Index Entries for Issue No. 01-9, "Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)"

**CONTINGENCIES**

Accounting for Certain Sales Incentives                                    01-9

**INCOME STATEMENT PRESENTATION**

Classification

. . Accounting for Certain Sales Incentives                                01-9

. . Vendor Income Statement Characterization of Consideration Paid

   to a Customer                                                       01-9


**INVENTORY**

Accounting for Certain Sales Incentives                                    01-9


**REVENUE RECOGNITION**

Accounting for Certain Sales Incentives                                    01-9

Vendor Income Statement Characterization of Consideration Paid

  to a Customer                                                          01-9

Copyright © 2010, Financial Accounting Standards Board                    Not for redistribution