# EXHIBIT C

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## NEW YORK DIVISION

JETBLUE AIRWAYS CORPORATION
     Plaintiff,

       v.

COPYTELE INC., JOHN ROOP, CTI
PATENT ACQUISITION CORPORATION,
and LOYALTY CONVERSION SYSTEMS
CORPORATION,

     Defendants.

Civil Action No. 14-cv-1782

---

## MOTION TO DISMISS OR STAY OF DEFENDANTS COPYTELE INC., JOHN ROOP, CTI PATENT ACQUISITION CORPORATION AND LOYALTY CONVERSION SYSTEMS CORPORATION

# Table of Contents

I.   introduction ............................................................................................................ 3

II.   PROCEDURAL BACKGROUND ......................................................................... 3

III.  Motion ................................................................................................................... 5

    **A.**   The Complaint Should Be Dismissed Under the First-to-File Rule ............... 5

    **B.**   The Complaint Should Be Dismissed Because It Alleges No Commercial Use ............ 7

    **C.**   The Complaint Should Be Dismissed Because Rule 11 of the Federal Rules of Civil Procedure and the Federal Circuit Require a Thorough Investigation ...................................... 9

    **D.**   The Complaint Should Be Dismissed Because the Terms of Use Are Unenforceable to Promote JetBlue's Illegal Patent Infringement ...................................... 12

    **E.**   The Complaint Should Be Dismissed Because a Controlling Court Order Required the Submission of Available Evidence .......................................... 13

    **F.**   The Complaint Should Be Dismissed Because Other Alleged Terms of Use Provide No Basis for Affirmative Relief .......................................... 14

    **G.**   In the Alternative, this Proceeding Should Be Stayed Pending Resolution of the 2013 Texas Action .......................................... 15

    **H.**   Sanctions Should Be Awarded Against the Attorneys in this Action Because the Same Counsel Has Submitted the Same Frivolous Theory Previously, and It was Appropriately Rejected .......................................... 16

IV.  CONCLUSION ................................................................................................... 17

**MOTION TO DISMISS OR STAY OF DEFENDANTS COPYTELE INC.,
JOHN ROOP, CTI PATENT ACQUISITION CORPORATION AND
LOYALTY CONVERSION SYSTEMS CORPORATION**

Defendants CopyTele Inc. ("CopyTele"), John Roop ("Roop"), CTI Patent Acquisition Corporation ("CTI") and Loyalty Conversion Systems Corporation ("Loyalty Conversion"), (collectively, "Defendants") hereby file this Motion to Dismiss or Stay Plaintiff's Original Complaint (Dkt. 2) filed by JetBlue Airways Corporation ("JetBlue" or "Plaintiff") (the "Complaint"), and in support thereof states as follows:

## I.      INTRODUCTION

JetBlue's Complaint follows a patent litigation matter pending in the United States District Court for the Eastern District of Texas since August, 2013, between Defendant Loyalty Conversion and Plaintiff JetBlue.  JetBlue's second-filed and transparently retaliatory Complaint is putatively predicated on the collection of evidence to support claims made in the Original Complaint filed in the 2013 Texas Action, and should be dismissed on both procedural and substantive grounds:

- JetBlue's Complaint should be dismissed based on the first-to-file doctrine; and

- JetBlue's Complaint fails to state a substantive claim on which relief can be granted.

## II.     PROCEDURAL BACKGROUND

Loyalty Conversion, Defendant in the present action, sued JetBlue on August 20, 2013. Attached as Exhibit 1 hereto is a true and correct copy of Loyalty Conversion's Original Complaint against JetBlue (the "Original Complaint").  The first-filed action, filed in the Eastern District of Texas, is referred to herein as the "2013 Texas Action."  A total of nine actions were

filed in Texas, and were consolidated for judicial efficiency reasons in lead case *Loyalty Conversion Systems Corp. v. American Airlines Inc., et al.*, Case No. 2:13-cv-655.

The Original Complaint alleged infringement by JetBlue of two patents in the field of loyalty programs: U.S. Patent Nos. 8,313,023 (the "'023 Patent"), issued on November 20, 2012, for "Exchange of Non-negotiable Credits of an Entity's Rewards Program for Entity Independent Funds," and United States Patent No. 8,511,550 (the "'550 Patent"), issued on August 20, 2013, for "Graphical User Interface for the Conversion of Loyalty Points Via a Loyalty Points Website." True and correct copies of the '023 Patent and '550 Patent are attached hereto as Exhibits 2 and 3.

On November 4, 2013, JetBlue moved to dismiss the 2013 Texas Action for lack of jurisdiction and improper venue. Following focused document and deposition discovery and completed briefing, that motion has been fully submitted and is pending consideration by the Court.

JetBlue filed the present Complaint in the Southern District of New York on March 14, 2014, some seven months after the Original Complaint was filed. The sole allegations set forth in the Complaint relating to federal question subject matter jurisdiction are 28 U.S.C. § 1338(a), relating to patent and copyright litigation, and 28 U.S.C. § 1367(a), providing supplemental jurisdiction to the foregoing. Complaint, ¶ 6. The Complaint does not allege copyright infringement, so it is apparent that JetBlue asserts subject matter jurisdiction in this case on the basis of the same two patents asserted in the 2013 Texas Action. *See generally* Complaint at 12-14.

On April 7, 2014, the 2013 Texas Action was transferred to U.S. Circuit Judge William C. Bryson of the Federal Circuit pursuant to Judge Bryson's inter-circuit designation to the Eastern District of Texas.

## III.   MOTION

### A.   The Complaint Should Be Dismissed Under the First-to-File Rule

Loyalty Conversion, Defendant in the present action, sued JetBlue in the 2013 Texas Action for infringing the '023 Patent and '550 Patent.  Despite alleging breach of contract, fraud and declaratory judgment claims, the sole basis on which JetBlue claims federal jurisdiction is 28 U.S.C. § 1338(a), acting as an admission that JetBlue claims subject matter jurisdiction on the same basis as the first-filed Texas Action.  *See* Complaint, ¶6.

The Federal Circuit has expressly stated that "because of the importance of national uniformity in patent cases, we hold that injunctions arbitrating between co-pending patent declaratory judgment and infringement cases in different district courts are reviewed under the law of the Federal Circuit."  *Intema v. NTD Labs, Inc.*, 654 F.Supp.2d 133, (E.D.N.Y. 2009) (quoting Lab Corp. v. Chiron Corp., 384 F.3d 1326, 1328 (Fed. Cir. 2004).  The general rule favors the forum of the first-filed action, whether or not it is a declaratory action.  *Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993).

The Federal Circuit has stated that "[t]here must … be sound reason that would make it unjust or inefficient to continue the first-filed action."  *Id.* at 938.  Such reasons may include the convenience and availability of witnesses, absence of jurisdiction over all desirable parties, possibility of consolidation with related litigation, or consideration relating to the real party in interest.  *Id.*  In cases with competing forum interests, the trial court of the first-filed action should consider the "convenience factors" found in a transfer analysis under section 1404(a). *See Micron Tech. v. Mosaid Tech.*, 518 F.3d 897, 904 (Fed. Cir. 2008).

5

JetBlue has apparently attempted to circumvent the first-to-file rule by adding a number of irrelevant parties to this action, including Loyalty Conversion's parent company, CTI, its parent, CopyTele, and John Roop individually.[1]  In patent cases the determination of which case was first filed is made based on which court first takes possession of the subject of the dispute, and not necessarily the parties to it.  *See e.g.*, *Time Warner Cable, Inc. v. USA Video Tech. Corp.*, 520 F.Supp.2d 579, 585-86 (D. Del. 2007); *Shire U.S., Inc. v. Johnson Matthey, Inc.*, 543 F.Supp.2d 404, 409 (E.D. Pa. 2008); *Intersearch Worldwide, Ltd. v. Intersearch Group, Inc.*, 544 F.Supp.2d 949, 958 (N.D. Cal. 2008).[2]  As reasoned in *Shire*:

> The 'subject matter' requirement of the first-to-file rule is satisfied in patent infringement matters where the actions in question involve the same patent and the same allegedly infringing product, though not necessarily the same parties.  A rigid requirement that there be identical parties in the action at issue would be at odds with the rule's flexible nature, which the Federal Circuit has emphasized.  In contrast, the rule accomplishes its core purpose of avoiding wasteful, and potentially inconsistent, duplicative litigation where it causes one action regarding a particular product's possible infringement of a patent to yield to another, earlier-filed action regarding the exact same question.

*Shire*, 543 F.Supp.2d at 409.

The United States Supreme Court has acknowledged that application of the "first-filed" rule promotes "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation…."  *Id.* at 244 (*citing Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)).  The "first-filed" rule enables courts to prevent

---

[1] Mr. Roop resides in California, is an officer of CopyTele and acted in his capacity as a corporate officer.  The scope of New York's "long-arm" statutes are limited by the fiduciary shield doctrine, which provides that acts performed in New York by a nonresident officer of a corporation in his corporate capacity may not serve as the basis for the exercise of personal jurisdiction over that individual.  *See Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 92-93 (2d Cir. 1975) (acts done solely in capacity as corporate officer insufficient basis for personal jurisdiction).  Mr. Roop plans to file a motion to dismiss on this additional ground.

[2] The Second Circuit has held that application of the first-filed rule does not require identical parties, merely substantial overlap.  *See Wyler-Wittenberg v. Metlife Home Loans, Inc.*, 899 F.Supp.2d 235, 244 (E.D.N.Y. 2012).  *See also Elite Physicians Services, LLC v. Citicorp Credit Services, Inc.*, 2007 WL 1100481 *3 (E.D.Tenn. Apr. 11, 2007) (noting that "[c]ourts generally hold that privity or affiliation between/among defendants is sufficient to find 'substantial overlap'").  Here, there is affiliation among all Defendants.

"duplicative litigation by adhering to the inherently fair concept that the party who commenced the first suit should generally be the party to attain its choice of venue." *Id*.

All of JetBlue's claims arise out of Defendants' investigation and proof of the patent infringement claims arising from the 2013 Texas Action. These claims could and should have been brought in the Texas Action under Section 1367(a) to the identical extent pleaded by JetBlue in the Complaint, ¶ 6.

### B.     The Complaint Should Be Dismissed Because It Alleges No Commercial Use

The sole substantive contractual provision JetBlue alleges to have been breached by the Defendants, and further identified as the putative basis for JetBlue's fraud and estoppel claims, is that Defendants allegedly made "commercial use" of JetBlue's web pages while investigating and proving JetBlue's patent infringement. Complaint, ¶ 50. On their face, the Terms of Use do not proscribe Defendants' conduct in pursuing patent infringement claims for JetBlue's ongoing infringement.

The Terms of Use comprise six single-spaced pages of small text. The single substantive provision of the Terms of Use which JetBlue has cited as the basis for its claims is the following sentence: "8.2. No Commercial Use 8.2.1. Except as provided by Section 7 or if JetBlue has granted You permission in advance and in writing, You may use the JetBlue Web sites only for personal, non-commercial use." Complaint, Exhibit B, § 8.2.

The Complaint neglects to mention that the Terms of Use also contain a section which delineates "commercial purpose" stating:

8.2.2. Except as provided by Section 7 or if JetBlue has granted You permission in advance and in writing, You shall not use the JetBlue Web sites to engage in any commercial purpose, including but not limited to:

8.2.2.1. Advertising or offering to sell any goods or services;

8.2.2.2. Conducting contests or surveys;

7

              8.2.2.3. Distributing chain letters, or advertising with respect to any Ponzi scheme or pyramid scheme;

              8.2.2.4. Advertising or offering to sell any business opportunities, direct sale opportunities, employment or contractor positions, multi-level marketing opportunities, or securities.

*Id.*, § 8.2.2.    While this list is stated to be "included but not limited to," it describes the types of activities that JetBlue considers commercial.  There is no prohibition against use in a judicial proceeding, and certainly no restriction against determining whether JetBlue's services infringe a United States patent.

Moreover, use for purposes of litigation or a judicial proceeding is explicitly not "commercial use" in the Second Circuit in the copyright context, which is highly instructive. Fair use is governed by statute.  The very first factor centers on whether use is or is not "commercial."

      In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include:

      (1) the purpose and character of the use, **including whether such use is of a commercial nature** or is for nonprofit educational purposes;

      (2) the nature of the copyrighted work;

      (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

      (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107 (emphasis added).  The Senate and House Reports give examples of possible noncommercial fair uses, including "**reproduction of a work in legislative or judicial proceedings or reports**."  1975 Senate Report 61–62; 1976 House Report 65, U.S.Code Cong. & Admin.News 1976, p. 5678 (emphasis added).

Two recent cases in the Second Circuit hold that written materials can be used as evidence, and that such use is not deemed "commercial." *See Hollander v. Steinberg*, 419 Fed.Appx. 44 (2d Cir. 2011) and *Scott v. Worldstarhiphop Inc.*, 2011 WL 5082410 (S.D.N.Y. 2011). In *Hollander*, with respect to the first factor, the Second Circuit noted that the "purpose and character" of the use was not commercial, but part of a litigation proceeding.

> As to the first statutory factor, Steinberg used Den Hollander's essays in the course of **two judicial proceedings. The "purpose and character" of that use was not commercial, but rather part of a litigation strategy.** *See* 17 U.S.C. § 107(1). In the Note accompanying § 107, Congress listed numerous examples of "the sort of activities the courts might regard as fair use under the circumstances," including "**reproduction of a work in legislative or judicial proceedings or reports.**" House Committee on the Judiciary, H.R. Rep. No. 94–1476 (1976).

419 Fed.Appx. at *47. The *Scott* case applied a similar rationale in dismissing the plaintiff's complaint, noting that "Using this analysis, courts have repeatedly held that the reproduction of copyrighted works as evidence in litigation is fair use." *Scott*, 2011 WL at *7 (applying the first factor, and determining that evidentiary use was "noncommercial use prompted by plaintiff's commencement of litigation"). While JetBlue has not pleaded copyright infringement in the Complaint, the interpretation of "commercial use" should similarly exclude use in the context of a judicial proceeding as evidence.

> **C.** The Complaint Should Be Dismissed Because Rule 11 of the Federal Rules of Civil Procedure and the Federal Circuit Require a Thorough Investigation

The requirement that at attorney must investigate an accused product before making a patent infringement claim is well-established by Rule 11 of the Federal Rules of Civil Procedure and the Federal Circuit. Accordingly, the obligation is recognized in United States District Courts sitting in New York—and those sitting in Texas, where the Original Complaint was filed. For example, in *Automated Business Companies, Inc. v. NEC America, Inc.*, 1999 U.S. Dist. LEXIS 20962 at **8-9 (N.D. Tex. Feb. 8, 1999), the court declared:

In a patent infringement case, a reasonable pre-filing investigation includes an examination of the product accused of infringement. *S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996). Determining infringement requires that the patent claims be interpreted and that the claims be found to read on the accused devices. *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997). Rule 11 sanctions are appropriate where there is no evidence that plaintiff or his attorney compared the accused devices with the patent claims prior to filing suit. Id. As the Fifth Circuit has noted, Rule 11 requires that facts regarding a cause of action be developed before the lawsuit is filed; a plaintiff cannot file suit hoping that later discovery will uncover something. *Southern Leasing Partners, Ltd. V. McMullan*, 801 F.2d 783, 787-89 (5th Cir. 1986).

A patentee and its counsel are thus ***required*** to engage in a pre-filing investigation prior to asserting claims for infringement. Analysis of the prospective accused product, including possible reverse engineering, is an important step of the pre-suit investigation mandated by the Federal Circuit. *See Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (*citing Refac Int'l, Ltd. v. Hitachi, Ltd.*, 141 F.R.D. 281, 286–88 (C.D. Cal.1991) (imposing Rule 11 sanctions on patent infringement plaintiff that failed to reverse engineer or examine accused products prior to filing complaint)).

Indeed, the Federal Circuit has declared that counsel would violate Rule 11 of the Federal Rules of Civil Procedure if he or she did not analyze the accused product against the asserted claims of the patent:

> CTC made a substantial Rule 11 showing in this case. For example, in support of its charge that Bravo failed to conduct a reasonable inquiry before filing this lawsuit, CTC argues that Bravo's only evidence or pre-suit inquiry is that Mr. Case Bravo examined the CTC devices and literature and concluded that they infringed this patents. The evidence of record indicates that Bravo's attorneys relied on their client's lay opinion that CTC's devices infringed. Determining infringement, however, requires that he patent claims be interpreted and that the claims be found to read on the accused devices. Although one of Bravo's attorneys asserted in an affidavit that he "spoke to Mr. Bravo at length about what he had observed and his conclusions and analysis", and that he "conducted independent research into appropriate legal issues," there is no evidence that either of Bravo's attorneys ever compared the accused devices with the patent claims. If the district court finds that Bravo's attorney's conducted no investigation of the factual and legal merits of Bravo's claims other than to rely

10

on Mr. Bravo's lay opinion that CTC was infringing the '024 patent, it would be difficult to avoid the conclusion that sanctions are appropriate.

*S. Bravo Systems v. Containment Technologies Comp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996) (emphasis added); *accord, View Engineering Inc v. Robotic Vision Systems, Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000) ("Before filing counterclaims of patent infringement, Rule 11, we think, must require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted.")

Given this requirement, it would have been unlawful for Loyalty Conversion not to investigate JetBlue's service prior to making a claim for patent infringement. JetBlue's service is offered to the public at large over the Internet, and potential users are encouraged to use the Internet to access the service. Under these circumstances, JetBlue's proposed construction of its Terms of Use would be void as violative of public policy. The Second Circuit has acknowledged this balance between public policy and patent laws, observing:

> As noted above, our task in this case is to balance the policy concerns of patent law articulated in *Lear* against countervailing policy concerns that favor requiring parties to adhere to the terms of agreements resolving their legal disputes. *See Idaho Potato Comm'n*, 335 F.3d at 137 (" *Lear* makes clear that **courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest**.").

*Rates Technology Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 171 (2d Cir. 2012) (emphasis added).

In *Adrain v. Superchips, Inc.*, 2006 U.S. Dist LEXIS 25212 at **23-24 (S.D. Tex. 2006), the court likewise admonished:

> As Defendants correctly point out, Rule 11 requires counsel for a plaintiff alleging patent infringement to investigate the accused device(s) before filing suit. *See Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066, 1072 (Fed. Citr. 2002) ("Patent infringement is a question of fact . . . . An attorney's allegation of infringement is therefore subject to the requirement of Rule 11(b)(3) that all allegations and factual contentions have evidentiary support."); FED. R. CIV. P.

11(B)(3). This rule allows the assertion only of claims that a reasonable attorney would make, "based on some actual evidence uncovered during a prefiling investigation." *Id*.

Given that strong public policy, JetBlue's proposed construction of its Terms of Use is untenable. Indeed, the irony of JetBlue's claims lies in the fact that had Loyalty Conversion not investigated how JetBlue's publicly-available system operates, JetBlue would have attacked Loyalty Conversion for claiming infringement without any reasonable basis for doing so or appropriate prefiling investigation.

### D. The Complaint Should Be Dismissed Because the Terms of Use Are Unenforceable to Promote JetBlue's Illegal Patent Infringement

The Counts in the Complaint are all premised on the assumption that the Terms of Use prohibit a determination of whether JetBlue service infringes a United States patent. The only fair reading of that provision is that JetBlue seeks to insure that its website content itself is not sold or distributed commercially. Nowhere in what JetBlue describes as "prohibited" is any mention of a determination of whether JetBlue is engaged in patent infringement.

Even if the Terms of Use could be construed as prohibiting a determination as to whether JetBlue is engaged in patent infringement, such a construction would be void as violative of public policy. Patent infringement is unlawful activity subjecting an infringer to civil liability in the form of monetary damages, injunction or both. *See* 28 U.S.C. § 284. Should JetBlue's proposed construction of its Terms of Use be adopted, JetBlue would be insulated from its own illegal conduct in contravention of public policy.

JetBlue's argument, if accepted, would mean that infringers could infringe patents with impunity simply by inserting boilerplate language on products and services stating "user agrees that this product cannot be used to determine whether we are engaging in patent infringement" or, for that matter, "user agrees not to sue us for any of our actions." Such a result would be

absurd and contravene a patentee's right to enforce its patent under the Patent Act.  *See Labrado v. County of El Paso*, 132 S.W.3d 581, 595 (Tex. App. El Paso [8th Dist.] 2004) ("public policy precludes us from construing the waiver language in Bid Number 01-042 as a waiver of the appellants' statutory right . . . to enjoin performance of a contract awarded in violation of the County Purchasing Act.').

In addition, a well-established rule of law cannot be violated by contract. *See, e.g., Texas Commerce Bank v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002). ("[C]ourts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law").

This Court has similarly declined to enforce contracts to promote an unlawful objective. In the gaming context, the court has severed those portions of the agreement that promote unlawful objects.  *See Carruthers v. Flaum*, 365 F. Supp. 2d 448, 468 (S.D.N.Y. 2005).  In the context of an agreement that included both lawful and unlawful objectives, the court observed:

> To the extent that they call for the development of non-gaming enterprises, they could, in theory, be valid and enforceable-but only as long as that non-gaming development is not incidental to a primary illegal purpose.  "Where an agreement consists in part of an unlawful objective and in part of lawful objectives, the court may sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement."  *Donnell v. Stogel*, 161 A.D.2d 93, 97-98, 560 N.Y.S.2d 200 (2d Dep't 1990) (citations omitted).

*Carruthers*, 365 F. Supp. at 468.  The Terms of Use should thus not be construed to facilitate the unlawful objective of JetBlue's patent infringement.

> **E.**    The Complaint Should Be Dismissed Because a Controlling Court Order Required the Submission of Available Evidence

JetBlue argues that it is impermissible to use the evidence of their infringement in a court of law because such use is proscribed "commercial use."  Complaint, ¶50.  Loyalty Conversion is

subject to an Order of the United States District Court for the Eastern District of Texas to provide such evidence of infringement in the form of a claim chart:

> Not later than 10 days before the Initial Case Management Conference with the Court, a party claiming patent infringement must serve on all parties a "Disclosure of Asserted Claims and Infringement Contentions." Separately for each opposing party, the "Disclosure of Asserted Claims and Infringement Contentions" shall contain the following information:
>
> (a) Each claim of each patent in suit that is allegedly infringed by each opposing party;
>
> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. **This identification shall be as specific as possible.** Each product, device, and apparatus must be identified by name or model number, if known. **Each method or process must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process**;
>
> (c) **A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality**….

Patent L.R. 3-1 (emphasis added).

Just as a protective order may supersede confidentiality agreements between the parties, so too does the P.R. 3-1 order supersede the Terms of Use on JetBlue's website. If JetBlue takes issue with the order, its appropriate remedy is in the Texas court. *See* 12 C.F.R. 1081.119 (providing a third party the limited right to intervene when its confidential information may be revealed). Instead, JetBlue is attempting to circumvent the Texas court by bringing a frivolous and vexatious action that is contrary to well-established legal principles.

**F.**     The Complaint Should Be Dismissed Because Other Alleged Terms of Use Provide No Basis for Affirmative Relief

All grounds other than the "commercial use" provision raised in Count 1, ¶50 are directed to inapposite limitations on liability and forum selection. If they were applicable to JetBlue's patent infringement, which they manifestly are not, the appropriate forum in which to raise them

14

would be the court in which the patent litigation has been brought.  *See Silver Line Building Prods. LLC v. J-Channel Indus. Corp.*, Civ. Action No. 13-cv-6561 (E.D.N.Y. March 24, 2014) (attached as Exhibit 4).  Similarly, if JetBlue wishes to urge that its forum selection clause somehow controls the patent infringement case in the Eastern District of Texas, it should have brought those claims there.  *See id.* at 7.

In *Silver Line*, the district court was presented with a motion to dismiss, stay or transfer a case that followed an earlier-filed Tennessee action.  First, the court found that the Tennessee Action was the first-filed action, and observed that Federal Circuit law "generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions."  *Id.*, Exhibit 4 at 1 (*quoting Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012)).  The court also held:

> [T]he Eastern District of Tennessee, and not this Court, is the appropriate forum to balance all relevant convenience factors and determine whether they warrant departure from the first-to-file rule's presumption favoring the forum of the first-filed action.

*Id.*, Exhibit 4 at 7.

Notably, JetBlue has filed a motion to dismiss in Texas, has not raised the forum selection clause as a ground on which to dismiss, despite filing a motion to dismiss for improper venue.  Not only are JetBlue's arguments without merit, but they have chosen the wrong court in which to adjudicate their claims.

**G.**     In the Alternative, this Proceeding Should Be Stayed Pending Resolution of the 2013 Texas Action

Where the "first-filed" rule is found applicable, "[t]he decision of whether to stay or dismiss a proceeding rests within a district judge's discretion."  *Wyler-Wittenberg*, 899 F.Supp.2d at 247.  The court should take whichever action it deems proper to "avoid duplication of judicial effort, void vexatious litigation in multiple forums, achieve comprehensive disposition

of litigation among parties over related issues, and eliminate the risk of inconsistent adjudication." *Id*.

Defendants respectfully submit that dismissal of this action would be the most efficient result. JetBlue can bring the same claims in the 2013 Texas Action. Further, staying this action will result in the unnecessary expenditure of additional resources of the parties and the Court. For example, staying this action would unnecessarily require the Court to retain jurisdiction to potentially reexamine parallel issues that will be raised and decided in the 2013 Texas Action. *See Wyler-Wittenberg*, 899 F.Sup.2d at 247-48 (refusing to stay for these reasons). Nonetheless, should the Court not determine that dismissal is appropriate, a stay until the resolution of the 2013 Texas Action would likely resolve all or substantially all of the issues raised herein.

**H.**   Sanctions Should Be Awarded Against the Attorneys in this Action Because the Same Counsel Has Submitted the Same Frivolous Theory Previously, and It was Appropriately Rejected

A vexatious litigation strategy of the type employed here by JetBlue—to needlessly multiply litigation costs and to advance frivolous theories of recovery—supports an award of attorneys' fees as a sanction. *See Monolithic Power Systems, Inc. v. O2 Micro Int'l, Inc.*, 726 F.3d 1359, 67 (Fed. Cir. 2013).

The precise theory JetBlue now advances has been tried and rejected by the same counsel before. That court rejected the same theory. Undeterred, the same lawyer has adopted the same frivolous and vexatious tact here.

In that case, the district court found persuasive that a patent plaintiff has an obligation to conduct a pre-suit investigation. The district court also noted the impropriety of interposing the terms and conditions of a website to shield illegal conduct. In *TrueBeginnings, LLC v. Spark Network Services, Inc*., 631 F. Supp. 2d 849 (N.D. Tex. 2009), "the threshold issue . . . [was] whether the pre-suit investigation of [the accused] website conducted by NHSN [fell] within the

scope of the Terms of Use."  NHSN argued that the terms of use applied only to the dating and match-making services offered by TrueBeginnings.  *Id*.  TrueBeginnings contended that that the terms of use "govern[ed] any access or use of the website." *Id*. at 853.  The court rejected TrueBeginnings' argument, concluding that "there can be little doubt that the terms and conditions apply only to the dating and relationship services offered by [TrueBeginnings] through its website. Because NSHN used the True.com website for the sole purpose of investigating whether the [TrueBeginnings] infringed the . . .patent, its conduct is outside the scope of the Terms of Use."  *Id*. at 856.

Although JetBlue may be in a position to tolerate incurring extraneous legal fees and expenses as its counsel brings improper and vexatious litigation that is contrary to established rules of law, Defendants should not be forced to tolerate such costs to have their patent rights adjudicated.  Defendants have been forced to engage local counsel, respond to both a complaint and an improper motion for preliminary injunction, and their costs are ongoing.  Upon direction by the Court, Defendants will promptly proffer a tally of these fees and expenses.

## IV.  CONCLUSION

For these reasons and the reasons set forth above, Defendants respectfully request that the Complaint be dismissed, or in the alternative, transferred or stayed.  In addition, Defendants seek an award of sanctions for Plaintiff's frivolous, vexatious and harassing litigation.

Dated: April 14, 2014                                    Respectfully submitted,

                                                         */s/Gregory O. Koerner*
                                                         Gregory O. Koerner
                                                         **Koerner Law Firm**
                                                         111 John Street, Suite 420
                                                         New York, NY 10038
                                                         Telephone: (212)461-4377

Andrew G.  DiNovo
Texas State Bar No. 00790594
Stefanie T. Scott
Texas State Bar No. 24061617
**DiNovo Price Ellwanger & Hardy LLP**
7000 N.  MoPac Expressway, Suite 350
Austin, Texas  78731
Telephone:  (512) 539-2626
Telecopier:  (512) 539-2627

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system.

/s/ *Gregory O. Koerner*
Gregory O. Koerner

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **LOYALTY CONVERSION SYSTEMS CORPORATION,** §<br>§<br>§ | |
| *Plaintiff,* § | |
| § | **Civil Action No. 2:13-cv-655** |
| **v.** § | |
| § | |
| **AMERICAN AIRLINES, INC.,** § | |
| § | **Jury Trial Demanded** |
| *Defendant.* § | |

## <u>ORIGINAL COMPLAINT</u>

Loyalty Conversion Systems Corporation ("Plaintiff" or "Loyalty Conversion"), by and through its attorneys, for its Original Complaint against Defendant American Airlines, Inc., ("American" or "Defendant"), hereby alleges as follows:

### I.     NATURE OF THE ACTION

1.     This is a patent infringement action to end Defendant's unauthorized and infringing manufacture, use, sale, offering for sale, and/or importation of products and methods incorporating Plaintiff Loyalty's patented inventions.

2.     Loyalty Conversion holds all substantial rights and interest in and to United States Patent No. 8,313,023 (the "'023 Patent"), issued on November 20, 2012, for "Exchange of Non-negotiable Credits of an Entity's Rewards Program for Entity Independent Funds."  A true and correct copy of the '023 Patent is attached hereto as Exhibit 1.

3.      Loyalty Conversion further holds all substantial rights and interest in and to United States Patent No. 8,511,550 (the "'550 Patent"), issued on August 20, 2013, for ""Exchange of Non-Negotiable Credits of an Entity's Rewards Program for Entity Independent Funds."  A true and correct copy of the '550 Patent is attached hereto as Exhibit 2.

ORIGINAL COMPLAINT

1

4.      Defendant makes, uses, sells and imports infringing products and provides infringing services in violation of the Patents.  More specifically, Defendant operates a computerized system whereby users and administrators convert loyalty program points into other units for acquiring goods or services. Plaintiff Loyalty Conversion seeks injunctive relief to prevent Defendant from continuing infringement of Plaintiff's patent rights.  Plaintiff Loyalty Conversion further seeks monetary damages and prejudgment interest for Defendant's past infringement of the '023 Patent and the '550 Patent.

## II.      THE PARTIES

5.      Plaintiff Loyalty Conversion is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 900 Walt Whitman Drive, Melville NY 11747.

6.      Upon information and belief, Defendant is a Delaware corporation with its principal place of business located at 4333 Amon Carter Blvd., Fort Worth, Texas 76155. American has appointed CT Corp System, 350 N. Paul Street, Suite 2900, Dallas, Texas 75201-4234 as its agent for service of process.  American transacts business within the State of Texas and this District.

## III.      JURISDICTION AND VENUE

7.      This is an action for patent infringement which arises under the Patent Laws of the United States, in particular, 35 U.S.C. §§271, 281, 283, 284, and 285.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1338(a).

8.      This Court has personal jurisdiction over Defendant, and venue is proper in this Court pursuant to 28 U.S.C. §§1391(b), (c), and 1400.

## IV.     THE '023 PATENT AND '050 PATENT

9.     The '023 and '050 Patents relate to computerized systems for administering loyalty points programs.  In accordance with these patents, a system and method is disclosed wherein a commerce partner agreeing to accept transfers or conversions of quantities of non-negotiable credits to entity independent funds in accordance with a credit-to-funds ratio effects such transactions.  Computers grant a consumer a quantity of the entity independent funds based on a conversion of the credits into funds.  The commerce partner is compensated for providing the entity independent funds to the consumer.

10.     Loyalty Conversion holds all substantial rights in and to the '023 and '050 Patents, including all rights to recover for all past and future infringements thereof.

## VI.     AMERICAN'S ACTS

11.     American provides, makes, uses, sells, offers for sale, and/or distributes infringing systems.  The infringing systems include, for example, computerized systems whereby users manage and redeem loyalty rewards for American's loyalty rewards program, AAdvantage. American has entered into agreements with partners such as Marriott, and provides for the conversion of Marriott Rewards points to AAdvantage miles.  American provides related support services and instructions for the infringing operation of such systems to its customers.

12.     Through its actions, American has directly infringed the '023 and '050 Patents. In addition, with knowledge of the '023 and '050 Patents at least as early as the filing of Plaintiff's complaint, American has actively induced others including its customers to infringe and contributed to the infringement by others of the '023 and '050 Patents throughout the United States, knowing that Loyalty Conversion alleges such activities to be infringing.  American agrees and specifies with its loyalty program partners that conversions shall occur in the manner

claimed in the '023 and '050 Patents.   American has designed, installed, operated and implemented its computer systems to operate in an infringing manner.   The infringing systems have no substantial non-infringing uses.

13.   Loyalty Conversion has been and will continue to suffer damages as a result of Defendant American Airlines Inc.'s infringing acts unless and until enjoined.

## COUNT ONE
### PATENT INFRINGEMENT—U.S. PATENT NO. 8,313,023

14.   Plaintiff Loyalty Conversion realleges and incorporates herein paragraphs 1–13.

15.   Defendant has directly infringed the '023 Patent in violation of 35 U.S.C. §271(a).

16.   Defendant has indirectly infringed the '023 Patent by inducing the infringement of the '023 Patent and contributing to the infringement of the '023 Patent in violation of 35 U.S.C. §§271(b) and (c), including by their respective customers.

17.   Upon information and belief, Defendant has jointly infringed the '023 Patent, including by controlling, instructing and/or directing others to perform one or more of the claimed method steps.   More specifically, Defendant has agreed, controlled, instructed and/or directed its loyalty program partners to cooperate in the loyalty point conversion acts described above.

18.   Defendant's aforementioned acts have caused damage to Loyalty Conversion and will continue to do so unless and until enjoined.

## COUNT TWO
### PATENT INFRINGEMENT—U.S. PATENT NO. 8,511,550

19.   Plaintiff Loyalty Conversion realleges and incorporates herein paragraphs 1–13.

20.   Defendant has directly infringed the '050 Patent in violation of 35 U.S.C. §271(a).

21.     Defendant has indirectly infringed the '050 Patent by inducing the infringement of the '023 Patent and contributing to the infringement of the '050 Patent in violation of 35 U.S.C. §§271(b) and (c), including by their respective customers.

22.     Upon information and belief, Defendant has jointly infringed the '050 Patent, including by controlling, instructing and/or directing others to perform one or more of the claimed method steps. More specifically, Defendant has agreed, controlled, instructed and/or directed its loyalty program partners to cooperate in the loyalty point conversion acts described above.

23.     Defendant's aforementioned acts have caused damage to Loyalty Conversion and will continue to do so unless and until enjoined.

## VII.   JURY DEMAND

24.     Plaintiff Loyalty Conversion hereby demands a jury on all issues so triable.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff Loyalty Conversion respectfully requests that the Court:

    A.    Enter judgment that Defendant infringes one or more claims of the '023 Patent and '050 Patent literally and/or under the doctrine of equivalents;

    B.    Permanently enjoin Defendant, its agents, servants, and employees, and all those in privity with Defendant or in active concert and participation with Defendant, from engaging in acts of infringement of the '023 Patent and '050 Patent;

    C.    Award Plaintiff Loyalty Conversion past and future damages together with prejudgment and post-judgment interest to compensate for the infringement by Defendant of the '023 Patent and '050 Patent in accordance with 35 U.S.C. §284; and

    D.    Award Plaintiff Loyalty Conversion its costs, disbursements, and such further and additional relief as is deemed appropriate by this Court.

ORIGINAL COMPLAINT

Respectfully submitted,

Dated:  August 20, 2013                    By:  /s/  *Andrew G. DiNovo*

                                         Andrew G.  DiNovo
                                         Texas State Bar No. 00790594
                                         Jay D. Ellwanger
                                         Texas State Bar No. 24036522
                                         Adam G. Price
                                         Texas State Bar No. 24027750
                                         **DiNovo Price Ellwanger & Hardy LLP**
                                         7000 N.  MoPac Expressway, Suite 350
                                         Austin, Texas  78731
                                         Telephone:  (512) 539-2626
                                         Telecopier:  (512) 539-2627

ORIGINAL COMPLAINT

US008313023B1

(12) **United States Patent**
McGhie et al.

(10) Patent No.: **US 8,313,023 B1**
(45) Date of Patent: *\*Nov. 20, 2012*

(54) **EXCHANGE OF NON-NEGOTIABLE CREDITS OF AN ENTITY'S REWARDS PROGRAM FOR ENTITY INDEPENDENT FUNDS**

(76) Inventors: **Sean I. McGhie**, Boca Raton, FL (US); **Brian K. Buchheit**, Davie, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/531,904**

(22) Filed: **Jun. 25, 2012**

**Related U.S. Application Data**

(63) Continuation of application No. 11/420,255, filed on May 25, 2006, now Pat. No. 7,703,673.

(51) Int. Cl.
*G06K 5/00* (2006.01)

(52) **U.S. Cl.** ......... **235/380**; 235/375; 235/379; 235/487

(58) **Field of Classification Search** ................. 235/380, 235/375, 379, 487, 486; 705/14, 39
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,918,716 | A | 11/1975 | Nonaka et al. |
| 4,087,660 | A | 5/1978 | Sedley |
| 4,358,672 | A | 11/1982 | Hyatt et al. |
| 4,473,825 | A | 9/1984 | Walton |
| 4,518,098 | A | 5/1985 | Fleischer |
| 4,546,241 | A | 10/1985 | Walton |
| 4,582,324 | A | 4/1986 | Koza et al. |
| 4,607,155 | A | 8/1986 | Nao et al. |
| 4,609,812 | A | 9/1986 | Drexler |
| 4,621,814 | A | 11/1986 | Stephan et al. |
| 4,634,848 | A | 1/1987 | Shinohara et al. |
| 4,689,742 | A | 8/1987 | Seymour et al. |
| 4,695,053 | A | 9/1987 | Vazquez |
| 4,760,527 | A | 7/1988 | Sidley |

(Continued)

FOREIGN PATENT DOCUMENTS

| AU | 6484498 | 11/1998 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

"At Sports Superstore Online, Shoppers Get More for Their Money; 10,000 Reasons to Shop at Sports Superstore Online", Business Wire Dec. 4, 1998, 2 pp.

(Continued)

*Primary Examiner* — Edwyn Labaze
(74) *Attorney, Agent, or Firm* — Patents on Demand P.A.; Brian K. Buchheit; Scott M. Garrett

(57) **ABSTRACT**

In one embodiment, a rewards program for credit cards (e.g., payment artifacts) can be established. Non-negotiable credits are accrued in response to one of the payment artifacts being used for purchases of goods or services with venders. Restrictions on use prevent the non-negotiable credits from being directly applied for a purchase of at least one goods or services of a commerce partner, which is an independent entity from the entity. A quantity of the non-negotiable credits are subtracted in response to the purchase of the goods or services that cost a quantity of entity independent funds, which result from a conversion of the subtracted quantity of non-negotiable credits into the entity independent funds in accordance with a credit to fund conversion ratio. The entity provides compensation for the subtracted quantity of the non-negotiable credits. The commerce partner receives at least a portion of the compensation.

**46 Claims, 3 Drawing Sheets**

100



**US 8,313,023 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,764,666 A | 8/1988 | Bergeron |
| 4,882,473 A | 11/1989 | Bergeron |
| 4,910,672 A | 3/1990 | Off et al. |
| 4,941,090 A | 7/1990 | McCarthy |
| 4,942,090 A | 7/1990 | Morin |
| 4,968,873 A | 11/1990 | Dethloff |
| 5,025,372 A | 6/1991 | Burton et al. |
| 5,038,022 A | 8/1991 | Lucero |
| 5,056,019 A | 10/1991 | Schultz et al. |
| 5,080,364 A | 1/1992 | Seidman |
| 5,105,184 A | 4/1992 | Pirani et al. |
| 5,117,355 A | 5/1992 | McCarthy |
| 5,128,752 A | 7/1992 | Von Kohorn |
| 5,135,224 A | 8/1992 | Yamamoto |
| 5,173,851 A | 12/1992 | Off et al. |
| 5,179,517 A | 1/1993 | Sarbin et al. |
| 5,200,889 A | 4/1993 | Mori |
| 5,201,010 A | 4/1993 | McCarthy |
| 5,202,826 A | 4/1993 | McCarthy |
| 5,233,514 A | 8/1993 | Ayyoubi et al. |
| 5,237,620 A | 8/1993 | Deaton et al. |
| 5,256,863 A | 10/1993 | Ferguson et al. |
| 5,265,874 A | 11/1993 | Dickinson |
| 5,276,312 A | 1/1994 | McCarthy |
| 5,287,268 A | 2/1994 | McCarthy |
| 5,287,269 A | 2/1994 | Dorrough et al. |
| 5,290,033 A | 3/1994 | Bittner et al. |
| 5,305,196 A | 4/1994 | Deaton et al. |
| 5,327,508 A | 7/1994 | Deaton et al. |
| 5,332,076 A | 7/1994 | Ziegert |
| 5,344,144 A | 9/1994 | Canon |
| 5,353,218 A | 10/1994 | De Lapa et al. |
| 5,371,345 A | 12/1994 | LeStrange et al. |
| 5,373,440 A | 12/1994 | Cohen et al. |
| 5,382,779 A | 1/1995 | Gupta |
| 5,388,165 A | 2/1995 | Deaton et al. |
| 5,393,061 A | 2/1995 | Manship et al. |
| 5,397,125 A | 3/1995 | Adams |
| 5,398,932 A | 3/1995 | Eberhardt et al. |
| 5,402,872 A | 4/1995 | Clurman |
| 5,424,524 A | 6/1995 | Ruppert et al. |
| 5,429,361 A | 7/1995 | Raven et al. |
| 5,430,644 A | 7/1995 | Deaton et al. |
| 5,434,394 A | 7/1995 | Roach et al. |
| 5,448,471 A | 9/1995 | Deaton et al. |
| 5,457,306 A | 10/1995 | Lucero |
| 5,457,308 A | 10/1995 | Lucero |
| 5,467,269 A | 11/1995 | Flaten |
| 5,470,079 A | 11/1995 | LeStrange et al. |
| 5,471,669 A | 11/1995 | Lidman |
| 5,477,038 A | 12/1995 | Levine et al. |
| 5,483,444 A | 1/1996 | Heintzeman et al. |
| 5,491,326 A | 2/1996 | Marceau et al. |
| 5,502,363 A | 3/1996 | Clarke |
| 5,511,781 A | 4/1996 | Wood et al. |
| 5,513,102 A | 4/1996 | Auriemma |
| 5,529,361 A | 6/1996 | Raven |
| 5,535,407 A | 7/1996 | Yanagawa et al. |
| 5,537,314 A | 7/1996 | Kanter |
| 5,551,692 A | 9/1996 | Pettit et al. |
| 5,559,312 A | 9/1996 | Lucero |
| 5,559,313 A | 9/1996 | Claus et al. |
| 5,564,546 A | 10/1996 | Molbak et al. |
| 5,564,700 A | 10/1996 | Celona |
| 5,580,309 A | 12/1996 | Piechowiak |
| 5,586,936 A | 12/1996 | Bennett et al. |
| 5,592,560 A | 1/1997 | Deaton et al. |
| 5,609,337 A | 3/1997 | Clapper, Jr. |
| 5,612,868 A | 3/1997 | Off et al. |
| 5,613,912 A | 3/1997 | Slater |
| 5,621,812 A | 4/1997 | Deaton et al. |
| 5,635,696 A | 6/1997 | Dabrowski |
| 5,638,457 A | 6/1997 | Deaton et al. |
| 5,642,485 A | 6/1997 | Deaton et al. |
| 5,643,088 A | 7/1997 | Vaughn et al. |
| 5,644,723 A | 7/1997 | Deaton et al. |
| 5,649,114 A | 7/1997 | Deaton et al. |
| 5,649,115 A | 7/1997 | Schrader et al. |

| | | | |
|---|---|---|---|
| 5,655,961 A | 8/1997 | Acres et al. |
| 5,659,469 A | 8/1997 | Deaton et al. |
| 5,672,109 A | 9/1997 | Natanian |
| 5,673,322 A | 9/1997 | Pepe et al. |
| 5,674,123 A | 10/1997 | Roberson, Jr. et al. |
| 5,674,128 A | 10/1997 | Holch |
| 5,675,662 A | 10/1997 | Deaton et al. |
| 5,677,952 A | 10/1997 | Blakley, III et al. |
| 5,687,322 A | 11/1997 | Deaton et al. |
| 5,689,100 A | 11/1997 | Carrithers et al. |
| 5,697,611 A | 12/1997 | Kelly et al. |
| 5,708,782 A | 1/1998 | Larson et al. |
| 5,710,886 A | 1/1998 | Christensen et al. |
| 5,715,399 A | 2/1998 | Bezoz |
| 5,725,428 A | 3/1998 | Achmuller |
| 5,729,693 A | 3/1998 | Holda-Fleck |
| 5,734,838 A | 3/1998 | Robinson et al. |
| 5,741,183 A | 4/1998 | Acres |
| 5,742,845 A | 4/1998 | Wagner |
| 5,749,075 A | 5/1998 | Toader et al. |
| 5,754,655 A | 5/1998 | Hughes |
| 5,761,647 A | 6/1998 | Boushy |
| 5,761,648 A | 6/1998 | Golden et al. |
| 5,765,141 A | 6/1998 | Spector |
| 5,766,075 A | 6/1998 | Cook et al. |
| 5,769,716 A | 6/1998 | Saffari et al. |
| 5,770,533 A | 6/1998 | Franchi |
| 5,774,868 A | 6/1998 | Cragun et al. |
| 5,774,869 A | 6/1998 | Toader |
| 5,774,870 A | 6/1998 | Storey |
| 5,779,549 A | 7/1998 | Walker et al. |
| 5,794,230 A | 8/1998 | Horadan et al. |
| 5,802,275 A | 9/1998 | Blonder |
| 5,806,043 A | 9/1998 | Toader |
| 5,806,044 A | 9/1998 | Powell |
| 5,806,045 A | 9/1998 | Biorge et al. |
| 5,809,482 A | 9/1998 | Strisower |
| 5,814,796 A | 9/1998 | Benson et al. |
| 5,816,918 A | 10/1998 | Kelly et al. |
| 5,820,460 A | 10/1998 | Fulton |
| 5,822,230 A | 10/1998 | Kikinis et al. |
| 5,823,874 A | 10/1998 | Adams |
| 5,832,457 A | 11/1998 | O'Brien et al. |
| 5,832,458 A | 11/1998 | Jones |
| 5,833,536 A | 11/1998 | Davids et al. |
| 5,834,748 A | 11/1998 | Litman |
| 5,836,817 A | 11/1998 | Acres |
| 5,839,117 A | 11/1998 | Cameron et al. |
| 5,844,230 A | 12/1998 | Lalonde |
| 5,845,259 A | 12/1998 | West et al. |
| 5,848,399 A | 12/1998 | Burke |
| 5,851,148 A | 12/1998 | Brune et al. |
| 5,855,007 A | 12/1998 | Jovicic et al. |
| D404,436 S | 1/1999 | McGahn et al. |
| 5,857,175 A | 1/1999 | Day et al. |
| 5,864,822 A | 1/1999 | Baker, III |
| RE36,116 E | 2/1999 | McCarthy |
| 5,870,722 A | 2/1999 | Albert et al. |
| 5,876,284 A | 3/1999 | Acres et al. |
| 5,882,261 A | 3/1999 | Adams |
| 5,882,262 A | 3/1999 | Balhorn |
| 5,884,277 A | 3/1999 | Khosla |
| 5,892,827 A | 4/1999 | Beach et al. |
| 5,892,900 A | 4/1999 | Ginter et al. |
| 5,892,905 A | 4/1999 | Brandt et al. |
| 5,898,838 A | 4/1999 | Wagner |
| 5,902,184 A | 5/1999 | Bennett |
| 5,902,983 A | 5/1999 | Crevelt et al. |
| 5,903,874 A | 5/1999 | Leonard et al. |
| 5,903,880 A | 5/1999 | Biffar |
| 5,905,246 A | 5/1999 | Fajkowski |
| 5,905,908 A | 5/1999 | Wagner |
| 5,907,830 A | 5/1999 | Engel et al. |
| 5,907,831 A | 5/1999 | Lotvin et al. |
| 5,909,023 A | 6/1999 | Ono et al. |
| 5,909,486 A | 6/1999 | Walker et al. |
| 5,911,418 A | 6/1999 | Adams |
| 5,913,210 A | 6/1999 | Call |
| 5,915,007 A | 6/1999 | Klapka |

## US 8,313,023 B1

Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5,915,019 | A | 6/1999 | Ginter et al. | 6,036,601 | A | 3/2000 | Heckel |
| 5,915,243 | A | 6/1999 | Smolen | 6,038,321 | A | 3/2000 | Torigai et al. |
| 5,915,244 | A | 6/1999 | Jack et al. | 6,039,244 | A | 3/2000 | Finsterwald |
| 5,918,211 | A | 6/1999 | Sloane | 6,039,648 | A | 3/2000 | Guinn |
| 5,918,213 | A | 6/1999 | Bernard et al. | 6,041,308 | A | 3/2000 | Walker et al. |
| 5,918,214 | A | 6/1999 | Perkowski | 6,041,309 | A | 3/2000 | Laor |
| 5,919,091 | A | 7/1999 | Bell | 6,044,360 | A | 3/2000 | Picciallo |
| 5,920,847 | A | 7/1999 | Kolling et al. | 6,047,269 | A | 4/2000 | Biffar |
| 5,923,016 | A | 7/1999 | Fredregill et al. | 6,048,269 | A | 4/2000 | Burns et al. |
| 5,933,811 | A | 8/1999 | Angles et al. | 6,049,778 | A | 4/2000 | Walker et al. |
| 5,935,000 | A | 8/1999 | Sanchez, III | 6,049,779 | A | 4/2000 | Berkson |
| 5,937,391 | A | 8/1999 | Ikeda et al. | 6,055,573 | A | 4/2000 | Gardenswartz et al. |
| 5,937,394 | A | 8/1999 | Wong et al. | 6,058,371 | A | 5/2000 | Djian |
| 5,938,727 | A | 8/1999 | Ikeda | 6,058,482 | A | 5/2000 | Liu |
| 5,940,506 | A | 8/1999 | Chang et al. | 6,061,660 | A | 5/2000 | Eggleston et al. |
| 5,941,771 | A | 8/1999 | Haste, III | 6,062,980 | A | 5/2000 | Luciano |
| 5,941,772 | A | 8/1999 | Paige | 6,064,979 | A | 5/2000 | Perkowski |
| 5,943,241 | A | 8/1999 | Nichols et al. | 6,064,987 | A | 5/2000 | Walker |
| 5,946,664 | A | 8/1999 | Ebisawa | 6,065,120 | A | 5/2000 | Laursen et al. |
| 5,947,820 | A | 9/1999 | Morro et al. | 6,068,533 | A | 5/2000 | Parker |
| 5,949,042 | A | 9/1999 | Dietz, II et al. | 6,068,553 | A | 5/2000 | Parker |
| 5,950,173 | A | 9/1999 | Perkowski | 6,072,468 | A | 6/2000 | Hocker et al. |
| 5,951,397 | A | 9/1999 | Dickinson | 6,073,840 | A | 6/2000 | Marion |
| 5,952,638 | A | 9/1999 | Demers et al. | 6,075,863 | A | 6/2000 | Krishnan et al. |
| 5,953,005 | A | 9/1999 | Liu | 6,076,101 | A | 6/2000 | Kamakura et al. |
| 5,956,038 | A | 9/1999 | Rekimoto | 6,078,898 | A | 6/2000 | Davis et al. |
| 5,956,695 | A | 9/1999 | Carrithers et al. | 6,081,900 | A | 6/2000 | Subramaniam et al. |
| 5,956,700 | A | 9/1999 | Landry | 6,088,730 | A | 7/2000 | Kato et al. |
| 5,959,277 | A | 9/1999 | Lucero | 6,089,982 | A | 7/2000 | Holch |
| 5,967,896 | A | 10/1999 | Jorasch et al. | 6,092,069 | A | 7/2000 | Johnson et al. |
| 5,970,469 | A | 10/1999 | Scroggie et al. | 6,092,201 | A | 7/2000 | Turnbull et al. |
| 5,970,470 | A | 10/1999 | Walker | 6,094,486 | A | 7/2000 | Marchant |
| 5,971,277 | A | 10/1999 | Cragun et al. | 6,098,837 | A | 8/2000 | Izawa |
| 5,974,135 | A | 10/1999 | Breneman et al. | 6,101,483 | A | 8/2000 | Petrovich et al. |
| 5,974,398 | A | 10/1999 | Hanson et al. | 6,101,484 | A | 8/2000 | Halbert et al. |
| 5,978,777 | A | 11/1999 | Garnier | 6,101,485 | A | 8/2000 | Fortenberry et al. |
| 5,979,757 | A | 11/1999 | Tracy et al. | 6,105,001 | A | 8/2000 | Masi et al. |
| 5,980,385 | A | 11/1999 | Clapper | 6,105,865 | A | 8/2000 | Hardesty |
| 5,982,520 | A | 11/1999 | Weiser et al. | 6,110,041 | A | 8/2000 | Walker et al. |
| 5,983,196 | A | 11/1999 | Wendkos | 6,110,042 | A | 8/2000 | Walker et al. |
| 5,983,205 | A | 11/1999 | Brams et al. | 6,113,098 | A | 9/2000 | Adams |
| 5,984,191 | A | 11/1999 | Chapin, Jr. | 6,113,495 | A | 9/2000 | Walker et al. |
| 5,988,500 | A | 11/1999 | Litman | 6,115,737 | A | 9/2000 | Ely et al. |
| 5,991,376 | A | 11/1999 | Hennessy et al. | 6,119,229 | A | 9/2000 | Martinez |
| 5,991,736 | A | 11/1999 | Ferguson et al. | 6,119,230 | A | 9/2000 | Carter |
| 5,992,738 | A | 11/1999 | Matsumoto et al. | 6,124,947 | A | 9/2000 | Sea |
| 5,992,752 | A | 11/1999 | Wilz, Sr. et al. | 6,128,599 | A | 10/2000 | Walker et al. |
| 5,993,316 | A | 11/1999 | Coyle | 6,128,603 | A | 10/2000 | Dent et al. |
| 5,995,942 | A | 11/1999 | Smith et al. | 6,129,274 | A | 10/2000 | Suzuki |
| 5,999,324 | A | 12/1999 | Hopkins | 6,131,810 | A | 10/2000 | Weiss et al. |
| 5,999,914 | A | 12/1999 | Blinn et al. | 6,134,318 | A | 10/2000 | O'Neil |
| 6,000,608 | A | 12/1999 | Dorf | 6,134,548 | A | 10/2000 | Gottsman et al. |
| 6,002,771 | A | 12/1999 | Nielsen | 6,138,911 | A | 10/2000 | Fredregill et al. |
| 6,003,013 | A | 12/1999 | Boushy et al. | 6,139,431 | A | 10/2000 | Walker et al. |
| 6,007,426 | A | 12/1999 | Kelly et al. | 6,141,161 | A | 10/2000 | Sato et al. |
| 6,009,411 | A | 12/1999 | Kepecs | 6,141,653 | A | 10/2000 | Conklin |
| 6,009,412 | A | 12/1999 | Storey | 6,141,684 | A | 10/2000 | McDonald et al. |
| 6,009,458 | A | 12/1999 | Hawkins | 6,145,739 | A | 11/2000 | Bertina et al. |
| 6,012,038 | A | 1/2000 | Hoffman et al. | 6,148,405 | A | 11/2000 | Liao et al. |
| 6,012,051 | A | 1/2000 | Sammon, Jr. et al. | 6,154,214 | A | 11/2000 | Uyehara et al. |
| 6,012,636 | A | 1/2000 | Smith | 6,161,096 | A | 12/2000 | Bell |
| 6,014,594 | A | 1/2000 | Heidel | 6,162,122 | A | 12/2000 | Acres |
| 6,014,634 | A | 1/2000 | Scroggie et al. | 6,164,533 | A | 12/2000 | Barton |
| 6,014,635 | A | 1/2000 | Harris et al. | 6,165,071 | A | 12/2000 | Weiss |
| 6,015,344 | A | 1/2000 | Kelly et al. | 6,168,522 | B1 | 1/2001 | Walker et al. |
| 6,016,476 | A | 1/2000 | Maes et al. | 6,173,267 | B1 | 1/2001 | Cairns |
| 6,018,695 | A | 1/2000 | Ahrens et al. | 6,178,407 | B1 | 1/2001 | Lotvin et al. |
| 6,018,718 | A | 1/2000 | Walker et al. | 6,178,408 | B1 | 1/2001 | Copple et al. |
| 6,018,724 | A | 1/2000 | Arent | 6,182,894 | B1 | 2/2001 | Hackett et al. |
| 6,021,399 | A | 2/2000 | Demers et al. | 6,183,362 | B1 | 2/2001 | Boushy |
| 6,024,640 | A | 2/2000 | Walker et al. | 6,183,366 | B1 | 2/2001 | Goldberg et al. |
| 6,026,370 | A | 2/2000 | Jermyn | 6,185,541 | B1 | 2/2001 | Scroggie et al. |
| 6,026,375 | A | 2/2000 | Hall et al. | 6,186,893 | B1 | 2/2001 | Walker et al. |
| 6,026,377 | A | 2/2000 | Burke | 6,186,894 | B1 | 2/2001 | Mayeroff |
| 6,032,133 | A | 2/2000 | Hilt et al. | 6,189,103 | B1 | 2/2001 | Nevarez et al. |
| 6,032,136 | A | 2/2000 | Brake, Jr. et al. | 6,193,608 | B1 | 2/2001 | Walker et al. |
| 6,032,955 | A | 3/2000 | Luciano et al. | 6,195,677 | B1 | 2/2001 | Utsumi |
| 6,035,280 | A | 3/2000 | Christensen | 6,196,458 | B1 | 3/2001 | Walker et al. |
| 6,035,281 | A | 3/2000 | Crosskey et al. | 6,199,099 | B1 | 3/2001 | Gershman et al. |

## US 8,313,023 B1

Page 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6,216,129 | B1 | 4/2001 | Eldering | 6,829,586 | B2 | 12/2004 | Postrel |
| 6,222,914 | B1 | 4/2001 | McMullin | 6,842,739 | B2 | 1/2005 | Postrel |
| 6,224,483 | B1 | 5/2001 | Mayeroff | 6,843,720 | B2 | 1/2005 | Luciano |
| 6,227,972 | B1 | 5/2001 | Walker et al. | 6,846,238 | B2 | 1/2005 | Wells |
| 6,229,533 | B1 | 5/2001 | Farmer | 6,852,031 | B1 | 2/2005 | Rowe |
| 6,231,442 | B1 | 5/2001 | Mayeroff | 6,856,976 | B2 | 2/2005 | Bible et al. |
| 6,234,896 | B1 | 5/2001 | Walker et al. | 6,866,586 | B2 | 3/2005 | Oberberger |
| 6,236,978 | B1 | 5/2001 | Tuzhilin | 6,898,570 | B1 | 5/2005 | Tedesco et al. |
| 6,243,688 | B1 | 6/2001 | Kalina | 6,915,271 | B1 | 7/2005 | Meyer et al. |
| 6,244,958 | B1 | 6/2001 | Acres | 6,920,611 | B1 | 7/2005 | Spaeth et al. |
| 6,249,773 | B1 | 6/2001 | Allard et al. | 6,929,550 | B2 | 8/2005 | Hisada |
| 6,267,671 | B1 | 7/2001 | Hogan | 6,931,538 | B1 | 8/2005 | Sawaguchi |
| 6,273,820 | B1 | 8/2001 | Haste, III | 6,947,898 | B2 | 9/2005 | Postrel |
| 6,280,326 | B1 | 8/2001 | Saunders | 6,951,302 | B2 | 10/2005 | Potts |
| 6,280,328 | B1 | 8/2001 | Holch | 6,985,876 | B1 | 1/2006 | Lee |
| 6,289,261 | B1 | 9/2001 | Heidel | 6,997,807 | B2 | 2/2006 | Weiss |
| 6,289,322 | B1 | 9/2001 | Kitchen et al. | 7,003,496 | B2 | 2/2006 | Ishii |
| 6,292,786 | B1 | 9/2001 | Deaton et al. | 7,025,674 | B2 | 4/2006 | Adams et al. |
| 6,293,865 | B1 | 9/2001 | Kelly et al. | 7,043,752 | B2 | 5/2006 | Royer et al. |
| 6,293,866 | B1 | 9/2001 | Walker et al. | 7,072,864 | B2 | 7/2006 | Brake, Jr. et al. |
| 6,293,867 | B1 | 9/2001 | Heidel | 7,096,190 | B2 | 8/2006 | Postrel |
| 6,298,335 | B1 | 10/2001 | Bernstein | 7,127,414 | B1 | 10/2006 | Awadallah et al. |
| 6,302,793 | B1 | 10/2001 | Fertitta, III | 7,128,652 | B1 | 10/2006 | Lavoie |
| 6,306,035 | B1 | 10/2001 | Kelly et al. | 7,130,828 | B2 | 10/2006 | Phillips et al. |
| 6,311,976 | B1 | 11/2001 | Yoseloff et al. | 7,134,959 | B2 | 11/2006 | Penrice |
| 6,312,333 | B1 | 11/2001 | Acres | 7,137,883 | B1 | 11/2006 | Falciglia |
| 6,315,665 | B1 | 11/2001 | Faith | 7,146,342 | B1 | 12/2006 | Angelin |
| 6,319,125 | B1 | 11/2001 | Acres | 7,168,089 | B2 | 1/2007 | Nguyen |
| 6,327,573 | B1 | 12/2001 | Walker et al. | 7,174,315 | B2 | 2/2007 | Phillips et al. |
| 6,332,099 | B1 | 12/2001 | Heidel | 7,187,947 | B1 | 3/2007 | White et al. |
| 6,332,157 | B1 | 12/2001 | Mighdoli et al. | 7,200,571 | B1 | 4/2007 | Jenninges et al. |
| 6,341,353 | B1 | 1/2002 | Herman | 7,249,139 | B2 | 7/2007 | Chuah |
| 6,345,261 | B1 | 2/2002 | Feidelson et al. | 7,249,197 | B1 | 7/2007 | Roestenburg et al. |
| 6,352,175 | B2 | 3/2002 | Izawa | 7,289,970 | B1 | 10/2007 | Siegel |
| 6,358,149 | B1 | 3/2002 | Schneider et al. | 7,290,061 | B2 | 10/2007 | Lentini et al. |
| 6,363,362 | B1 | 3/2002 | Burfield et al. | 7,291,064 | B2 | 11/2007 | Yamada |
| 6,379,247 | B1 | 4/2002 | Walker et al. | 7,321,901 | B1 | 1/2008 | Blinn et al. |
| 6,394,907 | B1 | 5/2002 | Rowe | 7,349,867 | B2 | 3/2008 | Rollins et al. |
| 6,402,029 | B1 | 6/2002 | Gangi | 7,360,693 | B1 | 4/2008 | Sullivan |
| 6,408,284 | B1 | 6/2002 | Hill et al. | 7,387,571 | B2 | 6/2008 | Walker |
| 6,431,983 | B2 | 8/2002 | Acres | 7,390,264 | B2 | 6/2008 | Walker |
| 6,438,527 | B1 | 8/2002 | Powar | 7,398,226 | B2 | 7/2008 | Haines et al. |
| 6,452,498 | B2 | 9/2002 | Stewart | 7,455,586 | B2 | 11/2008 | Nguyen |
| 6,476,830 | B1 | 11/2002 | Farmer | 7,613,629 | B2 | 11/2009 | Antonucci et al. |
| 6,484,940 | B1 | 11/2002 | Dilday et al. | 7,641,547 | B2 | 1/2010 | Walker et al. |
| 6,486,788 | B1 | 11/2002 | French et al. | 7,680,688 | B2 | 3/2010 | Hessburg |
| 6,491,584 | B2 | 12/2002 | Graham | 7,703,673 | B2 | 4/2010 | Buchheit et al. |
| 6,505,772 | B1 | 1/2003 | Mollett et al. | 7,747,463 | B1 | 6/2010 | Phillips et al. |
| 6,510,998 | B1 | 1/2003 | Stanford et al. | 7,765,124 | B2 | 7/2010 | Postrel |
| 6,511,377 | B1 | 1/2003 | Weiss | 7,827,056 | B2 | 11/2010 | Walker et al. |
| 6,522,889 | B1 | 2/2003 | Aarnio | 7,827,057 | B1 | 11/2010 | De Lapa et al. |
| 6,533,664 | B1 | 3/2003 | Crumby | 7,828,206 | B2 | 11/2010 | Hessburg et al. |
| 6,547,131 | B1 | 4/2003 | Foodman | 7,856,376 | B2 | 12/2010 | Storey |
| 6,549,912 | B1 | 4/2003 | Chen | 7,886,011 | B2 | 2/2011 | Buchheit |
| 6,554,705 | B1 | 4/2003 | Cumbers | 8,046,256 | B2 | 10/2011 | Chien et al. |
| 6,572,471 | B1 | 6/2003 | Bennett | 8,062,116 | B2 | 11/2011 | Lutnick et al. |
| 6,575,832 | B1 | 6/2003 | Manfredi et al. | 8,100,758 | B2 | 1/2012 | Walker et al. |
| 6,578,015 | B1 | 6/2003 | Haseltine et al. | 8,123,127 | B2 | 2/2012 | McGhie et al. |
| 6,579,179 | B2 | 6/2003 | Poole et al. | 8,162,209 | B2 | 4/2012 | Buchheit et al. |
| 6,601,040 | B1 | 7/2003 | Kolls | 8,181,863 | B1 | 5/2012 | McGhie et al. |
| 6,607,441 | B1 | 8/2003 | Acres | 8,181,864 | B2 | 5/2012 | McGhie et al. |
| 6,609,150 | B2 | 8/2003 | Lee et al. | 8,186,583 | B2 | 5/2012 | McGhie et al. |
| 6,609,969 | B1 | 8/2003 | Luciano | 8,201,734 | B1 | 6/2012 | McGhie et al. |
| 6,609,970 | B1 | 8/2003 | Luciano | 8,234,164 | B2 | 7/2012 | Walker et al. |
| 6,609,978 | B1 | 8/2003 | Paulsen | 2001/0032137 | A1 | 10/2001 | Bennett et al. |
| 6,623,357 | B2 | 9/2003 | Chowdhury | 2001/0032182 | A1 | 10/2001 | Kumar et al. |
| 6,631,358 | B1 | 10/2003 | Ogilvie | 2001/0032183 | A1 | 10/2001 | Landry |
| 6,631,849 | B2 | 10/2003 | Blossom | 2001/0034259 | A1 | 10/2001 | Luciano et al. |
| 6,645,077 | B2 | 11/2003 | Rowe | 2001/0034649 | A1 | 10/2001 | Acres |
| 6,648,755 | B1 | 11/2003 | Luciano, Jr. | 2001/0034653 | A1 | 10/2001 | Yamamoto |
| 6,656,050 | B2 | 12/2003 | Busch | 2001/0034720 | A1 | 10/2001 | Breck |
| 6,685,559 | B2 | 2/2004 | Luciano | 2001/0037295 | A1 | 11/2001 | Olsen |
| 6,687,679 | B1 | 2/2004 | Van Luchene et al. | 2001/0041610 | A1 | 11/2001 | Luciano et al. |
| 6,721,743 | B1 | 4/2004 | Sakakibara | 2001/0044337 | A1 | 11/2001 | Rowe |
| 6,748,365 | B1 | 6/2004 | Quinlan et al. | 2001/0046891 | A1 | 11/2001 | Acres |
| 6,800,029 | B2 | 10/2004 | Rowe | 2001/0047342 | A1 | 11/2001 | Cuervo |
| 6,813,609 | B2 | 11/2004 | Wilson | 2001/0054003 | A1 | 12/2001 | Chien et al. |
| 6,820,061 | B2 | 11/2004 | Postrel | 2002/0002075 | A1 | 1/2002 | Rowe |
| 6,826,594 | B1 | 11/2004 | Pettersen | 2002/0002532 | A1 | 1/2002 | Tso |

**US 8,313,023 B1**

Page 5

| | | | |
|---|---|---|---|
| 2002/0002538 | A1 | 1/2002 | Ling |
| 2002/0010025 | A1 | 1/2002 | Kelly et al. |
| 2002/0013728 | A1 | 1/2002 | Wilkman |
| 2002/0013767 | A1 | 1/2002 | Katz |
| 2002/0016734 | A1 | 2/2002 | McGill et al. |
| 2002/0020965 | A1 | 2/2002 | Potter |
| 2002/0026348 | A1 | 2/2002 | Fowler et al. |
| 2002/0039923 | A1 | 4/2002 | Cannon |
| 2002/0045476 | A1 | 4/2002 | Poole |
| 2002/0046110 | A1 | 4/2002 | Gallagher |
| 2002/0049631 | A1 | 4/2002 | Williams |
| 2002/0052940 | A1 | 5/2002 | Myers et al. |
| 2002/0055874 | A1 | 5/2002 | Cohen |
| 2002/0056044 | A1 | 5/2002 | Andersson |
| 2002/0062253 | A1 | 5/2002 | Dosh et al. |
| 2002/0065126 | A1 | 5/2002 | Miller et al. |
| 2002/0068624 | A1 | 6/2002 | Ellis |
| 2002/0069109 | A1 | 6/2002 | Wendkos |
| 2002/0069150 | A1 | 6/2002 | Ni |
| 2002/0072412 | A1 | 6/2002 | Young |
| 2002/0075844 | A1 | 6/2002 | Hagen |
| 2002/0077173 | A1 | 6/2002 | Luciano et al. |
| 2002/0077890 | A1 | 6/2002 | LaPointe et al. |
| 2002/0077978 | A1 | 6/2002 | O'Leary et al. |
| 2002/0082918 | A1 | 6/2002 | Warwick |
| 2002/0082920 | A1 | 6/2002 | Austin |
| 2002/0082990 | A1 | 6/2002 | Jones |
| 2002/0086733 | A1 | 7/2002 | Wang |
| 2002/0087468 | A1 | 7/2002 | Ganesan et al. |
| 2002/0091593 | A1 | 7/2002 | Fowler |
| 2002/0095365 | A1 | 7/2002 | Slavin et al. |
| 2002/0107072 | A1 | 8/2002 | Giobbi |
| 2002/0107733 | A1 | 8/2002 | Liu et al. |
| 2002/0111210 | A1 | 8/2002 | Luciano, Jr. |
| 2002/0111907 | A1 | 8/2002 | Ling |
| 2002/0111919 | A1 | 8/2002 | Weller et al. |
| 2002/0116257 | A1 | 8/2002 | Helbig |
| 2002/0120513 | A1 | 8/2002 | Webb et al. |
| 2002/0123949 | A1 | 9/2002 | VanLeeuwen |
| 2002/0143614 | A1 | 10/2002 | MacLean et al. |
| 2002/0146018 | A1 | 10/2002 | Kailamaki et al. |
| 2002/0147047 | A1 | 10/2002 | Letovsky |
| 2002/0152116 | A1 | 10/2002 | Yan |
| 2002/0160838 | A1 | 10/2002 | Kim |
| 2002/0161630 | A1 | 10/2002 | Kern et al. |
| 2002/0169021 | A1 | 11/2002 | Urie |
| 2002/0169660 | A1 | 11/2002 | Taylor et al. |
| 2002/0177479 | A1 | 11/2002 | Walker |
| 2002/0194069 | A1 | 12/2002 | Thakur et al. |
| 2002/0198043 | A1 | 12/2002 | Chowdhury |
| 2003/0003996 | A1 | 1/2003 | Nguyen |
| 2003/0004802 | A1 | 1/2003 | Callegari |
| 2003/0004808 | A1 | 1/2003 | Elhaossine et al. |
| 2003/0008707 | A1 | 1/2003 | Walker et al. |
| 2003/0009379 | A1 | 1/2003 | Narasimhan et al. |
| 2003/0013438 | A1 | 1/2003 | Darby |
| 2003/0018523 | A1 | 1/2003 | Rappaport et al. |
| 2003/0033534 | A1 | 2/2003 | Rand |
| 2003/0036425 | A1 | 2/2003 | Kaminkow et al. |
| 2003/0040964 | A1 | 2/2003 | Lacek |
| 2003/0045353 | A1 | 3/2003 | Paulsen |
| 2003/0050831 | A1 | 3/2003 | Klayh |
| 2003/0055722 | A1 | 3/2003 | Perreault et al. |
| 2003/0055780 | A1 | 3/2003 | Hansen et al. |
| 2003/0060264 | A1 | 3/2003 | Chilton |
| 2003/0061097 | A1 | 3/2003 | Walker |
| 2003/0062242 | A1 | 4/2003 | Hallowell et al. |
| 2003/0069787 | A1 | 4/2003 | Tendon et al. |
| 2003/0069842 | A1 | 4/2003 | Kight et al. |
| 2003/0074311 | A1 | 4/2003 | Saylors et al. |
| 2003/0078094 | A1 | 4/2003 | Gatto |
| 2003/0083943 | A1 | 5/2003 | Adams et al. |
| 2003/0087650 | A1 | 5/2003 | Aarnio |
| 2003/0087692 | A1 | 5/2003 | Weiss |
| 2003/0101131 | A1 | 5/2003 | Warren et al. |
| 2003/0104862 | A1 | 6/2003 | Acres |
| 2003/0104865 | A1 | 6/2003 | Itkis |
| 2003/0106769 | A1 | 6/2003 | Weiss |
| 2003/0115456 | A1 | 6/2003 | Kapoor |
| 2003/0130948 | A1 | 7/2003 | Algiene et al. |
| 2003/0148807 | A1 | 8/2003 | Acres |
| 2003/0163425 | A1 | 8/2003 | Cannon, Jr. |
| 2003/0182218 | A1 | 9/2003 | Blagg |
| 2003/0186747 | A1 | 10/2003 | Nguyen |
| 2003/0187762 | A1 | 10/2003 | Coyle |
| 2003/0200142 | A1 | 10/2003 | Hicks et al. |
| 2003/0200144 | A1 | 10/2003 | Antonucci et al. |
| 2003/0208445 | A1 | 11/2003 | Compiano |
| 2003/0211883 | A1 | 11/2003 | Potts |
| 2003/0216960 | A1 | 11/2003 | Postrel |
| 2003/0216967 | A1 | 11/2003 | Williams |
| 2003/0228902 | A1 | 12/2003 | Walker |
| 2003/0229584 | A1 | 12/2003 | Brown |
| 2003/0236749 | A1 | 12/2003 | Shergalis |
| 2004/0002369 | A1 | 1/2004 | Walker et al. |
| 2004/0006531 | A1 | 1/2004 | Kwan |
| 2004/0015438 | A1 | 1/2004 | Compiano et al. |
| 2004/0019522 | A1 | 1/2004 | Bortolin |
| 2004/0019560 | A1 | 1/2004 | Evans et al. |
| 2004/0035923 | A1 | 2/2004 | Kahr |
| 2004/0039644 | A1 | 2/2004 | Postrel |
| 2004/0039692 | A1 | 2/2004 | Shields et al. |
| 2004/0043806 | A1 | 3/2004 | Kirby |
| 2004/0048658 | A1 | 3/2004 | Sanders |
| 2004/0049439 | A1 | 3/2004 | Johnston et al. |
| 2004/0053093 | A1 | 3/2004 | An |
| 2004/0068438 | A1 | 4/2004 | Mitchell |
| 2004/0078273 | A1 | 4/2004 | Loeb et al. |
| 2004/0097287 | A1 | 5/2004 | Postrel |
| 2004/0098317 | A1 | 5/2004 | Postrel |
| 2004/0107140 | A1 | 6/2004 | Postrel |
| 2004/0111346 | A1 | 6/2004 | Macbeath |
| 2004/0111366 | A1 | 6/2004 | Schneider |
| 2004/0128197 | A1 | 7/2004 | Barn |
| 2004/0143500 | A1 | 7/2004 | Lopez |
| 2004/0143501 | A1 | 7/2004 | Lopez |
| 2004/0158492 | A1 | 8/2004 | Lopez |
| 2004/0173673 | A1 | 9/2004 | Potts |
| 2004/0215505 | A1 | 10/2004 | Sullivan |
| 2004/0220854 | A1 | 11/2004 | Postrel |
| 2004/0229671 | A1 | 11/2004 | Stronach |
| 2004/0262381 | A1 | 12/2004 | Mesaros |
| 2005/0015332 | A1 | 1/2005 | Chen |
| 2005/0021399 | A1 | 1/2005 | Postrel |
| 2005/0021400 | A1 | 1/2005 | Postrel |
| 2005/0021401 | A1 | 1/2005 | Postrel |
| 2005/0021457 | A1 | 1/2005 | Johnston et al. |
| 2005/0043082 | A1 | 2/2005 | Peterson |
| 2005/0060225 | A1 | 3/2005 | Postrel |
| 2005/0080727 | A1 | 4/2005 | Postrel |
| 2005/0080728 | A1 | 4/2005 | Sobek |
| 2005/0096124 | A1 | 5/2005 | Stronach |
| 2005/0107155 | A1 | 5/2005 | Potts et al. |
| 2005/0137015 | A1 | 6/2005 | Rogers |
| 2005/0143174 | A1 | 6/2005 | Goldman |
| 2005/0149394 | A1 | 7/2005 | Postrel |
| 2005/0177428 | A1 | 8/2005 | Ganz |
| 2005/0177519 | A1 | 8/2005 | Block |
| 2005/0182693 | A1 | 8/2005 | Alivandi |
| 2005/0192864 | A1 | 9/2005 | Ganz |
| 2005/0240472 | A1 | 10/2005 | Postrel |
| 2005/0250415 | A1 | 11/2005 | Barthold |
| 2005/0261056 | A1 | 11/2005 | Smolucha |
| 2006/0004629 | A1 | 1/2006 | Neemann et al. |
| 2006/0020511 | A1 | 1/2006 | Postrel |
| 2006/0035692 | A1 | 2/2006 | Kirby |
| 2006/0046827 | A1 | 3/2006 | Saffari et al. |
| 2006/0052150 | A1 | 3/2006 | Hedrick et al. |
| 2006/0063580 | A1 | 3/2006 | Nguyen |
| 2006/0079150 | A1 | 4/2006 | Filoseta |
| 2006/0100018 | A1 | 5/2006 | Ganz |
| 2006/0148559 | A1 | 7/2006 | Jordan |
| 2006/0178217 | A1 | 8/2006 | Jung |
| 2006/0178899 | A1 | 8/2006 | Jung |
| 2006/0178964 | A1 | 8/2006 | Jung |
| 2006/0178965 | A1 | 8/2006 | Jung |
| 2006/0178966 | A1 | 8/2006 | Jung |
| 2006/0178967 | A1 | 8/2006 | Jung |

**US 8,313,023 B1**

Page 6

| | | | |
|---|---|---|---|
| 2006/0178968 | A1 | 8/2006 | Jung |
| 2006/0178970 | A1 | 8/2006 | Jung |
| 2006/0178972 | A1 | 8/2006 | Jung |
| 2006/0178975 | A1 | 8/2006 | Jung |
| 2006/0178985 | A1 | 8/2006 | Jung |
| 2006/0195376 | A1 | 8/2006 | Jung |
| 2006/0195377 | A1 | 8/2006 | Jung |
| 2006/0195378 | A1 | 8/2006 | Jung |
| 2006/0195394 | A1 | 8/2006 | Jung |
| 2006/0205481 | A1 | 9/2006 | Dominelll |
| 2006/0224505 | A1 | 10/2006 | Jung |
| 2006/0229976 | A1 | 10/2006 | Jung |
| 2007/0073582 | A1 | 3/2007 | Jung |
| 2007/0087822 | A1 | 4/2007 | Van Luchene |
| 2007/0167218 | A1 | 7/2007 | Rothschild |
| 2007/0168266 | A1 | 7/2007 | Questember |
| 2007/0239523 | A1 | 10/2007 | Yi |
| 2008/0086759 | A1 | 4/2008 | Colson |
| 2009/0023490 | A1 | 1/2009 | Moshal et al. |
| 2010/0174600 | A1 | 7/2010 | Walker et al. |
| 2010/0222675 | A1 | 9/2010 | Luxton et al. |
| 2010/0248823 | A1 | 9/2010 | Smith |
| 2011/0151976 | A1 | 6/2011 | Holloway |
| 2011/0183749 | A1 | 7/2011 | Allen |
| 2011/0207525 | A1 | 8/2011 | Allen |
| 2011/0256924 | A1 | 10/2011 | McGhie et al. |
| 2011/0275432 | A1 | 11/2011 | Lutnick et al. |
| 2012/0041810 | A1 | 2/2012 | Hofer |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2497399 | 11/1999 |
| AU | 2497499 | 11/1999 |
| AU | 2497599 | 11/1999 |
| AU | 199924973 | 11/1999 |
| AU | 199924974 | 11/1999 |
| AU | 199924975 | 11/1999 |
| AU | 3018500 | 11/2000 |
| AU | 200030185 | 11/2000 |
| EP | 0308224 | 3/1989 |
| EP | 0525363 | 2/1993 |
| EP | 0949596 | 10/1999 |
| EP | 1107196 | 6/2001 |
| EP | 1399897 | 3/2004 |
| GB | 2319381 | 5/1998 |
| GB | 2333879 | 8/1999 |
| GB | 2380687 | 4/2003 |
| JP | 8235276 | 9/1996 |
| JP | 2003132224 | 5/2003 |
| WO | W09215174 A1 | 3/1992 |
| WO | WO9215174 A1 | 3/1992 |
| WO | 9323817 | 11/1993 |
| WO | 9416781 | 8/1994 |
| WO | 9713228 | 4/1997 |
| WO | 9748078 | 12/1997 |
| WO | 9926176 | 5/1999 |
| WO | 9930256 | 6/1999 |
| WO | 9952051 | 10/1999 |
| WO | 9960503 | 11/1999 |
| WO | 0014665 | 3/2000 |
| WO | 0031658 | 6/2000 |
| WO | 0033159 | 6/2000 |
| WO | 0033222 | 6/2000 |
| WO | 0079461 | 12/2000 |
| WO | 0101282 | 1/2001 |
| WO | 0152078 | 7/2001 |
| WO | 0157617 | 8/2001 |
| WO | 0164306 | 9/2001 |
| WO | WO200506113 | 1/2005 |
| WO | 200582480 | 9/2005 |
| WO | 2006020413 | 2/2006 |
| WO | 2009094395 | 7/2009 |

OTHER PUBLICATIONS

"Amazon.com and Netflix.com Establish Promotional Relationship for the Sale and Rental of DVD Titles" Business Wire Dec. 4, 1998, 3 pp.

Brook, Valerie. "GM turns up the heat with plan to cross-sell some financial products." Nov. 18, 1994 http://www.americanbanker.com/issues/159__150/-49630-1.html?zkPrintable=true.

"Beneficial, Casual Male Team Up on Card", American Banker. May 4, 1998. http://www.americanbanker.com.

"E-Centives," (http://www.emaginet.com/de...memfaq.shtml), download date: May 23, 1999, 3 pp. X.

Bloom, Jennifer Kingson. "Wal-Mart on Retail Road Less Traveled: Cobranding," The American Banker Sep. 11, 1998, 3 pp.

Elkin, Tobi "Promotions: Mastercard Wins Coveted On-Pack Real Estate in Tie-in with Microsoft" Brandweek Sep. 14, 1998, 1 page.

"Microsoft and First USA Announces $90 Million Online Advertising Alliance" EDP Weekly's IT Monitor Nov. 2, 1998, 2 pp.

Feldman, Amy "Paying with Plastic Not Such a Smart Idea", New York Daily News Nov. 4, 1998, 2 pp.

Cowell, Alan "America's Turn to Colonize; Creditcard Issuers Invade Britain, with U.S. Firepower", The New York Times Nov. 12, 1998, 5 pp.

Armstrong, Larry, "The Free-PC Game: Lure 'Em in and Lock 'Em Up," Business Week, Information Technology, Jul. 19, 1999, 1 pg.

"Shoppers Charge Accounts Co. to Administer Private Label Credit Card for Lew Magram LTD; Program Marks SCA,s Entry into Retail Catalog/Mail Order Industry" PR Newswire Jun. 29, 1998, 6 pp.

"About Click Rewards." Wired Magazine. http://www.wired.com/wired/subscribe/clickmiles.html.

Souccar, Miriam K. "Epidemic of Rate Shopping Spurs a Search for remedies," Jan. 7, 1999, Copyright 1999 American Banker, Inc.

"Wellsparks Group Launches V.I.P. Rewards; The Most Comprehensive Relationship Marketing Program Ever Created by a Mall Developer", Business wire May 19, 1998, 2 pp.

"Jay Jacobs Inc. Introduces Private Label Credit Card", Business Wire May 18, 1998, 1 page.

Meece, Mickey "Big Finance Companies May Want Piece of Limited's Private-Label Card Program", The American Banker Apr. 12, 1995, 2 pp.

"Points Earn Little Credit as Cardholders Fail to Cash in" Birmingham Post May 9, 1998, 2 pp.

"Card Briefs: Beneficial, Casual Male Team Up on Card" The American Banker May 4, 1998 1 pg.

AAdvantage Auction "Experience More with You AAdvantage Miles". http://www.aa.com/il8n/urls/auction.jsp?anchorLocation=DirectURL.&title=auction.

Wald, Matthew L. "Spending It; Untying Cellular Phones From Those Annual Contracts" The New York Times Mar. 15, 1998, 2 pp.

Wijnen, Renee "Cendant Eyes Cross-Marketing Opportunities; CUC International-HFS Inc. Merger Expected to Yield an Additional 2 Million Club Members" DM News Feb. 2, 1998, 2 pp.

Sanders, Edmund "Tricky Business; The Magic of Rebate Cards can Quickly Disappear", Chicago Tribune Aug. 18, 1997, 3 pp.

Simon, Ruth "Make Sure Your Rebate Card Still Delivers the Goods", Money Aug. 1997, 2 pp.

Selasky, Susan "Easy-To-Swallow Savings; Diner Credit Cards Serve Wide menu of Discounts", Pittsburgh Post-Gazette Dec. 5, 1996, 3 pp.

"Chemical Bank and AT&T Smart Cards form Strategic Alliance", www.att.com/press/1193/931117.blb.html, 3 pp.

Kristof, Kathy "Card Sharks are in Season; be Wary of Discounts and Rebates as You Shop Around for Good Credit Deals", Chicago Tribune, Nov. 23, 1993, 2 pp.

Wessel, Harry "Rewarding Experience?; Credit Cards Offering Bonuses Not for Everyone", Chicago Poet-Gazette Dec. 5, 1996, 3 pp.

Ross, Chuck et al., "Coke Card promotion set for '98", (http //adage com/news.sub.—and.sub.—features/features/19971117/article3 html), Copyright Nov. 1997, 2 pg.

Singletary, Michelle, "Electronic World, Unchecked Problem?", The Washington Post, Mar. 4, 1997, Section: Financial, p. C01, 4 pp.

Ellin, Abby, "Listening to an Earful for Savings," (Hear the Pitches and talk for Free), The New York Times, Jan. 24, 1999, 1 pg.

Cox, Beth, "Visa, Travelweb Enter Online Marketing Partnership," Internetnews.com, Jan. 21, 1999, 1 pg.

Tedesco, Richard. "Pactel Pushes Net Access." Broadcasting & Cable. Jun. 3, 1996, pp. 64-65.

US 8,313,023 B1

Page 7

Colman, Price. "Cross-marketing Cuts Cable Bills." Broadcasting & Cable. Jul. 15, 1996, p. 44, 2 pp.

O'Brien, Timothy L., "The Market: Market Place—Taking the Danger out of Danger out of Risk; Chase says Models Helped it avoid Financial Minefields," The New York Times Business/Financial Desk, Jan. 20, 1999 Section C. col. 2 at p. 1, 4 pp.

"Rent from NetFlix.com Buy from Amazon.com," Official Press Release, Jan. 17, 1999, 1 pg.

"Let's Play the Cash Register Receipts Lottery", The New York Times, Dec. 25, 1990, Section: Section 1, p. 30, col. 4, Editorial Desk, 1 pg.

Dennis, Sylvia. "Visa Gets ready for Interactive Set-Top Boxes," Newsbytes, Dec. 14, 1998, 2 pp.

"Philips offers customers financing through Citicorp; Philips Medical Systems North America, Citicorp North America Inc." Health Industry Today, Jun. 1991, Section: vol. 54, No. 6, p. 4, ISSN: 0745-4678, 1 page.

Sinclair, Stewart. "To Mail or Not to Mail?" Strategy, Strategy Directresponse Special Report, Couponing, Oct. 12, 1998 at p. D21, 4 pp.

"Winn-Dixie/The Salvation Army Report Contributions for War Against Hunger", PR Newswire, Jun. 10, 1993, Section: Financial News, 1 pg.

Armstrong, Larry. "Coupon Clippers, save Your Scissors," Vons Supermarkets are Revolutionizing the Delivery of Discounts. Business week, Jun. 20, 1994, No. 3377 at p. 164, 2 pp.

Patch, Kimberly, "Sled InterNIC Debut Internet Services; Sled Corp Offers Electronic Coupons for Encryption software; InteNIC Information Services Launches InfoGuide to Internet Computer Network" PC Week, May 16, 1994 vol. 11 No. 19 at p. 130, ISSN: 0740-1604, 1 page.

"American Eagle Outfitters" PR Newswire. Mar. 26, 2010. www. printthis.clickability.com/pt/cpt?expire=&title= American+Eagle+Outfitters%2C+Inc.+Introduces+the . . . .

Andreoli, Tom et al., "Cash Machines Offer a Whole Lotto Money . . . ", Crain's Chicago Business, Jun. 19, 1995, Section: News, p. 8, 2 pp.

Brochure: "MyPoints (R)", MotivationNet, Inc. (TM), Homepage: www.mypoints.com, Copyright: Apr. 1998, 29 pp.

Bonnici, Joseph et al., "Consumer issues in coupon usage: An exploratory analysis", Journal of Applied Business Research, winter 1996/ 1997, vol. 13, No. 1, pp. 31-40, ISSNn: 0892-7626, CODEN: JPBEBK, 11 pp.

Hoeschen, Brad. "Brookfield Square Hopes Mall Card Strikes a Chord," Business Journal-Milwaukee, vol. 14, No. 50, p. 19, Sep. 12, 1997, 2 pp.

Armstrong, Larry. "The Free-PC Game: Lure 'Em in and Lock 'Em Up". Jul. 19, 1999 http://www.businessweek.com/1999/99__29/ b3638169.htm?scriptFramed.

Iverson, Mark. "DataCard Partners With CSI to Offer Card-Based Loyalty Solution to Merchants." Jul. 19, 1998 http://www. thefreelibrary.com/_/print/PrintArticle.aspx?id=20883274.

"Cardbriefs: Stored-Value Card Designed for Casinos", The American Banker, Oct. 31, 1995, Section: Credit/Debit/ATMS, 1 pg.

"Tecmark Reward Terminal", (http //www tecmarkinc com/terminal htm), copyright, 1996 Tecmark Services, Inc., 1 pg.

WAP WTLS: Wireless Application Protocol Wireless Transport Layer Security Specification, Wireless Applications Forum, Limited, Apr. 30, 1998. [Retrieved on Jan. 19, 2009]. Retrieved from the Internet <Oct. 7, 2008>.

Fallon: "UK Retailers Loyal Customer 'Card Wars' Prove costly (Most major retailers in the UK have grown their sales over the past 2 years by lunching loyalty-card program" ; Supermarket News, May 5, 1997; vol. 47, No. 18, p. 57

Booker, Ellis, "Checkout lines to offer more than just candy and waiting", Computer World, May 21, 1990, 1 pg.

Fickenscher, Lisa, "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patters", The American Banker, Mar. 24, 1997, Credit/Debit/ATMS, 2 pp.

Fickenscher, Lisa, "Amex to Start Free Rewards Program with Discounts on Merchandise", The American Banker, Oct. 18, 1996, Section: Credit/Debit/ATMS, p. 10, 2 pp.

Fitzgerald, Kate, "Amex program moves loyalty to next level: Custom Extras finds a medium customers can't ignore: Billing Statements", Advertising Age, Nov. 4, 1996, Section: News, 2 pp.

Amato-McCoy, Deena, "Co-Branded Acme Credit Card Rewards Loyal Users" Supermarket News, Jun. 15, 1998, Section: p. 17, ISSN: 0039-5803, 2 pages "DataCard Partners With CSI to Offer Card-Based Loyalty Solution to Merchants", Business Wire, Jul. 9, 1998, 1 pg.

Albright, Mark, "Grocery savings via Web coupons", St. Petersburg Times, Jul. 22, 1998, Section: Business, 2 pp.

Notice of Allowance; U.S. Appl. No. 13/441,365; Mailing Date Jun. 16, 2012.

Non Final Rejection dated May 4, 2012; U.S. Appl. No. 13/428,656; pp. 1-6.

Notice of Allowance; U.S. Appl. No. 13/428,656; Mailing Date May 15, 2012.

Non Final Rejection dated Mar. 6, 2012; U.S. Appl. No. 13/359,120; pp. 1-7.

Notice of Allowance; U.S. Appl. No. 13/359,120; Mailing Date Apr. 18, 2012.

Non Final Rejection dated Mar. 12, 2012; U.S. Appl. No. 13/359,104; pp. 1-8.

Notice of Allowance; U.S. Appl. No. 13/359,104; Mailing Date Apr. 13, 2012.

Non Final Rejection dated Mar. 6, 2012; U.S. Appl. No. 13/359,080; pp. 1-11.

Notice of Allowance; U.S. Appl. No. 13/359,080; Mailing date Apr. 11, 2012.

Non Final Rejection dated Jan. 10, 2012; U.S. Appl. No. 12/759,506; pp. 1-10.

Notice of Allowance; U.S. Appl. No. 12/759,506; Mail date Mar. 5, 2012.

Non Final Rejection dated Dec. 15, 2012; U.S. Appl. No. 12/720,743; pp. 1-10.

Notice of Allowance; U.S. Appl. No. 12/720,743; Mailing date Jan. 24, 2012.

Non Final Rejection dated May 12, 2009; U.S. Appl. No. 11/420,255; pp. 1-7.

Notice of Allowance; U.S. Appl. No. 11/420,255; Mailing Date Dec. 16, 2009.

Case 2:13-cv-00655-WCB   Document 117-3   Filed 08/15/14   Page 34 of 67 PageID #:  2064

Case 1:14-cv-01782-GBD   Document 13-2   Filed 04/14/14   Page 8 of 16



**FIG. 1**

200
Ecommerce Site 210
Mr. Smith, you have 3 items in your shopping cart.
Purchase Options:
Credit Card
Check
E-wards
215
E-wards Account 220
Mr. Smith:
Airline Rewards
10,000
Loyalty Rewards
2,000
Entertainment Rewards
100.00
Funds
$100.00
222
Convert Checked Credits to Funds
225
E-wards Account 230
Mr. Smith,
You have selected to pay $100 credits (1 credit = 1 USD) to Ecommerce Site.
Is this correct?
Yes
Cancel
232
233
Ecommerce Site 240
Receipt
Mr. Smith, we have received your payment of $100.00 for 3 items.
Thank You

FIG. 2

Case 2:13-cv-00655-WCB   Document 117-3   Filed 08/15/14   Page 36 of 67 PageID #: 2066

Case 1:14-cv-01782-GBD   Document 13-2   Filed 04/14/14   Page 10 of 16



_300_

Consumer logs onto a rewards Web site

305

Rewards web site accesses user account information to determine the quantity of user earned non-negotiable credits

310

Consumer elects to redeem the non-negotiable credits

315

Consumer optionally selects a conversion form for the non-negotiable credits

320

A conversion ratio is determined, either internally through the rewards Web site or via a system that is remote and/or independent of the Web site, and a selected type of negotiable funds

325

An electronic commerce transaction is initiated to establish a converted quantity of negotiable funds in a user account

330

The quantity of converted non-negotiable credits is subtracted from the user's account

335

Consumer is presented via the rewards Web site with an access means for using the negotiable credits

340

Consumer logs off of the rewards Web site

345

**FIG. 3**

US 8,313,023 B1

**1**

EXCHANGE OF NON-NEGOTIABLE
CREDITS OF AN ENTITY'S REWARDS
PROGRAM FOR ENTITY INDEPENDENT
FUNDS

CROSS-REFERENCE TO RELATED
APPLICATIONS

This continuation application claims the benefit of U.S. patent application Ser. No. 11/420,255 filed 25 May 2006 entitled "Web Based Conversion of Non-Negotiable Credits Associated with an Entity to Entity Independent Negotiable Funds." The entire contents of U.S. application Ser. No. 11/420,255 are incorporated by reference herein.

BACKGROUND

The present disclosure relates to the field of exchanging non-negotiable credits for entity independent funds.

Entities often reward consumers for utilizing their services with non-negotiable credits, such as frequent flier miles, consumer loyalty points, and entertainment credits. These non-negotiable credits can be applied towards products and/or services provided by a granting entity or its affiliates. For example, consumers can apply frequent flyer credits towards the purchase of airline tickets or airline upgrades. In another example, a consumer can utilize purchase points from a credit card company to receive percentage discounts on goods provided by affiliates. In still another example, entertainment credits can be redeemed for prizes offered in a winnings storefront of an entertainment site.

Many problems are inherent to the current techniques for the redemption of entity provided credits. One such problem is the restriction on usage to goods and/or services of the entity. That is, a consumer may have no need for the products or services listed by the entity for which the non-negotiable credits can be redeemed. Further, additional restrictions and limitations can be placed upon the non-negotiable credits that lessen the usefulness of non-negotiable credits from the consumer's perspective. For instance, airlines often limit the choice of travel dates, known as black-out dates, to which frequent flyer credits can be applied.

Another problem encountered by consumers when redeeming non-negotiable credits is time. Once a consumer submits a request to redeem their non-negotiable credits, the consumer must wait for the entity to perform one or more actions required to fulfill their request. These steps often require days or weeks to complete. For instance, consumers participating in online entertainment sites often are required to wait a minimum of three days for their entertainment credits to be redeemed. Redemption delay can be particularly aggravating to e-commerce consumers, who by nature of an e-commerce marketplace expect rapid responses and immediate consumer gratification.

Time can also be a factor for redeeming credits having an associated expiration date. A consumer's non-negotiable credits may expire before a sufficient quantity is acquired for a desired purchase. Lesser purchases requiring fewer credits may not have a significant appeal for the consumer. Hence, credit expiration dates can further decrease the consumer value of non-negotiable credits.

Yet another problem with conventional implementation of non-negotiable credits is that consumers often belong to multiple credit-earning programs that provide the consumers with multiple incompatible forms of non-negotiable credit. Each of these multiple programs can span a single industry or can span multiple industries. For example, a consumer can acquire a moderate number of frequent flyer miles with multiple airlines, where each airline specific account contains insufficient credits to have any meaningful consumer value. Consumers can also have many different types of non-negotiable credits, such as multiple merchant specific credit, credit card credits, and frequent flier miles, each having different redemption values and program redemption rules. These different programs, values, and rules can understandably confuse and frustrate consumers, who due to their confusion, often elect to avoid participating in an entity sponsored credit program.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWINGS

FIG. **1** is a schematic diagram of a Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

FIG. **2** is a schematic diagram of successive GUIs that illustrate the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

FIG. **3** is a flow chart of a method for the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

DETAILED DESCRIPTION

The present disclosure permits consumers to transform non-negotiable credits provided by an entity to negotiable funds in an approximately immediate fashion using the Web. More specifically, a conversion agency can function as an intermediary that converts entity provided credits into entity independent funds. The conversion agency can be an independent entity that is not directly affiliated with the credit providing entities.

The conversion can occur automatically using a Web initiated action and can have approximately immediate results. Approximately immediate as used herein can signify that a transaction can occur within a single Web session with user acceptable delay tolerances, typically under half an hour and often under a few minutes. In one embodiment, credits can be automatically converted to funds as part of an e-commerce checkout. In another embodiment, credits can be converted into a user accessible account held with a financial institution.

The present disclosure can be implemented in accordance with numerous aspects consistent with material presented herein. For example, one aspect of the present disclosure can include a method for converting credits to funds. The method can include a step of a Web site receiving user identification information. Non-negotiable credits can be identified that are associated with an entity with which the user has previously interacted. The previous interactions could have earned the non-negotiable credits. Responsive to a user request, a conversion agency can convert a quantity of the non-negotiable credits into a quantity of negotiable funds. The conversion agency can be an agency not directly associated with the entity. The user can be permitted to access the quantity of negotiable funds. The quantity of negotiable funds can be applied to user specified purchases. At least a portion of the purchases can involve at least one vender that does not honor the non-negotiable credits.

Another aspect of the present disclosure can include a software method for converting non-negotiable credits into

US 8,313,023 B1

3

negotiable funds. The method can receive a user request to convert a quantity of non-negotiable credits held in a user account associated with an entity. A conversion rate between the non-negotiable credits available to the user and a form of negotiable funds can be automatically determined. A quantity of non-negotiable credits can be automatically subtracted from the user account. A quantity of the negotiable funds based upon the determined conversion rate and quantity of subtracted funds can be automatically transferred to a financial account. The financial account can be an account that is not associated with the entity. The entire method can occur in an approximately immediate fashion.

Still another aspect of the present disclosure can include a Web-based credit to fund conversion system. The system can include a non-negotiable credit account, a negotiable funds account, and a conversion agency. The non-negotiable credit account can be associated with an entity. Non-negotiable credits contained within the non-negotiable credit account can be earned though previous interactions between a user and the entity. The negotiable funds account can include negotiable funds that the user is able to apply to user specified e-commerce purchases. One or more venders involved in the e-commerce purchases can be venders that do not honor the non-negotiable credits for the e-commerce purchases. The conversion agency can automatically and approximately immediately convert a quantity of credits from the non-negotiable credit account to a quantity of funds in the negotiable funds account responsive to a request from the user.

It should be noted that various aspects of the disclosure can be implemented as a program for controlling computing equipment to implement the functions described herein, or a program for enabling computing equipment to perform processes corresponding to the steps disclosed herein. This program may be provided by storing the program in a magnetic disk, an optical disk, a semiconductor memory, or any other recording medium. The program can also be provided as a digitally encoded signal conveyed via a carrier wave. The described program can be a single program or can be implemented as multiple subprograms, each of which interact within a single computing device or interact in a distributed fashion across a network space.

It should also be noted that the methods detailed herein can also be methods performed at least in part by a service agent and/or a machine manipulated by a service agent in response to a service request.

FIG. 1 is a schematic diagram of a Web based conversion of non-negotiable credits associated with an entity to entity independent funds system 100 in accordance with an embodiment of the inventive arrangements disclosed herein. System 100 includes consumer 105 and conversion agency server 130.

Consumer 105 interacts with conversion agency server 130 via client 110. Client 110 can be any of a variety of interfaces including, but not limited to, another human being, a personal computer, a kiosk, a graphical user interface (GUI), a Web page, a telephone, a personal data assistant (PDA), a mobile phone, and the like.

Client 110 can operate in a stand-alone fashion. Alternatively, client 110 can be a device that cooperatively participates in a network of distributed computing devices. Client 110 can also be another human being utilizing an alternate form of Client 110 to access conversion agency server 130 via network 115. Network 115 can facilitate data exchanges over wireless as well as line-based communication pathways and protocols.

Both consumer 105 and conversion agency server 130 can interact with associate server 150, e-commerce server 120,

4

and financial institution server 140 via network 115. Conversion agency server 130 includes user account data store 135 in which consumer 105 is a member. Associate server 150 includes customer data store 155 in which consumer 105 is a member. Financial institution server 140 includes account data store 142. Account data store 142 includes conversion agency account 144 corresponding to conversion agency 130.

Consumer 105 earns non-negotiable credits from associate server 150. The quantity of these non-negotiable credits is saved in customer data store 155. The method in which consumer 105 earns credits can be any of a variety of activities including, but not limited to, making online purchases, making in-store purchases, playing online games, participating in online games of chance, participating in surveys, and the like. Consumer 105 uses conversion agency server 130 to convert the non-negotiable credits from associate server 150 into negotiable funds provided by e-commerce server 120 or financial institution 140. In one embodiment, conversion agency 130 can include multiple reward accounts of consumer 105.

For example, consumer 105 earns five hundred credits from participating in an online game of chance hosted by associate server 150. Consumer 105 can choose to use conversion agency 130 to convert any or all of these credits to a monetary equivalent. Conversion agency 130 withdraws the necessary amount from conversion agency account 144 contained within the account data store 142 of financial institution 140 and transfers it to an account specified by consumer 105. In another example, consumer 105 uses conversion agency 130 to complete a purchase at e-commerce server 120. Again, conversion agency 130 withdraws the necessary amount from conversion agency account 144 contained within the account data store 142 of financial institution 140 and transfers it to the account of e-commerce server 120.

E-commerce server 120 can be any Web site that supports online purchases of goods or services. In one embodiment, e-commerce server 120 can include a distinct payment option for conversion agency 130. This distinct payment option could process the conversion of credits through their Web site. Alternatively, the distinct payment option could launch an application to process the conversion of credit that is separate from their Web site. In another embodiment, associate server 150 can act as e-commerce server 120.

Financial institution server 140 can be any of a variety of entities including, but not limited to, a bank, a credit card company, an investment firm, and the like. In one embodiment, financial institution server 140 can reside in the same country as consumer 105 and/or associate server 150. In another embodiment, financial institution server 140 can reside in a country other than that of consumer 105 and/or associate server 150.

FIG. 2 is a schematic diagram of successive GUIs that illustrate the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system 200 in accordance with an embodiment of the inventive arrangements disclosed herein.

GUI 210 can be a checkout window from any e-commerce site. GUI 210 includes payment button 215. Payment button 215 can represent a payment option that includes the conversion of non-negotiable credits to purchase the items in the shopping cart. Selection of payment button 215 by a user can produce GUI 220.

GUI 220 can be a display window from a conversion agency. GUI 220 includes display box 222 and button 225. GUI 220 can be rendered by any of a variety of means including, but not limited to, a Web browser, a JAVA applet, a PERL script, and the like. In one embodiment, GUI 220 can be

US 8,313,023 B1

5

contained within the e-commerce site. GUI **220** can display the balance of non-negotiable credits from one or more reward programs. GUI **220** contains a means by which the user selects the type of non-negotiable credits to convert including, but not limited to, a set of radio buttons, a set of checkboxes, a highlighting mechanism, and the like. Display box **222** can display the monetary value of the selected non-negotiable credits. The value displayed in display box **222** can be based on preset conversion factors. Button **225** can represent the initiation of the process by which the selected non-negotiable credits are converted to negotiable funds. Selection of button **225** by a user can produce GUI **230**.

GUI **230** can be a display window from a conversion agency. GUI **230** includes yes button **232** and cancel button **233**. GUI **230** can be rendered by any of a variety of means including, but not limited to, a Web browser, a JAVA applet, a PERL script, and the like. In one embodiment, GUI **230** can be contained within the e-commerce site. GUI **230** can display a summary message of the transaction initiated by GUI **220**. GUI **230** can include a means to continue the transaction, yes button **232**, and a means to cancel the transaction, cancel button **233**. Selection of cancel button **233** by a user cancels the transaction and can return the user to GUI **220**. Selection of yes button **232** by a user completes the transaction initiated in GUI **220** and can produce GUI **240**.

GUI **240** can be a display window from the same said e-commerce site. GUI **240** can contain a message acknowledging the successful conversion of the user's non-negotiable credits into negotiable funds for the purchase of the items in the shopping cart.

FIG. **3** is a flow chart of a method **300** for the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

Method **300** can begin in step **305**, where a consumer logs onto a rewards Web site. In step **310**, the rewards Web site utilizes the user information provided in step **305** to access the consumer's account information and display the amount of non-negotiable credits in the consumer's account. The consumer elects to redeem some quantity of non-negotiable credits in step **315**. If supported by the rewards Web site, step **320** can occur in which the consumer can select the form of negotiable funds to convert the non-negotiable credits. In step **325**, a ratio is determined for the conversion of the non-negotiable credits to the selected type of negotiable funds. This ratio can be determined by any of a variety of means including, but not limited to, an algorithm internal to the rewards Web site, an algorithm contained in a system that is remote and/or independent of the rewards Web site, and the like. An electronic commerce transaction is initiated in step **330** to establish the converted amount of negotiable funds in a user account. The quantity of converted non-negotiable credits is subtracted from the user's account in step **335**. In step **340**, the rewards Web site presents the consumer with an access means for the negotiable funds. Lastly, the consumer terminates the session by logging off the rewards Web site in step **345**.

The present disclosure may be realized in hardware, software, or a combination of hardware and software. The present disclosure may be realized in a centralized fashion in one computer system or in a distributed fashion where different elements are spread across several interconnected computer systems. Any kind of computer system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general purpose computer system with a computer pro-

6

gram that, when being loaded and executed, controls the computer system such that it carries out the methods described herein.

The present disclosure also may be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

This disclosure may be embodied in other forms without departing from the spirit or essential attributes thereof. Accordingly, reference should be made to the following claims, rather than to the foregoing specification, as indicating the scope of the disclosure.

What is claimed is:

1. A method comprising:

at least one of one or more computers identifying non-negotiable credits earned as part of a rewards program of an entity that provides a payment artifact, the non-negotiable credits being accrued or earned by charging amounts to an account linked to the payment artifact, the amounts charged being for goods or services purchased using the payment artifact, wherein the reward program credits are stored as digitally encoded information in at least one storage device, wherein the goods or services purchased are purchased from at least one different entity than the entity;

at least one of one or more computers receiving a request to transfer or convert a quantity of the non-negotiable credits to entity independent funds of a commerce partner, the commerce partner being a company that is not the entity; and

responsive to the request to transfer or convert the quantity of non-negotiable funds, at least one of one or more computers transferring or converting at least a subset of the non-negotiable credits into entity independent funds that the commerce partner accepts for goods or services that the commerce partner provides, wherein a plurality of the non-negotiable credits being converted or transferred into the entity independent funds the commerce partner does not accept the non-negotiable credits for the goods or services that the commerce partner provides.

2. The method of claim **1**, wherein the converting or transferring of the subset of the non-negotiable credits into entity independent funds permits access to the entity independent funds thereby enabling purchases of the goods or services that the commerce partner provides.

3. The method of claim **1**, wherein charging amounts to the account linked to the payment artifact occurs as part of a set of previous interactions involving a member participating in the rewards program and the entity that provides the payment artifact.

4. The method of claim **1**, wherein the one or more computers are computers for serving content of a Web site, wherein the Web site is used for converting or transferring the quantity of non-negotiable funds into the entity independent funds.

5. The method of claim **1**, wherein a point of sale device is a device from which the request to transfer the quantity of the non-negotiable credits originates.

US 8,313,023 B1

7

**6**. The method of claim **1**, further comprising:

responsive to the transferring or converting of the subset of non-negotiable credits, at least one of the one or more computers subtracting the subset of non-negotiable credits from a total number of available non-negotiable credits earned through the rewards program.

**7**. The method of claim **1**, further comprising:

at least one of the one or more computers identifying a ratio for transferring or converting the non-negotiable credits into entity independent funds; and

at least one of the one or more computers transferring or converting the subset of the non-negotiable credits into entity independent funds in accordance with the identified ratio.

**8**. The method of claim **1**, wherein the payment artifact is a credit card, and wherein the non-negotiable credits are reward program points for the rewards program associated with the credit card.

**9**. The method of claim **1**, wherein per terms of the rewards program, the non-negotiable credits have no cash or monetary value, wherein the non-negotiable credits are accrued in proportion to the amount charged to the account.

**10**. The method of claim **1**, wherein the non-negotiable credits have a restriction on use related to an expiration date, whereby the non-negotiable credits either have an expiration date, have an expiration date triggered by a previously defined condition related to a status of the account linked to the payment artifact, or the entity has expressly reserved a right of imposing an expiration date on already accrued non-negotiable credits.

**11**. The method of claim **1**, wherein a single one of the one or more computers performs the identifying of the non-negotiable credits, the receiving of the request, and the converting or transferring of the non-negotiable credits to entity-independent funds.

**12**. The method of claim **1**, wherein a plurality of the one or more computers performs the identifying of the non-negotiable credits, the receiving of the request, and the converting or transferring of the non-negotiable credits to entity-independent funds.

**13**. The method of claim **1**, wherein each of the one or more computers comprises computing equipment having at least one processor executing program instructions that are digitally encoded in at least one storage device.

**14**. The method of claim **1**, wherein the entity charges members participating in the rewards program a fee for converting or transferring the non-negotiable credits into entity-independent funds.

**15**. The method of claim **1**, wherein the entity-independent funds are loyalty points of a program of a company or organization that is not the entity.

**16**. A method comprising:

at least one of one or more computers establishing a rewards program for credit cards, the credit cards being referred to herein as payment artifacts, wherein each of the payment artifacts are provided by an entity to one or more card holders, wherein card holders participating in the rewards program are referred to herein as members;

at least one of one or more computers accruing non-negotiable credits, referred to as membership reward points, in response to one of the payment artifacts being used for purchases of goods or services with venders accepting the payment artifact, wherein a quantity of non-negotiable credits accrued is directly proportional to amounts spent for the purchases using the payment artifact, wherein the non-negotiable credits have restrictions on use, wherein the restrictions on use prevent the non-

8

negotiable credits from being directly applied for a purchase of at least one goods or services of a commerce partner, wherein the commerce partner is an independent entity from the entity; and

at least one of one or more computers subtracting a quantity of the non-negotiable credits in response to the purchase of the goods or services, the purchase costing a quantity of entity independent funds, the entity independent funds resulting from a conversion of the subtracted quantity of non-negotiable credits into the entity independent funds in accordance with a credit to fund conversion ratio, wherein the entity provides compensation for the subtracted quantity of the non-negotiable credits, wherein the commerce partner receives at least a portion of the compensation.

**17**. The method of claim **16**, wherein the compensation is in negotiable funds.

**18**. The method of claim **16**, wherein a conversion agency converts the non-negotiable credits into the entity independent funds.

**19**. The method of claim **18**, where the conversion agency is not the entity.

**20**. The method of claim **16**, wherein each of the one or more computers comprises computing equipment having at least one processor executing program instructions that are digitally encoded in at least one storage device.

**21**. The method of claim **16**, wherein a single one of the one or more computers performs the accruing and subtracting of the non-negotiable credits.

**22**. The method of claim **16**, wherein the entity charges members participating in the rewards program a fee for converting or transferring the non-negotiable credits into entity independent funds.

**23**. The method of claim **16**, wherein the entity-independent funds are loyalty points of a program of the commerce partner.

**24**. The method of claim **16**, wherein the entity-independent funds are negotiable funds.

**25**. The method of claim **16**, wherein per terms of the rewards program, the non-negotiable credits have no cash or monetary value, and wherein the non-negotiable credits have at least one restriction on use related to an expiration date, whereby the non-negotiable credits either have an expiration date, have an expiration date triggered by a previously defined condition related to a status of the account linked to the payment artifact, or the entity has expressly reserved a right of imposing an expiration date on already accrued non-negotiable credits.

**26**. The method of claim **16**, wherein the entity provides the non-negotiable credits to incentive the card holders to utilize the payment artifacts for the purchase with venders, wherein the entity charges the venders that accept the payment artifact in accordance with a vender charged ratio of the amounts spent.

**27**. A method comprising:

at least one of one or more computers establishing an account for non-negotiable credits provided by an entity to one or more users, wherein the established account is a rewards program account, wherein the non-negotiable credits are reward program points, wherein the entity provides credit cards to the one or more users, wherein usage of the credit cards earns the reward program points;

at least one of one or more computers detecting interactions in which one of the credit cards is utilized for one or more purchases, each of the interactions earning a quantity of non-negotiable credits, wherein the quantity

US 8,313,023 B1

9

of non-negotiable credits from the interactions are added to the account, wherein in absence of a conversion operation that converts the non-negotiable credits to entity independent funds, the at least one commerce partner does not accept the non-negotiable credits for a sale of goods or services provided by the commerce partner; and

at least one of one or more computers subtracting a quantity of the non-negotiable credits from the account, the subtracted quantity of non-negotiable credits corresponding to a quantity of entity independent funds in accordance with a conversion rate established for the conversion operation that converts the non-negotiable credits to the entity independent funds, wherein the quantity of entity independent funds resulting from the conversion operation are able to be exchanged with the commerce partner for goods or services provided by the commerce partner.

**28**. The method of claim **27**, wherein the entity-independent funds are negotiable funds.

**29**. The method of claim **27**, wherein the entity-independent funds are loyalty points of a program of the commerce partner.

**30**. A computer program product comprising:

one or more non-transitory computer-readable medium;

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to establish a rewards program for credit cards, the credit cards being referred to herein as payment artifacts, wherein each of the payment artifacts are provided by an entity to one or more card holders, wherein card holders participating in the rewards program are referred to herein as members;

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to accrue non-negotiable credits, referred to as membership reward points, in response to one of the payment artifacts being used for purchases of goods or services with venders accepting the payment artifact, wherein a quantity of non-negotiable credits accrued is directly proportional to amounts spent for the purchases using the payment artifact, wherein the non-negotiable credits have restrictions on use, wherein the restrictions on use prevent the non-negotiable credits from being directly applied for a purchase of at least one goods or services of a commerce partner, wherein the commerce partner is an independent entity from the entity; and

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to subtract a quantity of the non-negotiable credits in response to the purchase of the goods or services, the purchase costing a quantity of entity independent funds, the entity independent funds resulting from a conversion of the subtracted quantity of non-negotiable credits into the entity independent funds in accordance with a credit to fund conversion ratio, wherein the entity provides compensation for the subtracted quantity of the non-negotiable credits, wherein the commerce partner receives at least a portion of the compensation.

**31**. A method comprising:

a commerce partner agreeing to accept transfers or conversions of quantities of non-negotiable credits to entity independent funds in accordance with a credits-to-funds ratio, wherein the non-negotiable credits have been earned as part of a rewards program of an entity, wherein the commerce partner accepts the entity independent funds for goods or services that the commerce partner provides, wherein in absence of the non-negotiable cred-

10

its being converted or transferred into the entity independent funds the commerce partner does not accept the non-negotiable credits for the goods or services that the commerce partner provides, wherein the entity-independent funds are loyalty points of a loyalty program of the commerce partner;

at least one of one or more computers detecting a communication over a network to grant a consumer a quantity of the entity independent funds, wherein the quantity of entity independent funds results from a conversion or transfer of at least a subset of the non-negotiable credits into the quantity of entity independent funds in accordance with the credit-to-funds ratio, wherein the subset of the non-negotiable credits are expended as part of the conversion or transfer, and wherein the commerce partner is compensated for providing the entity independent funds to the consumer;

responsive to the communication, at least one of one or more computers granting the consumer the quantity of the entity independent funds; and

the at least one of the one or more computers accepting at least a portion of the quantity of entity independent funds in exchange for the goods or services that the commerce partner provides, wherein the one or more computers do not accept the non-negotiable credits of the entity's rewards program for the goods or services in absence of the conversion or transfer.

**32**. The method of claim **31**, wherein the granting of the quantity of entity independent funds comprises:

at least one of the one or more computers accessing a loyalty program account for the loyalty program that the commerce partner maintains for the consumer; and

at least one of the one or more computers adding the quantity of entity independent funds, referred to as loyalty points, to an existing quantity of loyalty points for the consumer, wherein records for the loyalty program account are maintained by the one or more computers within one or more non-transitory storage mediums.

**33**. The method of claim **32**, further comprising:

at least one of the one or more computers completing a sale of the goods or services, where the consumer expends at least the portion of the quantity of entity independent funds in exchange for the goods or services that the commerce partner provides.

**34**. The method of claim **31**, further comprising:

at least one of the one or more computers transferring or converting the subset of the non-negotiable credits into the quantity of entity independent funds in accordance with the credit-to-funds ratio.

**35**. The method of claim **31**, wherein the entity, the commerce partner, or both charges members participating in the rewards program or the loyalty program a fee for converting or transferring the subset of non-negotiable credits into the quantity of entity-independent funds.

**36**. The method of claim **31**, wherein a single one of the one or more computers detects the communication, grants the consumer the quantity of entity independent funds, and accepts the portion of the quantity of entity independent funds.

**37**. The method of claim **31**, wherein a plurality of different ones of the one or more computers detects the communication, grants the consumer the quantity of entity independent funds, and accepts the portion of the quantity of entity independent funds.

**38**. The method of claim **31**, wherein the one or more computers are owned by or operated for the commerce partner.

US 8,313,023 B1

11

**39**. A computer program product comprising:

one or more non-transitory computer-readable mediums;

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to detect a communication over a network to grant a consumer a quantity of entity independent funds, wherein the quantity of entity independent funds results from a conversion or transfer of at least a subset of non-negotiable credits into the quantity of entity independent funds in accordance with a credit-to-funds ratio, wherein the subset of the non-negotiable credits are expended as part of the conversion or transfer, and wherein the commerce partner is compensated for providing the entity independent funds to the consumer, wherein the commerce partner agrees to accept transfers or conversions of quantities of the non-negotiable credits to entity independent funds in accordance with the credits-to-funds ratio, wherein the non-negotiable credits have been earned as part of a rewards program of the entity, wherein the commerce partner accepts the entity independent funds for goods or services that the commerce partner provides, wherein in absence of the non-negotiable credits being converted into the entity independent funds the commerce partner does not accept the non-negotiable credits for the goods or services that the commerce partner provides, wherein the entity-independent funds are loyalty points of a loyalty program of the commerce partner;

one or more non-transitory computer-readable mediums;

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to, responsive to the communication, grant the consumer the quantity of the entity independent funds; and

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to accept at least a portion of the quantity of entity independent funds in exchange for the goods or services that the commerce partner provides, wherein, per the program instructions, the non-negotiable credits are not accepted for the goods or services in absence of the conversion or transfer.

**40**. The computer program product of claim **39**, wherein the program instructions to grant of the quantity of entity independent funds comprise:

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to access a loyalty program account for the loyalty program that the commerce partner maintains for the consumer; and

12

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to add the quantity of entity independent funds, referred to as loyalty points, to an existing quantity of loyalty points for the consumer, wherein records for the loyalty program account are maintained by the one or more computers within one or more non-transitory storage mediums.

**41**. The computer program product of claim **39**, further comprising:

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to complete a sale of the goods or services, where the consumer expends at least the portion of the quantity of entity independent funds in exchange for the goods or services that the commerce partner provides.

**42**. The computer program product of claim **39**, further comprising:

program instructions, stored on at least one of the one or more non-transitory computer-readable mediums, to transfer or convert the subset of the non-negotiable credits into the quantity of entity independent funds in accordance with the credit-to-funds ratio.

**43**. The computer program product of claim **39**, wherein the entity, the commerce partner, or both charges members participating in the rewards program or the loyalty program a fee for converting or transferring the subset of non-negotiable credits into the quantity of entity-independent funds.

**44**. The computer program product of claim **39**, wherein a single computer executes the program instructions to detect the communication, the program instructions to grant the consumer the quantity of entity independent funds, and the program instructions to accept the portion of the quantity of entity independent funds.

**45**. The computer program product of claim **39**, wherein a plurality of different computers communicating with each other execute the program instructions to detect the communication, the program instructions to grant the consumer the quantity of entity independent funds, and the program instructions to accept the portion of the quantity of entity independent funds.

**46**. The computer program product of claim **39**, wherein the one or more computers upon which the program instructions are loaded and executed are owned by or operated for the commerce partner.

*    *    *    *    *

US008511550B1

(12) **United States Patent**
McGhie et al.

(10) Patent No.: **US 8,511,550 B1**
(45) Date of Patent: ***Aug. 20, 2013**

(54) **GRAPHICAL USER INTERFACE FOR THE CONVERSION OF LOYALTY POINTS VIA A LOYALTY POINT WEBSITE**

(71) Applicants: **Sean I. McGhie**, Boca Raton, FL (US); **Brian K. Buchheit**, Davie, FL (US)

(72) Inventors: **Sean I. McGhie**, Boca Raton, FL (US); **Brian K. Buchheit**, Davie, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/863,556**

(22) Filed: **Apr. 16, 2013**

**Related U.S. Application Data**

(63) Continuation of application No. 11/420,255, filed on May 25, 2006, now Pat. No. 7,703,673, and a continuation of application No. 13/532,342, filed on Jun. 25, 2012, now Pat. No. 8,297,502, and a continuation-in-part of application No. 13/681,479, filed on Nov. 20, 2012, and a continuation-in-part of application No. 13/681,493, filed on Nov. 20, 2012.

(51) **Int. Cl.**
*G06K 5/00* (2006.01)

(52) **U.S. Cl.**
USPC ........... **235/380**; 235/375; 235/379; 235/487; 463/25

(58) **Field of Classification Search**
USPC ........... 235/380, 375, 379, 487, 486; 705/14, 705/39; 463/25
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,918,716 A | 11/1975 | Nonaka et al. | |
| 4,087,660 A | 5/1978 | Sedley | |
| 4,358,672 A | 11/1982 | Hyatt et al. | |
| 4,473,825 A | 9/1984 | Walton | |
| 4,518,098 A | 5/1985 | Fleischer | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 6484498 | 11/1998 |
| AU | 2497399 | 11/1999 |

(Continued)

OTHER PUBLICATIONS

Joan Magretta—"Why Business Models Matter" Harvard Business Review—May 2002 pp. 1-8.

(Continued)

*Primary Examiner* — Edwyn Labaze
(74) *Attorney, Agent, or Firm* — Patents on Demand, P.A.; Brian K. Buchheit; Scott M. Garrett

(57) **ABSTRACT**

In one embodiment, a graphical user interface includes a conversion option to convert at least a subset of non-negotiable credits earned from one into entity independent funds in accordance with a conversion ratio. The entity independent funds are accepted by a commerce partner as at least partial payment for goods or services provided by the commerce partner. In absence of converting the non-negotiable credits into entity independent funds, the commerce partner does not accept the non-negotiable credits as payment for goods or services. Responsive to a received selection of the conversion option, the computer presents within the graphical user interface a quantity of available entity independent funds for use as payment for the goods or services provided by the commerce partner. The quantity of available entity independent funds results from converting the subset of non-negotiable credits into the quantity of available entity independent funds in accordance with the conversion ratio.

**20 Claims, 3 Drawing Sheets**



## US 8,511,550 B1
Page 2

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,546,241 | A | 10/1985 | Walton |
| 4,582,324 | A | 4/1986 | Koza et al. |
| 4,607,155 | A | 8/1986 | Nao et al. |
| 4,609,812 | A | 9/1986 | Drexler |
| 4,621,814 | A | 11/1986 | Stephan et al. |
| 4,634,848 | A | 1/1987 | Shinohara et al. |
| 4,689,742 | A | 8/1987 | Troy et al. |
| 4,695,053 | A | 9/1987 | Vazquez |
| 4,760,527 | A | 7/1988 | Sidley |
| 4,764,666 | A | 8/1988 | Bergeron |
| 4,882,473 | A | 11/1989 | Bergeron et al. |
| 4,910,672 | A | 3/1990 | Off et al. |
| 4,941,090 | A | 7/1990 | McCarthy |
| 4,942,090 | A | 7/1990 | Morin |
| 4,968,873 | A | 11/1990 | Dethloff |
| 5,025,372 | A | 6/1991 | Burton et al. |
| 5,038,022 | A | 8/1991 | Lucero |
| 5,056,019 | A | 10/1991 | Schultz et al. |
| 5,080,364 | A | 1/1992 | Seidman |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,117,355 | A | 5/1992 | McCarthy |
| 5,128,752 | A | 7/1992 | Von Kohorn |
| 5,135,224 | A | 8/1992 | Yamamoto |
| 5,173,851 | A | 12/1992 | Off et al. |
| 5,179,517 | A | 1/1993 | Sarbin et al. |
| 5,200,889 | A | 4/1993 | Mori |
| 5,201,010 | A | 4/1993 | Deaton et al. |
| 5,202,826 | A | 4/1993 | McCarthy |
| 5,233,514 | A | 8/1993 | Ayyoubi et al. |
| 5,237,620 | A | 8/1993 | Deaton et al. |
| 5,256,863 | A | 10/1993 | Ferguson et al. |
| 5,265,874 | A | 11/1993 | Dickinson |
| 5,276,312 | A | 1/1994 | McCarthy |
| 5,287,268 | A | 2/1994 | McCarthy |
| 5,287,269 | A | 2/1994 | Dorrough et al. |
| 5,290,033 | A | 3/1994 | Bittner et al. |
| 5,305,196 | A | 4/1994 | Deaton et al. |
| 5,327,508 | A | 7/1994 | Deaton et al. |
| 5,332,076 | A | 7/1994 | Ziegert |
| 5,344,144 | A | 9/1994 | Cannon |
| 5,353,218 | A | 10/1994 | De Lapa et al. |
| 5,371,345 | A | 12/1994 | LeStrange et al. |
| 5,373,440 | A | 12/1994 | Cohen et al. |
| 5,382,779 | A | 1/1995 | Gupta |
| 5,388,165 | A | 2/1995 | Deaton et al. |
| 5,393,061 | A | 2/1995 | Manship et al. |
| 5,397,125 | A | 3/1995 | Adams |
| 5,398,932 | A | 3/1995 | Eberhardt et al. |
| 5,402,872 | A | 4/1995 | Clurman |
| 5,424,524 | A | 6/1995 | Ruppert et al. |
| 5,429,361 | A | 7/1995 | Raven et al. |
| 5,430,644 | A | 7/1995 | Deaton et al. |
| 5,434,394 | A | 7/1995 | Roach et al. |
| 5,448,471 | A | 9/1995 | Deaton et al. |
| 5,457,306 | A | 10/1995 | Lucero |
| 5,467,269 | A | 11/1995 | Flaten |
| 5,470,079 | A | 11/1995 | LeStrange et al. |
| 5,471,669 | A | 11/1995 | Lidman |
| 5,477,038 | A | 12/1995 | Levine et al. |
| 5,483,444 | A | 1/1996 | Heintzeman et al. |
| 5,491,326 | A | 2/1996 | Marceau et al. |
| 5,502,636 | A | 3/1996 | Clarke |
| 5,511,781 | A | 4/1996 | Wood et al. |
| 5,513,102 | A | 4/1996 | Auriemma |
| 5,535,407 | A | 7/1996 | Yanagawa et al. |
| 5,537,314 | A | 7/1996 | Kanter |
| 5,551,692 | A | 9/1996 | Pettit et al. |
| 5,559,312 | A | 9/1996 | Lucero |
| 5,559,313 | A | 9/1996 | Claus et al. |
| 5,564,546 | A | 10/1996 | Molbak et al. |
| 5,564,700 | A | 10/1996 | Celona |
| 5,580,309 | A | 12/1996 | Piechowiak |
| 5,586,936 | A | 12/1996 | Bennett et al. |
| 5,592,560 | A | 1/1997 | Deaton et al. |
| 5,609,337 | A | 3/1997 | Clapper, Jr. |
| 5,612,868 | A | 3/1997 | Off et al. |
| 5,613,912 | A | 3/1997 | Slater |
| 5,621,812 | A | 4/1997 | Deaton et al. |
| 5,635,696 | A | 6/1997 | Dabrowski |
| 5,638,457 | A | 6/1997 | Deaton et al. |
| 5,642,485 | A | 6/1997 | Deaton et al. |
| 5,643,088 | A | 7/1997 | Vaughn et al. |
| 5,644,723 | A | 7/1997 | Deaton et al. |
| 5,649,114 | A | 7/1997 | Deaton et al. |
| 5,649,115 | A | 7/1997 | Schrader et al. |
| 5,655,961 | A | 8/1997 | Acres et al. |
| 5,659,469 | A | 8/1997 | Deaton et al. |
| 5,672,109 | A | 9/1997 | Natanian |
| 5,673,322 | A | 9/1997 | Pepe et al. |
| 5,674,128 | A | 10/1997 | Holch et al. |
| 5,675,662 | A | 10/1997 | Deaton et al. |
| 5,677,952 | A | 10/1997 | Blakley, III et al. |
| 5,687,322 | A | 11/1997 | Deaton et al. |
| 5,689,100 | A | 11/1997 | Carrithers |
| 5,697,611 | A | 12/1997 | Kelly et al. |
| 5,708,782 | A | 1/1998 | Larson et al. |
| 5,710,886 | A | 1/1998 | Christensen et al. |
| 5,715,399 | A | 2/1998 | Bezoz |
| 5,725,428 | A | 3/1998 | Achmuller |
| 5,729,693 | A | 3/1998 | Holda-Fleck |
| 5,734,838 | A | 3/1998 | Robinson et al. |
| 5,741,183 | A | 4/1998 | Acres |
| 5,742,845 | A | 4/1998 | Wagner |
| 5,749,075 | A | 5/1998 | Toader et al. |
| 5,754,655 | A | 5/1998 | Hughes |
| 5,761,647 | A | 6/1998 | Boushy |
| 5,761,648 | A | 6/1998 | Golden et al. |
| 5,765,141 | A | 6/1998 | Spector |
| 5,766,075 | A | 6/1998 | Cook et al. |
| 5,769,716 | A | 6/1998 | Saffari et al. |
| 5,770,533 | A | 6/1998 | Franchi |
| 5,774,868 | A | 6/1998 | Cragun et al. |
| 5,774,869 | A | 6/1998 | Toader |
| 5,774,870 | A | 6/1998 | Storey |
| 5,779,242 | A | 7/1998 | Kaufmann |
| 5,779,549 | A | 7/1998 | Walker et al. |
| 5,794,230 | A | 8/1998 | Horadan et al. |
| 5,802,275 | A | 9/1998 | Blonder |
| 5,806,043 | A | 9/1998 | Toader |
| 5,806,044 | A | 9/1998 | Powell |
| 5,806,045 | A | 9/1998 | Biorge et al. |
| 5,809,482 | A | 9/1998 | Strisower |
| 5,814,796 | A | 9/1998 | Benson et al. |
| 5,816,918 | A | 10/1998 | Kelly et al. |
| 5,820,460 | A | 10/1998 | Fulton |
| 5,822,230 | A | 10/1998 | Kikinis et al. |
| 5,823,874 | A | 10/1998 | Adams |
| 5,832,457 | A | 11/1998 | O'Brien et al. |
| 5,832,458 | A | 11/1998 | Jones |
| 5,833,536 | A | 11/1998 | Davids et al. |
| 5,834,748 | A | 11/1998 | Litman |
| 5,836,817 | A | 11/1998 | Acres |
| 5,839,117 | A | 11/1998 | Cameron et al. |
| 5,844,230 | A | 12/1998 | Lalonde |
| 5,845,259 | A | 12/1998 | West et al. |
| 5,848,399 | A | 12/1998 | Burke |
| 5,851,148 | A | 12/1998 | Brune et al. |
| 5,855,007 | A | 12/1998 | Jovicic et al. |
| D404,436 | S | 1/1999 | McGahn et al. |
| 5,857,175 | A | 1/1999 | Day et al. |
| 5,864,822 | A | 1/1999 | Baker, III |
| RE36,116 | E | 2/1999 | McCarthy |
| 5,870,722 | A | 2/1999 | Albert et al. |
| 5,876,284 | A | 3/1999 | Acres et al. |
| 5,882,261 | A | 3/1999 | Adams |
| 5,882,262 | A | 3/1999 | Balhorn |
| 5,884,277 | A | 3/1999 | Khosla |
| 5,892,827 | A | 4/1999 | Beach et al. |
| 5,892,900 | A | 4/1999 | Ginter et al. |
| 5,892,905 | A | 4/1999 | Brandt et al. |
| 5,898,838 | A | 4/1999 | Wagner |
| 5,902,184 | A | 5/1999 | Bennett |
| 5,902,983 | A | 5/1999 | Crevelt et al. |
| 5,903,874 | A | 5/1999 | Leonard et al. |

**US 8,511,550 B1**

Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5,903,880 | A | 5/1999 | Biffar | 6,021,399 | A | 1/2000 | Demers et al. |
| 5,905,246 | A | 5/1999 | Fajkowski | 6,024,640 | A | 2/2000 | Walker et al. |
| 5,905,908 | A | 5/1999 | Wagner | 6,026,370 | A | 2/2000 | Jermyn |
| 5,907,830 | A | 5/1999 | Engel et al. | 6,026,375 | A | 2/2000 | Hall et al. |
| 5,907,831 | A | 5/1999 | Lotvin et al. | 6,026,377 | A | 2/2000 | Burke |
| 5,909,023 | A | 6/1999 | Ono et al. | 6,032,133 | A | 2/2000 | Hilt et al. |
| 5,909,486 | A | 6/1999 | Walker et al. | 6,032,136 | A | 2/2000 | Brake, Jr. et al. |
| 5,911,418 | A | 6/1999 | Adams | 6,032,955 | A | 3/2000 | Luciano et al. |
| 5,913,210 | A | 6/1999 | Call | 6,035,280 | A | 3/2000 | Christensen |
| 5,915,007 | A | 6/1999 | Klapka | 6,035,281 | A | 3/2000 | Crosskey et al. |
| 5,915,019 | A | 6/1999 | Ginter et al. | 6,036,601 | A | 3/2000 | Heckel |
| 5,915,243 | A | 6/1999 | Smolen | 6,038,321 | A | 3/2000 | Torigai et al. |
| 5,915,244 | A | 6/1999 | Jack et al. | 6,039,244 | A | 3/2000 | Finsterwald |
| 5,918,211 | A | 6/1999 | Sloane | 6,039,648 | A | 3/2000 | Guinn |
| 5,918,213 | A | 6/1999 | Bernard et al. | 6,041,308 | A | 3/2000 | Walker et al. |
| 5,918,214 | A | 6/1999 | Perkowski | 6,041,309 | A | 3/2000 | Laor |
| 5,919,091 | A | 7/1999 | Bell | 6,044,360 | A | 3/2000 | Picciallo |
| 5,920,847 | A | 7/1999 | Kolling et al. | 6,047,269 | A | 4/2000 | Biffar |
| 5,923,016 | A | 7/1999 | Fredregill et al. | 6,048,269 | A | 4/2000 | Burns et al. |
| 5,933,811 | A | 8/1999 | Angles et al. | 6,049,778 | A | 4/2000 | Walker et al. |
| 5,935,000 | A | 8/1999 | Sanchez, III | 6,049,779 | A | 4/2000 | Berkson |
| 5,937,391 | A | 8/1999 | Ikeda et al. | 6,055,573 | A | 4/2000 | Gardenswartz et al. |
| 5,937,394 | A | 8/1999 | Wong et al. | 6,058,371 | A | 5/2000 | Dijan |
| 5,938,727 | A | 8/1999 | Ikeda | 6,058,482 | A | 5/2000 | Liu |
| 5,940,506 | A | 8/1999 | Chang et al. | 6,061,660 | A | 5/2000 | Eggleston et al. |
| 5,941,771 | A | 8/1999 | Haste, III | 6,062,980 | A | 5/2000 | Luciano |
| 5,941,772 | A | 8/1999 | Paige | 6,064,979 | A | 5/2000 | Perkowski |
| 5,943,241 | A | 8/1999 | Nichols et al. | 6,064,987 | A | 5/2000 | Walker |
| 5,946,664 | A | 8/1999 | Ebisawa | 6,065,120 | A | 5/2000 | Laursen et al. |
| 5,947,820 | A | 9/1999 | Morro et al. | 6,068,553 | A | 5/2000 | Parker |
| 5,949,042 | A | 9/1999 | Dietz, II et al. | 6,072,468 | A | 6/2000 | Hocker et al. |
| 5,950,173 | A | 9/1999 | Perkowski | 6,073,840 | A | 6/2000 | Marion |
| 5,951,397 | A | 9/1999 | Dickinson | 6,075,863 | A | 6/2000 | Krishnan et al. |
| 5,952,638 | A | 9/1999 | Demers et al. | 6,076,101 | A | 6/2000 | Kamakura et al. |
| 5,953,005 | A | 9/1999 | Liu | 6,078,898 | A | 6/2000 | Davis et al. |
| 5,956,038 | A | 9/1999 | Rekimoto | 6,081,900 | A | 6/2000 | Subramaniam et al. |
| 5,956,695 | A | 9/1999 | Carrithers et al. | 6,088,730 | A | 7/2000 | Kato et al. |
| 5,956,700 | A | 9/1999 | Landry | 6,089,982 | A | 7/2000 | Holch |
| 5,959,277 | A | 9/1999 | Lucero | 6,092,069 | A | 7/2000 | Johnson et al. |
| 5,967,896 | A | 10/1999 | Jorasch et al. | 6,092,201 | A | 7/2000 | Turnbull et al. |
| 5,970,469 | A | 10/1999 | Scroggie et al. | 6,094,486 | A | 7/2000 | Marchant |
| 5,970,470 | A | 10/1999 | Walker | 6,098,837 | A | 8/2000 | Izawa |
| 5,971,277 | A | 10/1999 | Cragun et al. | 6,101,483 | A | 8/2000 | Petrovich et al. |
| 5,974,135 | A | 10/1999 | Breneman et al. | 6,101,484 | A | 8/2000 | Halbert et al. |
| 5,974,398 | A | 10/1999 | Hanson et al. | 6,101,485 | A | 8/2000 | Fortenberry et al. |
| 5,978,777 | A | 11/1999 | Garnier | 6,105,001 | A | 8/2000 | Masi et al. |
| 5,979,757 | A | 11/1999 | Tracy et al. | 6,105,865 | A | 8/2000 | Hardesty |
| 5,980,385 | A | 11/1999 | Clapper | 6,110,041 | A | 8/2000 | Walker et al. |
| 5,982,520 | A | 11/1999 | Weiser et al. | 6,110,042 | A | 8/2000 | Walker et al. |
| 5,983,196 | A | 11/1999 | Wendkos | 6,113,098 | A | 9/2000 | Adams |
| 5,983,205 | A | 11/1999 | Brams et al. | 6,113,495 | A | 9/2000 | Walker et al. |
| 5,984,191 | A | 11/1999 | Chapin, Jr. | 6,115,737 | A | 9/2000 | Ely et al. |
| 5,988,500 | A | 11/1999 | Litman | 6,119,229 | A | 9/2000 | Martinez |
| 5,991,376 | A | 11/1999 | Hennessy et al. | 6,119,230 | A | 9/2000 | Carter |
| 5,991,736 | A | 11/1999 | Ferguson et al. | 6,124,947 | A | 9/2000 | Seo |
| 5,992,738 | A | 11/1999 | Matsumoto et al. | 6,126,542 | A | 10/2000 | Fier |
| 5,992,752 | A | 11/1999 | Wilz, Sr. et al. | 6,128,599 | A | 10/2000 | Walker et al. |
| 5,993,316 | A | 11/1999 | Coyle | 6,128,603 | A | 10/2000 | Dent et al. |
| 5,995,942 | A | 11/1999 | Smith et al. | 6,129,274 | A | 10/2000 | Suzuki |
| 5,999,624 | A | 12/1999 | Hopkins | 6,131,810 | A | 10/2000 | Weiss et al. |
| 5,999,914 | A | 12/1999 | Blinn et al. | 6,134,318 | A | 10/2000 | O'Neil |
| 6,000,608 | A | 12/1999 | Dorf | 6,134,548 | A | 10/2000 | Gottsman et al. |
| 6,002,771 | A | 12/1999 | Nielsen | 6,138,911 | A | 10/2000 | Fredregill et al. |
| 6,003,013 | A | 12/1999 | Boushy et al. | 6,139,431 | A | 10/2000 | Walker et al. |
| 6,007,426 | A | 12/1999 | Kelly et al. | 6,141,161 | A | 10/2000 | Sato et al. |
| 6,009,411 | A | 12/1999 | Kepecs | 6,141,653 | A | 10/2000 | Conklin |
| 6,009,412 | A | 12/1999 | Storey | 6,141,684 | A | 10/2000 | McDonald et al. |
| 6,009,458 | A | 12/1999 | Hawkins | 6,145,739 | A | 11/2000 | Bertina et al. |
| 6,012,039 | A | 1/2000 | Hoffman et al. | 6,148,405 | A | 11/2000 | Liao et al. |
| 6,012,051 | A | 1/2000 | Sammon, Jr. et al. | 6,154,214 | A | 11/2000 | Uyehara et al. |
| 6,012,636 | A | 1/2000 | Smith | 6,161,096 | A | 12/2000 | Bell |
| 6,014,594 | A | 1/2000 | Heidel | 6,162,122 | A | 12/2000 | Acres |
| 6,014,634 | A | 1/2000 | Scroggie et al. | 6,164,533 | A | 12/2000 | Barton |
| 6,014,635 | A | 1/2000 | Harris et al. | 6,165,071 | A | 12/2000 | Weiss |
| 6,015,344 | A | 1/2000 | Kelly et al. | 6,168,522 | B1 | 1/2001 | Walker |
| 6,016,476 | A | 1/2000 | Maes et al. | 6,173,267 | B1 | 1/2001 | Cairns |
| 6,018,695 | A | 1/2000 | Ahrens et al. | 6,178,407 | B1 | 1/2001 | Lotvin et al. |
| 6,018,718 | A | 1/2000 | Walker et al. | 6,178,408 | B1 | 1/2001 | Copple et al. |
| 6,018,724 | A | 1/2000 | Arent | 6,182,894 | B1 | 2/2001 | Hackett et al. |

**US 8,511,550 B1**

Page 4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6,183,362 | B1 | 2/2001 | Boushy | 6,631,358 | B1 | 10/2003 | Ogilvie |
| 6,183,366 | B1 | 2/2001 | Goldberg et al. | 6,631,849 | B2 | 10/2003 | Blossom |
| 6,185,541 | B1 | 2/2001 | Scroggie et al. | 6,645,077 | B2 | 11/2003 | Rowe |
| 6,186,893 | B1 | 2/2001 | Walker et al. | 6,648,755 | B1 | 11/2003 | Luciano, Jr. |
| 6,186,894 | B1 | 2/2001 | Mayeroff | 6,656,050 | B2 | 12/2003 | Busch |
| 6,189,103 | B1 | 2/2001 | Nevarez et al. | 6,685,559 | B2 | 2/2004 | Luciano |
| 6,193,608 | B1 | 2/2001 | Walker et al. | 6,687,679 | B1 | 2/2004 | Van Luchene et al. |
| 6,195,677 | B1 | 2/2001 | Utsumi | 6,721,743 | B1 | 4/2004 | Sakakibara |
| 6,196,458 | B1 | 3/2001 | Walker et al. | 6,748,365 | B1 | 6/2004 | Quinlan et al. |
| 6,199,099 | B1 | 3/2001 | Gershman et al. | 6,800,029 | B2 | 10/2004 | Rowe |
| 6,216,129 | B1 | 4/2001 | Eldering | 6,813,609 | B2 | 11/2004 | Wilson |
| 6,222,914 | B1 | 4/2001 | McMullin | 6,824,464 | B2 | 11/2004 | Weil et al. |
| 6,224,483 | B1 | 5/2001 | Mayeroff | 6,826,594 | B1 | 11/2004 | Pettersen |
| 6,227,972 | B1 | 5/2001 | Walker et al. | 6,837,436 | B2 | 1/2005 | Swartz et al. |
| 6,229,533 | B1 | 5/2001 | Farmer | 6,842,739 | B2 | 1/2005 | Postrel |
| 6,231,442 | B1 | 5/2001 | Mayeroff | 6,843,720 | B2 | 1/2005 | Luciano |
| 6,234,896 | B1 | 5/2001 | Walker et al. | 6,846,238 | B2 | 1/2005 | Wells |
| 6,236,978 | B1 | 5/2001 | Tuzhilin | 6,852,031 | B1 | 2/2005 | Rowe |
| 6,243,688 | B1 | 6/2001 | Kalina | 6,856,976 | B2 | 2/2005 | Bible et al. |
| 6,244,958 | B1 | 6/2001 | Acres | 6,866,586 | B2 | 3/2005 | Oberberger |
| 6,249,773 | B1 | 6/2001 | Allard et al. | 6,898,570 | B1 | 5/2005 | Tedesco et al. |
| 6,267,671 | B1 | 7/2001 | Hogan | 6,915,271 | B1 | 7/2005 | Meyer et al. |
| 6,273,820 | B1 | 8/2001 | Haste, III | 6,920,611 | B1 | 7/2005 | Spaeth et al. |
| 6,280,326 | B1 | 8/2001 | Saunders | 6,929,550 | B2 | 8/2005 | Hisada |
| 6,280,328 | B1 | 8/2001 | Holch | 6,931,538 | B1 | 8/2005 | Sawaguchi |
| 6,289,261 | B1 | 9/2001 | Heidel | 6,947,898 | B2 | 9/2005 | Postrel |
| 6,289,322 | B1 | 9/2001 | Kitchen et al. | 6,951,302 | B2 | 10/2005 | Potts |
| 6,292,786 | B1 | 9/2001 | Deaton et al. | 6,985,876 | B1 | 1/2006 | Lee |
| 6,293,865 | B1 | 9/2001 | Kelly et al. | 6,997,807 | B2 | 2/2006 | Weiss |
| 6,293,866 | B1 | 9/2001 | Walker et al. | 7,003,496 | B2 | 2/2006 | Ishii |
| 6,293,867 | B1 | 9/2001 | Heidel | 7,021,531 | B2 | 4/2006 | Myttenaere |
| 6,298,335 | B1 | 10/2001 | Bernstein | 7,025,674 | B2 | 4/2006 | Adams et al. |
| 6,302,793 | B1 | 10/2001 | Fertitta, III et al. | 7,043,752 | B2 | 5/2006 | Royer et al. |
| 6,306,035 | B1 | 10/2001 | Kelly et al. | 7,072,864 | B2 | 7/2006 | Brake, Jr. et al. |
| 6,311,976 | B1 | 11/2001 | Yoseloff et al. | 7,096,190 | B2 | 8/2006 | Postrel |
| 6,312,333 | B1 | 11/2001 | Acres | 7,124,109 | B2 | 10/2006 | Sakamoto et al. |
| 6,315,665 | B1 | 11/2001 | Faith | 7,127,414 | B1 | 10/2006 | Awadallah et al. |
| 6,319,125 | B1 | 11/2001 | Acres | 7,128,652 | B1 | 10/2006 | Lavoie |
| 6,327,573 | B1 | 12/2001 | Walker et al. | 7,130,828 | B2 | 10/2006 | Phillips et al. |
| 6,332,099 | B1 | 12/2001 | Heidel | 7,134,087 | B2 | 11/2006 | Bushold et al. |
| 6,332,157 | B1 | 12/2001 | Mighdoli et al. | 7,134,959 | B2 | 11/2006 | Penrice |
| 6,336,098 | B1 | 1/2002 | Fortenberry et al. | 7,137,883 | B1 | 11/2006 | Falciglia |
| 6,341,353 | B1 | 1/2002 | Herman | 7,146,342 | B1 | 12/2006 | Angelin |
| 6,345,261 | B1 | 2/2002 | Feidelson et al. | 7,156,738 | B2 | 1/2007 | Rowe |
| 6,352,175 | B2 | 3/2002 | Izawa | 7,163,145 | B2 | 1/2007 | Cohagan et al. |
| 6,358,149 | B1 | 3/2002 | Schneider et al. | 7,168,089 | B2 | 1/2007 | Nguyen |
| 6,363,362 | B1 | 3/2002 | Burfield et al. | 7,174,315 | B2 | 2/2007 | Phillips et al. |
| 6,379,247 | B1 | 4/2002 | Walker et al. | 7,187,947 | B1 | 3/2007 | White et al. |
| 6,394,907 | B1 | 5/2002 | Rowe | 7,200,571 | B1 | 4/2007 | Jenniges et al. |
| 6,402,029 | B1 | 6/2002 | Gangi | 7,249,139 | B2 | 7/2007 | Chuah |
| 6,408,284 | B1 | 6/2002 | Hill et al. | 7,249,197 | B1 | 7/2007 | Roestenburg et al. |
| 6,431,983 | B2 | 8/2002 | Acres | 7,289,970 | B1 | 10/2007 | Siegel |
| 6,438,527 | B1 | 8/2002 | Powar | 7,290,061 | B2 | 10/2007 | Lentini et al. |
| 6,452,498 | B2 | 9/2002 | Stewart | 7,291,064 | B2 | 11/2007 | Yamada |
| 6,476,830 | B1 | 11/2002 | Farmer | 7,321,901 | B1 | 1/2008 | Blinn et al. |
| 6,484,940 | B1 | 11/2002 | Dilday et al. | 7,329,185 | B2 | 2/2008 | Conover et al. |
| 6,486,768 | B1 | 11/2002 | French et al. | 7,341,518 | B2 | 3/2008 | Muskin |
| 6,491,584 | B2 | 12/2002 | Graham | 7,349,867 | B2 | 3/2008 | Rollins et al. |
| 6,505,772 | B1 | 1/2003 | Mollett et al. | 7,360,693 | B1 | 4/2008 | Sullivan |
| 6,510,998 | B1 | 1/2003 | Stanford et al. | 7,360,699 | B2 | 4/2008 | Cohagan et al. |
| 6,511,377 | B1 | 1/2003 | Weiss | 7,387,571 | B2 | 6/2008 | Walker |
| 6,522,889 | B1 | 2/2003 | Aarnio | 7,390,264 | B2 | 6/2008 | Walker |
| 6,533,664 | B1 | 3/2003 | Crumby | 7,398,226 | B2 | 7/2008 | Haines et al. |
| 6,547,131 | B1 | 4/2003 | Foodman | 7,410,422 | B2 | 8/2008 | Fine |
| 6,549,912 | B1 | 4/2003 | Chen | 7,455,586 | B2 | 11/2008 | Nguyen |
| 6,554,705 | B1 | 4/2003 | Cumbers | 7,613,629 | B2 | 11/2009 | Antonucci et al. |
| 6,572,471 | B1 | 6/2003 | Bennett | 7,636,874 | B2 | 12/2009 | Gutbrod et al. |
| 6,575,832 | B1 | 6/2003 | Manfredi et al. | 7,641,547 | B2 | 1/2010 | Walker et al. |
| 6,578,015 | B1 | 6/2003 | Haseltine et al. | 7,680,688 | B2 | 3/2010 | Hessburg et al. |
| 6,579,179 | B1 | 6/2003 | Poole et al. | 7,703,673 | B2 | 4/2010 | Buchheit et al. |
| 6,593,640 | B1 | 7/2003 | Kalnitsky et al. | 7,747,463 | B1 | 6/2010 | Phillips et al. |
| 6,601,040 | B1 | 7/2003 | Kolls | 7,765,124 | B2 | 7/2010 | Postrel |
| 6,607,441 | B1 | 8/2003 | Acres | 7,827,056 | B2 | 11/2010 | Walker et al. |
| 6,609,150 | B2 | 8/2003 | Lee et al. | 7,827,057 | B1 | 11/2010 | Walker et al. |
| 6,609,969 | B1 | 8/2003 | Luciano | 7,828,206 | B2 | 11/2010 | Hessburg et al. |
| 6,609,970 | B1 | 8/2003 | Luciano | 7,856,376 | B2 | 12/2010 | Storey |
| 6,609,978 | B1 | 8/2003 | Paulsen | 7,856,377 | B2 | 12/2010 | Cohagan et al. |
| 6,623,357 | B2 | 9/2003 | Chowdhury | 7,867,079 | B2 | 1/2011 | Govender et al. |
| 6,629,890 | B2 | 10/2003 | Johnson | 7,925,533 | B2 | 4/2011 | Shaw et al. |

## US 8,511,550 B1

Page 5

| | | | | | | |
|---|---|---|---|---|---|---|
| 8,019,679 | B2 | 9/2011 | Bennett et al. | 2002/0169660 | A1 | 11/2002 | Taylor et al. |
| 8,046,256 | B2 | 10/2011 | Chien et al. | 2002/0177479 | A1 | 11/2002 | Walker |
| 8,062,116 | B2 | 11/2011 | Lutnick et al. | 2002/0194069 | A1 | 12/2002 | Thakur et al. |
| 8,100,758 | B2 | 1/2012 | Walker et al. | 2002/0198043 | A1 | 12/2002 | Chowdhry |
| 8,123,127 | B2 | 2/2012 | McGhie et al. | 2003/0003996 | A1 | 1/2003 | Nguyen |
| 8,162,209 | B2 | 4/2012 | Buchheit et al. | 2003/0004802 | A1 | 1/2003 | Callegari |
| 8,181,863 | B1 | 5/2012 | McGhie et al. | 2003/0004808 | A1 | 1/2003 | Elhaoussine et al. |
| 8,181,864 | B1 | 5/2012 | McGhie et al. | 2003/0008707 | A1 | 1/2003 | Walker et al. |
| 8,186,583 | B1 | 5/2012 | McGhie et al. | 2003/0009379 | A1 | 1/2003 | Narasimhan et al. |
| 8,201,734 | B1 | 6/2012 | McGhie et al. | 2003/0013438 | A1 | 1/2003 | Darby |
| 8,234,164 | B2 | 7/2012 | Walker et al. | 2003/0018523 | A1 | 1/2003 | Rappaport et al. |
| 8,245,925 | B1 | 8/2012 | McGhie et al. | 2003/0033534 | A1 | 2/2003 | Rand |
| 8,265,993 | B2 | 9/2012 | Chien et al. | 2003/0036425 | A1 | 2/2003 | Kaminkow et al. |
| 8,267,315 | B1 | 9/2012 | McGhie et al. | 2003/0040964 | A1 | 2/2003 | Lacek |
| 8,297,502 | B1 | 10/2012 | McGhie et al. | 2003/0045353 | A1 | 3/2003 | Paulsen |
| 8,298,074 | B1 | 10/2012 | Gibase et al. | 2003/0050831 | A1 | 3/2003 | Klayh |
| 2001/0032137 | A1 | 10/2001 | Bennett et al. | 2003/0055722 | A1 | 3/2003 | Perreault et al. |
| 2001/0032182 | A1 | 10/2001 | Kumar et al. | 2003/0055780 | A1 | 3/2003 | Hansen et al. |
| 2001/0032183 | A1 | 10/2001 | Landry | 2003/0060264 | A1 | 3/2003 | Chilton |
| 2001/0034259 | A1 | 10/2001 | Luciano et al. | 2003/0061097 | A1 | 3/2003 | Walker |
| 2001/0034720 | A1 | 10/2001 | Armes | 2003/0062242 | A1 | 4/2003 | Hallowell et al. |
| 2001/0037295 | A1 | 11/2001 | Olsen | 2003/0069787 | A1 | 4/2003 | Tendon et al. |
| 2001/0041610 | A1 | 11/2001 | Luciano et al. | 2003/0069842 | A1 | 4/2003 | Kight et al. |
| 2001/0044337 | A1 | 11/2001 | Rowe | 2003/0074311 | A1 | 4/2003 | Saylors et al. |
| 2001/0046891 | A1 | 11/2001 | Acres | 2003/0078094 | A1 | 4/2003 | Gatto |
| 2001/0047342 | A1 | 11/2001 | Cuervo | 2003/0083943 | A1 | 5/2003 | Adams et al. |
| 2001/0054003 | A1 | 12/2001 | Chien et al. | 2003/0087650 | A1 | 5/2003 | Aarnio |
| 2001/0054010 | A1 | 12/2001 | Bernabeo et al. | 2003/0087692 | A1 | 5/2003 | Weiss |
| 2002/0002075 | A1 | 1/2002 | Rowe | 2003/0101131 | A1 | 5/2003 | Warren et al. |
| 2002/0002532 | A1 | 1/2002 | Tso | 2003/0104862 | A1 | 6/2003 | Acres |
| 2002/0002538 | A1 | 1/2002 | Ling | 2003/0104865 | A1 | 6/2003 | Itkis |
| 2002/0010025 | A1 | 1/2002 | Kelly et al. | 2003/0106769 | A1 | 6/2003 | Weiss |
| 2002/0013728 | A1 | 1/2002 | Wilkman | 2003/0115456 | A1 | 6/2003 | Kapoor |
| 2002/0013767 | A1 | 1/2002 | Katz | 2003/0130948 | A1 | 7/2003 | Algiene et al. |
| 2002/0016734 | A1 | 2/2002 | McGill et al. | 2003/0148807 | A1 | 8/2003 | Acres |
| 2002/0020965 | A1 | 2/2002 | Potter | 2003/0149619 | A1 | 8/2003 | Stanley et al. |
| 2002/0026348 | A1 | 2/2002 | Fowler et al. | 2003/0163425 | A1 | 8/2003 | Cannon, Jr. |
| 2002/0039923 | A1 | 4/2002 | Cannon | 2003/0182218 | A1 | 9/2003 | Blagg |
| 2002/0045476 | A1 | 4/2002 | Poole | 2003/0186747 | A1 | 10/2003 | Nguyen |
| 2002/0046110 | A1 | 4/2002 | Gallagher | 2003/0187762 | A1 | 10/2003 | Coyle |
| 2002/0049631 | A1 | 4/2002 | Williams | 2003/0200142 | A1 | 10/2003 | Hicks et al. |
| 2002/0052940 | A1 | 5/2002 | Myers et al. | 2003/0200144 | A1 | 10/2003 | Antonucci et al. |
| 2002/0055874 | A1 | 5/2002 | Cohen | 2003/0208445 | A1 | 11/2003 | Compiano |
| 2002/0056044 | A1 | 5/2002 | Andersson | 2003/0211883 | A1 | 11/2003 | Potts |
| 2002/0062253 | A1 | 5/2002 | Dosh et al. | 2003/0216960 | A1 | 11/2003 | Postrel |
| 2002/0065126 | A1 | 5/2002 | Miller et al. | 2003/0216967 | A1 | 11/2003 | Williams |
| 2002/0068624 | A1 | 6/2002 | Ellis | 2003/0228902 | A1 | 12/2003 | Walker |
| 2002/0069109 | A1 | 6/2002 | Wendkos | 2003/0229584 | A1 | 12/2003 | Brown |
| 2002/0069150 | A1 | 6/2002 | Ni | 2003/0236704 | A1 | 12/2003 | Antonucci |
| 2002/0072412 | A1 | 6/2002 | Young | 2003/0236749 | A1 | 12/2003 | Shergalis |
| 2002/0075844 | A1 | 6/2002 | Hagen | 2004/0002369 | A1 | 1/2004 | Walker et al. |
| 2002/0077173 | A1 | 6/2002 | Luciano et al. | 2004/0006531 | A1 | 1/2004 | Kwan |
| 2002/0077890 | A1 | 6/2002 | LaPointe et al. | 2004/0015438 | A1 | 1/2004 | Compiano et al. |
| 2002/0077978 | A1 | 6/2002 | O'Leary et al. | 2004/0019522 | A1 | 1/2004 | Bortolin |
| 2002/0082018 | A1 | 6/2002 | Warwick | 2004/0019560 | A1 | 1/2004 | Evans et al. |
| 2002/0082920 | A1 | 6/2002 | Austin | 2004/0035923 | A1 | 2/2004 | Kahr |
| 2002/0082990 | A1 | 6/2002 | Jones | 2004/0039644 | A1 | 2/2004 | Postrel |
| 2002/0086733 | A1 | 7/2002 | Wang | 2004/0039692 | A1 | 2/2004 | Shields et al. |
| 2002/0087468 | A1 | 7/2002 | Ganesan et al. | 2004/0043806 | A1 | 3/2004 | Kirby |
| 2002/0091593 | A1 | 7/2002 | Fowler | 2004/0048658 | A1 | 3/2004 | Sanders |
| 2002/0095365 | A1 | 7/2002 | Slavin et al. | 2004/0049439 | A1 | 3/2004 | Johnston et al. |
| 2002/0107072 | A1 | 8/2002 | Giobbi | 2004/0053093 | A1 | 3/2004 | An |
| 2002/0107733 | A1 | 8/2002 | Liu et al. | 2004/0068438 | A1 | 4/2004 | Mitchell |
| 2002/0111210 | A1 | 8/2002 | Luciano, Jr. | 2004/0078273 | A1 | 4/2004 | Loeb et al. |
| 2002/0111907 | A1 | 8/2002 | Ling | 2004/0097287 | A1 | 5/2004 | Postrel |
| 2002/0111919 | A1 | 8/2002 | Weller et al. | 2004/0098317 | A1 | 5/2004 | Postrel |
| 2002/0116257 | A1 | 8/2002 | Helbig | 2004/0107140 | A1 | 6/2004 | Postrel |
| 2002/0120513 | A1 | 8/2002 | Webb et al. | 2004/0111346 | A1 | 6/2004 | Macbeath |
| 2002/0123949 | A1 | 9/2002 | VanLeeuwen | 2004/0111366 | A1 | 6/2004 | Schneider |
| 2002/0143614 | A1 | 10/2002 | MacLean et al. | 2004/0128197 | A1 | 7/2004 | Barn |
| 2002/0146018 | A1 | 10/2002 | Kailamaki et al. | 2004/0143500 | A1 | 7/2004 | Lopez et al. |
| 2002/0147047 | A1 | 10/2002 | Letovsky | 2004/0143501 | A1 | 7/2004 | Lopez et al. |
| 2002/0151359 | A1 | 10/2002 | Rowe | 2004/0158492 | A1 | 8/2004 | Lopez et al. |
| 2002/0152116 | A1 | 10/2002 | Yan | 2004/0171420 | A1 | 9/2004 | Potts |
| 2002/0160838 | A1 | 10/2002 | Kim | 2004/0186773 | A1 | 9/2004 | George et al. |
| 2002/0161630 | A1 | 10/2002 | Kern et al. | 2004/0215505 | A1 | 10/2004 | Sullivan |
| 2002/0169021 | A1 | 11/2002 | Urie | 2004/0220854 | A1 | 11/2004 | Postrel |
| | | | | 2004/0229671 | A1 | 11/2004 | Stronach |
| | | | | 2004/0262381 | A1 | 12/2004 | Mesaros |

## US 8,511,550 B1

Page 6

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2005/0015332 | A1 | 1/2005 | Chen | EP | 0308224 | | 3/1989 |
| 2005/0021399 | A1 | 1/2005 | Postrel | EP | 0525363 | | 2/1993 |
| 2005/0021400 | A1 | 1/2005 | Postrel | EP | 0949596 | | 10/1999 |
| 2005/0021401 | A1 | 1/2005 | Postrel | EP | 1014320 | A1 | 6/2000 |
| 2005/0021457 | A1 | 1/2005 | Johnston et al. | EP | 1107196 | | 6/2001 |
| 2005/0043082 | A1 | 2/2005 | Peterson | EP | 1141876 | A1 | 10/2001 |
| 2005/0060225 | A1 | 3/2005 | Postrel | EP | 1351180 | A2 | 10/2003 |
| 2005/0080727 | A1 | 4/2005 | Postrel | EP | 1399897 | | 3/2004 |
| 2005/0080728 | A1 | 4/2005 | Sobek | EP | 1330729 | A4 | 11/2005 |
| 2005/0096124 | A1 | 5/2005 | Stronach | EP | 1598762 | A1 | 11/2005 |
| 2005/0107155 | A1 | 5/2005 | Potts et al. | EP | 1746550 | A2 | 1/2007 |
| 2005/0137015 | A1 | 6/2005 | Rogers | EP | 1787250 | A2 | 5/2007 |
| 2005/0143174 | A1 | 6/2005 | Goldman | GB | 2319381 | | 5/1998 |
| 2005/0149394 | A1 | 7/2005 | Postrel | GB | 2333879 | | 8/1999 |
| 2005/0177428 | A1 | 8/2005 | Ganz | JP | 8235276 | | 9/1996 |
| 2005/0177519 | A1 | 8/2005 | Block | JP | 2003132224 | | 5/2003 |
| 2005/0182693 | A1 | 8/2005 | Alivandi | WO | WO9215174 | A1 | 3/1992 |
| 2005/0192864 | A1 | 9/2005 | Ganz | WO | 9323817 | | 11/1993 |
| 2005/0240472 | A1 | 10/2005 | Postrel | WO | 9416781 | | 8/1994 |
| 2005/0250415 | A1 | 11/2005 | Barthold | WO | 9503570 | A2 | 2/1995 |
| 2005/0261056 | A1 | 11/2005 | Smolucha | WO | 9713228 | | 4/1997 |
| 2006/0004629 | A1 | 1/2006 | Neemann et al. | WO | 9748078 | | 12/1997 |
| 2006/0010033 | A1 | 1/2006 | Thomas | WO | 9926176 | | 5/1999 |
| 2006/0020511 | A1 | 1/2006 | Postrel | WO | 9930256 | | 6/1999 |
| 2006/0035692 | A1 | 2/2006 | Kirby | WO | 9952051 | | 10/1999 |
| 2006/0046827 | A1 | 3/2006 | Saffari et al. | WO | 9960503 | | 11/1999 |
| 2006/0052150 | A1 | 3/2006 | Hedrick et al. | WO | 0014665 | | 3/2000 |
| 2006/0063580 | A1 | 3/2006 | Nguyen | WO | 0031658 | | 6/2000 |
| 2006/0079150 | A1 | 4/2006 | Filoseta | WO | 0033159 | | 6/2000 |
| 2006/0100018 | A1 | 5/2006 | Ganz | WO | 0033222 | | 6/2000 |
| 2006/0148559 | A1 | 7/2006 | Jordan | WO | 0038088 | A1 | 6/2000 |
| 2006/0178217 | A1 | 8/2006 | Jung | WO | 0079461 | | 12/2000 |
| 2006/0178899 | A1 | 8/2006 | Jung | WO | 0101282 | | 1/2001 |
| 2006/0178964 | A1 | 8/2006 | Jung | WO | 0152078 | | 7/2001 |
| 2006/0178965 | A1 | 8/2006 | Jung | WO | 0157617 | | 8/2001 |
| 2006/0178966 | A1 | 8/2006 | Jung | WO | 0164306 | | 9/2001 |
| 2006/0178967 | A1 | 8/2006 | Jung | WO | 0241556 | A3 | 5/2002 |
| 2006/0178968 | A1 | 8/2006 | Jung | WO | 02077884 | A2 | 10/2002 |
| 2006/0178970 | A1 | 8/2006 | Jung | WO | 2380687 | | 4/2003 |
| 2006/0178972 | A1 | 8/2006 | Jung | WO | 03083730 | A2 | 10/2003 |
| 2006/0178975 | A1 | 8/2006 | Jung | WO | 2004019257 | A1 | 3/2004 |
| 2006/0178985 | A1 | 8/2006 | Jung | WO | WO2005006113 | | 1/2005 |
| 2006/0195376 | A1 | 8/2006 | Jung | WO | 200582480 | | 9/2005 |
| 2006/0195377 | A1 | 8/2006 | Jung | WO | 2006020413 | | 2/2006 |
| 2006/0195378 | A1 | 8/2006 | Jung | WO | 2006022593 | A1 | 3/2006 |
| 2006/0195394 | A1 | 8/2006 | Jung | WO | 2009070889 | A1 | 6/2009 |
| 2006/0205481 | A1 | 9/2006 | Dominelli | WO | 2009094395 | | 7/2009 |
| 2006/0224505 | A1 | 10/2006 | Jung | | | | |
| 2006/0229976 | A1 | 10/2006 | Jung | | | | |
| 2006/0253321 | A1 | 11/2006 | Heywood | | OTHER PUBLICATIONS | | |
| 2007/0073582 | A1 | 3/2007 | Jung | | | | |
| 2007/0087822 | A1 | 4/2007 | Van Luchene | | | | |
| 2007/0167218 | A1 | 7/2007 | Rothschild | | | | |
| 2007/0168266 | A1 | 7/2007 | Questembert | | | | |
| 2007/0239523 | A1 | 10/2007 | Yi | | | | |
| 2008/0086759 | A1 | 4/2008 | Colson | | | | |
| 2009/0023490 | A1 | 1/2009 | Moshal et al. | | | | |
| 2009/0063261 | A1 | 3/2009 | Scribner et al. | | | | |
| 2010/0174600 | A1 | 7/2010 | Walker et al. | | | | |
| 2010/0211469 | A1 | 8/2010 | Salmon et al. | | | | |
| 2010/0227675 | A1 | 9/2010 | Luxton et al. | | | | |
| 2010/0248823 | A1 | 9/2010 | Smith | | | | |
| 2011/0151976 | A1 | 6/2011 | Holloway | | | | |
| 2011/0183749 | A1 | 7/2011 | Allen | | | | |
| 2011/0207525 | A1 | 8/2011 | Allen | | | | |
| 2011/0256924 | A1 | 10/2011 | McGhie et al. | | | | |
| 2011/0275432 | A1 | 11/2011 | Lutnick et al. | | | | |
| 2012/0041810 | A1 | 2/2012 | Hofer | | | | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 2497499 | | 11/1999 |
| AU | 2497599 | | 11/1999 |
| AU | 199924973 | | 11/1999 |
| AU | 199924974 | | 11/1999 |
| AU | 199924975 | | 11/1999 |
| AU | 3018500 | | 11/2000 |
| AU | 200030185 | | 11/2000 |
| AU | 2003200145 | A1 | 8/2003 |
| AU | 2004250640 | A1 | 12/2004 |

### OTHER PUBLICATIONS

A. Parasuraman, Dhruv Grewal The Impact of Technology on the Quality-Value_Loyalty Chain: A Research Agenda; University of Miami—Journal of the Academy of Marketing Science; vol. 28, No. 1. pp. 168-174.

Byron Sharp & Anne Sharp "Loyalty Programs and their Impact on Repeat-Purchase Loyalty Patterns: a replication and extension"—Marketing Science Centre; University of South Australia—pp. 1-18.

David S. Evans "Some Empirical Aspects of Multi-sided Platform Industries" —NERA Economic Consulting; Review of network Economics; vol. 2 Issue 3—Sep. 2003; pp. 191-209.

Uncles et. al. "Customer Loyalty and Customer Loyalty programs"—Journal of Consumer Marketing, vol. 20; No. 4 pp. 294-316.

Dennis L. Duffy—"Customer Loyalty Strategies"—Journal of Consumer Marketing, vol. 15; No. 5 1998; pp. 435-448.

Louise O'Brien & Charles Jones—"Do Rewards Really Creat Loyalty"?—Harvard Business Review; May-Jun. 1995; pp. 73-83.

Frederick F. Reichheld & Phil Schefter—"E-Loyalty—Your secret Weapon on the Web"—Harvard Business Review; Jul.-Aug. 2000; pp. 105-113.

Molly Plozay & Julie Bohn—"How Merchant-Funded Rewards Give new Life to Customer Loyalty programs"—First Data; Oct. 2008; firstdata.com—pp. 1-10.

MilePoint.com—Turning Miles into Money; Internet Archieve—WayBack Machines; web.archive.org/web/20010801155716/http://www.milepoint.com/about.faq.asp; pp. 1-5.

**US 8,511,550 B1**

Page 7

Rajiv Lal—"Harrah's Entertainment Inc."—Harvard Business School; 9-502-011; Rev. Jun. 14, 2004; pp. 1-27.

Avery Johnson—"Hotels Take 'Know Your Customer' to New Level"—The Wall Street Journal—Feb. 7, 2006; p. D1.

Anthony T.H.Chin—"Impact of Frequent Flyer Programs on the Demand for Air Travel"—Department of Economics; National University of Singapore; Journal of Air Transportation; vol. 7, No. 2-2002; pp. 53-86.

Frederick F. Reichheld—"Loyalty-Based Management"—Harvard Business Review; Mar.-Apr. 1993; pp. 63-74.

Points.com—"Get More Points, Faster"—Internet Archieve WayBack Machine; May 24, 2005.

points.com—Stuff It!—Stuff that stocking with a JCPenny Gift Certificate. She'll be happy to spend it.; Internet Archieve WayBack Machine; Dec. 10, 2005.

Peter Jin Hong, creative director at Tribal DDB in Vancouver—"Digital Eye".

Kumar et al. "Sales Promotions on the Internet"—USENIX Technical Program—Paper—Proceedings of the 3rd USENIX Workshop on Electronic Commerce, 1998; pp. 167-176; static.usenix.org/event/ef98/full_papers/kumar_promotions/kumar_html/kumar.html.

Christina Binkley—"Taking Retailers' Cues, Harrah's Taps into Science of Gambling"—The Wall Street Journal; Nov. 22, 2004-p. A1.

Werner Reinartz and V. Kumar—"The Mismanagement of Customer Loyalty"—Harvard Business Review; Jul. 2002 pp. 2-12.

points.com—exchange points. reward yourself. ; Internet Archieve WayBack Machine; Oct. 26, 2004.

"At Sports Superstore Online, Shoppers Get More for Their Money; 10,000 Reasons to Shop at Sports Superstore Online", Business Wire Dec. 4, 1998, 2 pp.

"Amazon.com and Netflix.com Establish Promotional Relationship for the Sale and Rental of DVD Titles" Business Wire Dec. 4, 1998, 3 pp.

Brook, Valerie. "GM turns up the heat with plan to cross-sell some financial products." Nov. 18, 1994 http://www.americanbanker.com/issues/159_150/-49630-1.html?zkPrintable=true.

"Beneficial, Casual Male Team Up on Card", American Banker. May 4, 1998. http://www.americanbanker.com.

"E-Centives," (http://www.emaginet.com/de...memfaq.shtml), download date: May 23, 1999, 3 pp.

Bloom, Jennifer Kingson. "Wal-Mart on Retail Road Less Traveled: Cobranding," The American Banker Sep. 11, 1998, 3 pp.

Elkin, Tobi "Promotions: Mastercard Wins Coveted On-Pack Real Estate in Tie-in with Microsoft" Brandweek Sep. 14, 1998, 1 page.

"Microsoft and First USA Announces $90 Million Online Advertising Alliance" EDP Weekly's IT Monitor Nov. 2, 1998, 2 pp.

Feldman, Amy "Paying with Plastic Not Such a Smart Idea", New York Daily News Nov. 4, 1998, 2 pp.

Cowell, Alan "America's Turn to Colonize; Creditcard Issuers Invade Britain, with U.S. Firepower", The New York Times Nov. 12, 1998, 5 pp.

Armstrong, Larry, "The Free-PC Game: Lure 'Em in and Lock 'Em Up," Business Week, Information Technology, Jul. 19, 1999, 1 pg.

"Shoppers Charge Accounts Co. to Administer Private Label Credit Card for Lew Magram LTD; Program Marks SCA,s Entry into Retail Catalog/Mail Order Industry" PR Newswire Jun. 29, 1998, 6 pp.

"About Click Rewards." Wired. Magazine. http://www.wired.com/wired/subscribe/clickmiles.html.

Souccar, Miriam K. "Epidemic of Rate Shopping Spurs a Search for remedies," Jan. 7, 1999, Copyright 1999 American Banker, Inc.

"Wellsparks Group Launches V.I.P. Rewards; The Most Comprehensive Relationship Marketing Program Ever Created by a Mall Developer", Business wire May 19, 1998, 2 pp.

"Jay Jacobs Inc. Introduces Private Label Credit Card", Business Wire May 18, 1998, 1 page.

Meece, Mickey "Big Finance Companies May Want Piece of Limited's Private-Label Card Program", The American Banker Apr. 12, 1995, 2 pp.

"Points Earn Little Credit as Cardholders Fail to Cash In" Birmingham Post May 9, 1998, 2 pp.

"Card Briefs: Beneficial, Casual Male Team Up on Card" The American Banker May 4, 1998 1 pg.

AAdvantage Auction "Experience More with You AAdvantage Miles". http://www.aa.com/il8n/urls/auction.jsp?anchorLocation=DirectURL&title=auction.

Wald, Matthew L. "Spending It; Untying Cellular Phones From Those Annual Contracts" The New York Times Mar. 15, 1998, 2 pp.

Wijnen, Renee "Cendant Eyes Cross-Marketing Opportunities; CUC International-HFS Inc. Merger Expected to Yield an Additional 2 Million Club Members" DM News Feb. 2, 1998, 2 pp.

Sanders, Edmund "Tricky Business; The Magic of Rebate Cards can Quickly Disappear", Chicago Tribune Aug. 18, 1997, 3 pp.

Simon, Ruth "Make Sure Your Rebate Card Still Delivers the Goods", Money Aug. 1997, 2 pp.

Selasky, Susan "Easy-To-Swallow Savings; Diner Credit Cards Serve Wide menu of Discounts", Pittsburgh Post-Gazette Dec. 5, 1996, 3 pp.

"Chemical Bank and AT&T Smart Cards form Strategic Alliance", www.att.com/press/1193/931117.blb.html, 3 pp.

Kristof, Kathy "Card Sharks are in Season; be Wary of Discounts and Rebates as You Shop Around for Good Credit Deals", Chicago Tribune, Nov. 23, 1993, 2 pp.

Wessel, Harry "Rewarding Experience?; Credit Cards Offering Bonuses Not for Everyone", Chicago Poet-Gazette Dec. 5, 1996, 3 pp.

Ross, Chuck et al., "Coke Card promotion set for '98", (http //adage com/news.sub.--and.sub.--features/features/19971117/article3 html), Copyright Nov. 1997, 2 pp.

Singletary, Michelle, "Electronic World, Unchecked Problem?", The Washington Post, Mar. 4, 1997, Section: Financial, p. C01, 4 pp.

Ellin, Abby, "Listening to an Earful for Savings," (Hear the Pitches and talk for Free), The New York Times, Jan. 24, 1999, 1 pg.

Cox, Beth, "Visa, Travelweb Enter Online Marketing Partnership," Internetnews.com, Jan. 21, 1999, 1 pg.

Tedesco, Richard. "Pactel Pushes Net Access." Broadcasting & Cable. Jun. 3, 1996, pp. 64-65.

Colman, Price. "Cross-marketing Cuts Cable Bills." Broadcasting & Cable. Jul. 15, 1996, p. 44, 2 pp.

O'Brien, Timothy L., "The Market: Market Place—Taking the Danger out of Danger out of Risk; Chase says Models Helped it avoid Financial Minefields," The New York Times Business/Financial Desk, Jan. 20, 1999 Section C. col. 2 at p. 1, 4 pp.

"Rent from NetFlix.com Buy from Amazon.com," Official Press Release, Jan. 17, 1999, 1 pg.

"Let's Play the Cash Register Receipts Lottery", The New York Times, Dec. 25, 1990, Section: Section 1, p. 30, col. 4, Editorial Desk, 1 pg.

Dennis, Sylvia. "Visa Gets ready for Interactive Set-Top Boxes," Newsbytes, Dec. 14, 1998, 2 pp.

"Philips offers customers financing through Citicorp; Philips Medical Systems North America, Citicorp North America Inc." Health Industry Today, Jun. 1991, Section: vol. 54, No. 6, p. 4, ISSN: 0745-4678, 1 page.

Sinclair, Stewart. "To Mail or Not to Mail?" Strategy, Strategy Directresponse Special Report, Couponing, Oct. 12, 1998 at p. D21, 4 pp.

"Winn-Dixie/The Salvation Army Report Contributions for War Against Hunger", PR Newswire, Jun. 10, 1993, Section: Financial News, 1 pg.

Armstrong, Larry. "Coupon Clippers, save Your Scissors," Vons Supermarkets are Revolutionizing the Delivery of Discounts. Business week, Jun. 20, 1994, No. 3377 at p. 164, 2 pp.

Patch, Kimberly, "Sled InterNIC Debut Internet Services; Sled Corp Offers Electronic Coupons for Encryption software; InteNIC Information Services Launches InfoGuide to Internet Computer Network" PC Week, May 16, 1994 vol. 11 No. 19 at p. 130, ISSN: 0740-1604, 1 page.

"American Eagle Outfitters" PR Newswire. Mar. 26, 2010. www.printthis.clickability.com/pt/cpt?expire=&title=American+Eagle+Outfitters%2C+Inc+Introduces+the . . .

Andreoli, Tom et al., "Cash Machines Offer a Whole Lotto Money . . . ", Crain's Chicago Business, Jun. 19, 1995, Section: News, p. 8, 2 pp.

Brochure: "MyPoints (R)", MotivationNet, Inc. (TM), Homepage: www.mypoints.com, Copyright: Apr. 1998, 29 pp.

## US 8,511,550 B1

Page 8

Bonnici, Joseph et al., "Consumer issues in coupon usage: An exploratory analysis", Journal of Applied Business Research, winter 1996/1997, vol. 13, No. 1, pp. 31-40, ISSNn: 0892-7626, CODEN: JPBEBK, 11 pp.

Hoeschen, Brad. "Brookfield Square Hopes Mall Card Strikes a Chord," Business Journal-Milwaukee, vol. 14, No. 50, p. 19, Sep. 12, 1997, 2 pp.

Armstrong, Larry. "The Free-PC Game: Lure 'Em in and Lock 'EM Up". Jul. 19, 1999  http://www.businessweek.com/1999/99__29/b3638169.htm?scriptFramed.

Iverson, Mark. "DataCard Partners With CSI to Offer Card-Based Loyalty Solution to Merchants." Jul. 19, 1998  http://www.thefreelibrary.com/__/print/PrintArticle.aspx?id=20883274.

"Cardbriefs: Stored-Value Card Designed for Casinos", The American Banker, Oct. 31, 1995, Section: Credit/Debit/ATMS, 1 pg.

"Tecmark Reward Terminal", (http //www tecmarkinc com/terminal htm), copyright, 1996 Tecmark Services, Inc., 1 pg.

WAP WTLS: Wireless Application Protocol Wireless Transport Layer Security Specification, Wireless Applications Forum, Limited, Apr. 30, 1998. [Retrieved on Jan. 19, 2009]. Retrieved from the Internet <Oct. 7, 2008>.

Fallon: "UK Retailers Loyal Customer 'Card Wars' Prove costly (Most major retailers in the UK have grown their sales over the past 2 years by lunching loyalty-card program" ; Supermarket News, May 5, 1997; vol. 47, No. 18, p. 57.

Booker, Ellis, "Checkout lines to offer more than just candy and waiting", Computer World, May 21, 1990, 1 pg.

Fickenscher, Lisa, "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patters", The American Banker, Mar. 24, 1997, Credit/Debit/ATMS, 2 pp.

Fickenscher, Lisa, "Amex to Start Free Rewards Program with Discounts on Merchandise", The American Banker, Oct. 18, 1996, Section: Credit/Debit/ATMS, p. 10, 2 pp.

Fitzgerald, Kate, "Amex program moves loyalty to next level: Custom Extras finds a medium customers can't ignore: Billing Statements", Advertising Age, Nov. 4, 1996, Section: News, 2 pp.

Amato-McCoy, Deena, "Co-Branded Acme Credit Card Rewards Loyal Users" Supermarket News, Jun. 15, 1998, Section: p. 17, ISSN: 0039-5803, 2 pp. "DataCard Partners With CSI to Offer Card-Based Loyalty Solution to Merchants", Business Wire, Jul. 9, 1998, 1 pg.

Albright, Mark, "Grocery savings via Web coupons", St. Petersburg Times, Jul. 22, 1998, Section: Business, 2 pg.

Notice of Allowance; U.S. Appl. No. 13/441,365; Mailing Date Jun. 16, 2012.

Non Final Rejection dated May 4, 2012; U.S. Appl. No. 13/428,656; pp. 1-6.

Notice of Allowance; U.S. Appl. No. 13/428,656; Mailing Date May 15, 2012.

Non Final Rejection dated Mar. 6, 2012; U.S. Appl. No. 13/359,120; pp. 1-7.

Notice of Allowance; U.S. Appl. No. 13/359,120; Mailing Date Apr. 18, 2012.

Non Final Rejection dated Mar. 12, 2012; U.S. Appl. No. 13/359,104; pp. 1-8.

Notice of Allowance; U.S. Appl. No. 13/359,104; Mailing Date Apr. 13, 2012.

Non Final Rejection dated Mar. 6, 2012; U.S. Appl. No. 13/359,080; pp. 1-11.

Notice of Allowance; U.S. Appl. No. 13/359,080; Mailing date Apr. 11, 2012.

Non Final Rejection dated Jan. 10, 2012; U.S. Appl. No. 12/759,506; pp. 1-10.

Notice of Allowance; U.S. Appl. No. 12/759,506; Mail date Mar. 5, 2012.

Non Final Rejection dated Dec. 15, 2012; U.S. Appl. No. 12/720,743; pp. 1-10.

Notice of Allowance; U.S. Appl. No. 12/720,743; Mailing date Jan. 24, 2012.

Non Final Rejection dated May 12, 2009; U.S. Appl. No. 11/420,255; pp. 1-7.

Notice of Allowance; U.S. Appl. No. 11/420,255; Mailing Date Dec. 16, 2009.

Non Final Rejection dated Sep. 24, 2012; U.S. Appl. No. 13/542,451; pp. 1-6.

Notice of Allowance; U.S. Appl. No. 13/542,451; Mailing Date Nov. 5, 2012.

Non Final Rejection dated Sep. 7, 2012; U.S. Appl. No. 13/532,342; pp. 1-6.

Notice of Allowance; U.S. Appl. No. 13/532,342; Mailing Date Sep. 24, 2012.

Non Final Rejection dated Sep. 6, 2012; U.S. Appl. No. 13/531,904; pp. 1-6.

Notice of Allowance; U.S. Appl. No. 13/531,904; Mailing Date Sep. 19, 2012.

Non Final Rejection dated Jul. 17, 2012; U.S. Appl. No. 13/479,417; pp. 1-11.

Notice of Allowance; U.S. Appl. No. 13/479,417; Mailing Date Jul. 30, 2012.

Notice of Allowance; U.S. Appl. No. 13/441,365; Mailing Date Jun. 18, 2012.

**U.S. Patent**          Aug. 20, 2013          Sheet 1 of 3          US 8,511,550 B1



**FIG. 1**

200
Ecommerce Site 210
Mr. Smith, you have 3 items in your shopping cart.
Purchase Options:
Credit Card
Check
E-wards
215
E-wards Account 220
Mr. Smith:
Airline Rewards
10,000
Loyalty Rewards
2,000
Entertainment Rewards
100.00
Funds
$100.00
222
Convert Checked Credits to Funds
225
E-wards Account 230
Mr. Smith,
You have selected to pay $100 credits (1 credit = 1 USD) to Ecommerce Site.
Is this correct?
Yes
Cancel
232
233
Ecommerce Site 240
Receipt
Mr. Smith, we have received your payment of $100.00 for 3 items.
Thank You

FIG. 2

**U.S. Patent**        Aug. 20, 2013        Sheet 3 of 3        US 8,511,550 B1



300

Consumer logs onto a rewards Web site
305

Rewards web site accesses user account information to determine the quantity of user earned non-negotiable credits
310

Consumer elects to redeem the non-negotiable credits
315

Consumer optionally selects a conversion form for the non-negotiable credits
320

A conversion ratio is determined, either internally through the rewards Web site or via a system that is remote and/or independent of the Web site, and a selected type of negotiable funds
325

An electronic commerce transaction is initiated to establish a converted quantity of negotiable funds in a user account
330

The quantity of converted non-negotiable credits is subtracted from the user's account
335

Consumer is presented via the rewards Web site with an access means for using the negotiable credits
340

Consumer logs off of the rewards Web site
345

**FIG. 3**

US 8,511,550 B1

**1**

# GRAPHICAL USER INTERFACE FOR THE CONVERSION OF LOYALTY POINTS VIA A LOYALTY POINT WEBSITE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/532,342 now issued U.S. Pat. No. 8,297,502 titled "User Interface For the Exchange of Non-Negotiable Credits For Entity Independent Funds", which was a continuation of U.S. Pat. No. 7,703,673, which was filed on May 25, 2006. U.S. Pat. Nos. 8,297,502 and 7,703,673 have been issued and are not presently pending.

Our claim to the priority date is through pending U.S. application Ser. No. 13/681,479 and U.S. application Ser. No. 13/681,493, which are continuation-in-part applications that claim the benefit of U.S. Pat. No. 8,342,399 and U.S. Pat. No. 8,376,224, which were pending at the time of filing these two applications.

U.S. Pat. No. 8,376,224 is a continuation-in-part application claiming the benefit of U.S. Pat. Nos. 7,703,673; 8,123, 127; and 8,162,209, which were pending at the time of the filing of this patent.

U.S. Pat. No. 8,342,399 is a continuation-in-part application claiming the benefit of U.S. Pat. Nos. 7,703,673; 8,123, 127; and 8,162,209, which were pending at the time of the filing of this patent.

Thus, there is a continuous chain of active pending U.S. cases from the co-pending applications back to U.S. Pat. No. 7,703,673, which was filed on May 25, 2006, which the present case is a continuation of—hence claiming the benefit of priority to this case (U.S. Pat. No. 7,703,673) is proper.

## BACKGROUND

The present disclosure relates to the field of graphical user interfaces for exchanging non-negotiable credits for entity independent funds.

Entities often reward consumers for utilizing their services with non-negotiable credits, such as frequent flier miles, consumer loyalty points, and entertainment credits. These non-negotiable credits can be applied towards products and/or services provided by a granting entity or its affiliates. For example, consumers can apply frequent flyer credits towards the purchase of airline tickets or airline upgrades. In another example, a consumer can utilize purchase points from a credit card company to receive percentage discounts on goods provided by affiliates. In still another example, entertainment credits can be redeemed for prizes offered in a winnings storefront of an entertainment site.

Many problems are inherent to the current techniques for the redemption of entity provided credits. One such problem is the restriction on usage to goods and/or services of the entity. That is, a consumer may have no need for the products or services listed by the entity for which the non-negotiable credits can be redeemed. Further, additional restrictions and limitations can be placed upon the non-negotiable credits that lessen the usefulness of non-negotiable credits from the consumer's perspective. For instance, airlines often limit the choice of travel dates, known as black-out dates, to which frequent flyer credits can be applied.

Another problem encountered by consumers when redeeming non-negotiable credits is time. Once a consumer submits a request to redeem their non-negotiable credits, the consumer must wait for the entity to perform one or more actions required to fulfill their request. These steps often require days or weeks to complete. For instance, consumers participating in online entertainment sites often are required to wait a minimum of three days for their entertainment credits to be redeemed. Redemption delay can be particularly aggravating to e-commerce consumers, who by nature of an e-commerce marketplace expect rapid responses and immediate consumer gratification.

Time can also be a factor for redeeming credits having an associated expiration date. A consumer's non-negotiable credits may expire before a sufficient quantity is acquired for a desired purchase. Lesser purchases requiring fewer credits may not have a significant appeal for the consumer. Hence, credit expiration dates can further decrease the consumer value of non-negotiable credits.

Yet another problem with conventional implementation of non-negotiable credits is that consumers often belong to multiple credit-earning programs that provide the consumers with multiple incompatible forms of non-negotiable credit. Each of these multiple programs can span a single industry or can span multiple industries. For example, a consumer can acquire a moderate number of frequent flyer miles with multiple airlines, where each airline specific account contains insufficient credits to have any meaningful consumer value. Consumers can also have many different types of non-negotiable credits, such as multiple merchant specific credit, credit card credits, and frequent flier miles, each having different redemption values and program redemption rules. These different programs, values, and rules can understandably confuse and frustrate consumers, who due to their confusion, often elect to avoid participating in an entity sponsored credit program.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

FIG. **1** is a schematic diagram of a Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

FIG. **2** is a schematic diagram of successive GUIs that illustrate the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

FIG. **3** is a flow chart of a method for the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

## DETAILED DESCRIPTION

The present disclosure permits consumers to transform non-negotiable credits provided by an entity to negotiable funds in an approximately immediate fashion using the Web. More specifically, a conversion agency can function as an intermediary that converts entity provided credits into entity independent funds. The conversion agency can be an independent entity that is not directly affiliated with the credit providing entities.

The conversion can occur automatically using a Web initiated action and can have approximately immediate results. Approximately immediate as used herein can signify that a transaction can occur within a single Web session with user acceptable delay tolerances, typically under half an hour and often under a few minutes. In one embodiment, credits can be automatically converted to funds as part of an e-commerce

US 8,511,550 B1

3

checkout. In another embodiment, credits can be converted into a user accessible account held with a financial institution.

The present disclosure can be implemented in accordance with numerous aspects consistent with material presented herein. For example, one aspect of the present disclosure can include a method for converting credits to funds. The method can include a step of a Web site receiving user identification information. Non-negotiable credits can be identified that are associated with an entity with which the user has previously interacted. The previous interactions could have earned the non-negotiable credits. Responsive to a user request, a conversion agency can convert a quantity of the non-negotiable credits into a quantity of negotiable funds. The conversion agency can be an agency not directly associated with the entity. The user can be permitted to access the quantity of negotiable funds. The quantity of negotiable funds can be applied to user specified purchases. At least a portion of the purchases can involve at least one vender that does not honor the non-negotiable credits.

Another aspect of the present disclosure can include a software method for converting non-negotiable credits into negotiable funds. The method can receive a user request to convert a quantity of non-negotiable credits held in a user account associated with an entity. A conversion rate between the non-negotiable credits available to the user and a form of negotiable funds can be automatically determined. A quantity of non-negotiable credits can be automatically subtracted from the user account. A quantity of the negotiable funds based upon the determined conversion rate and quantity of subtracted funds can be automatically transferred to a financial account. The financial account can be an account that is not associated with the entity. The entire method can occur in an approximately immediate fashion.

Still another aspect of the present disclosure can include a Web-based credit to fund conversion system. The system can include a non-negotiable credit account, a negotiable funds account, and a conversion agency. The non-negotiable credit account can be associated with an entity. Non-negotiable credits contained within the non-negotiable credit account can be earned though previous interactions between a user and the entity. The negotiable funds account can include negotiable funds that the user is able to apply to user specified e-commerce purchases. One or more venders involved in the e-commerce purchases can be venders that do not honor the non-negotiable credits for the e-commerce purchases. The conversion agency can automatically and approximately immediately convert a quantity of credits from the non-negotiable credit account to a quantity of funds in the negotiable funds account responsive to a request from the user.

It should be noted that various aspects of the disclosure can be implemented as a program for controlling computing equipment to implement the functions described herein, or a program for enabling computing equipment to perform processes corresponding to the steps disclosed herein. This program can be provided by storing the program in a magnetic disk, an optical disk, a semiconductor memory, or any other recording medium. The program can also be provided as a digitally encoded signal conveyed via a carrier wave. The described program can be a single program or can be implemented as multiple subprograms, each of which interact within a single computing device or interact in a distributed fashion across a network space.

It should also be noted that the methods detailed herein can also be methods performed at least in part by a service agent and/or a machine manipulated by a service agent in response to a service request.

4

FIG. 1 is a schematic diagram of a Web based conversion of non-negotiable credits associated with an entity to entity independent funds system 100 in accordance with an embodiment of the inventive arrangements disclosed herein. System 100 includes consumer 105 and conversion agency server 130.

Consumer 105 interacts with conversion agency server 130 via client 110. Client 110 can be any of a variety of interfaces including, but not limited to, another human being, a personal computer, a kiosk, a graphical user interface (GUI), a Web page, a telephone, a personal data assistant (PDA), a mobile phone, and the like.

Client 110 can operate in a stand-alone fashion. Alternatively, client 110 can be a device that cooperatively participates in a network of distributed computing devices. Client 110 can also be another human being utilizing an alternate form of Client 110 to access conversion agency server 130 via network 115. Network 115 can facilitate data exchanges over wireless as well as line-based communication pathways and protocols.

Both consumer 105 and conversion agency server 130 can interact with associate server 150, e-commerce server 120, and financial institution server 140 via network 115. Conversion agency server 130 includes user account data store 135 in which consumer 105 is a member. Associate server 150 includes customer data store 155 in which consumer 105 is a member. Financial institution server 140 includes account data store 142. Account data store 142 includes conversion agency account 144 corresponding to conversion agency 130.

Consumer 105 earns non-negotiable credits from associate server 150. The quantity of these non-negotiable credits is saved in customer data store 155. The method in which consumer 105 earns credits can be any of a variety of activities including, but not limited to, making online purchases, making in-store purchases, playing online games, participating in online games of chance, participating in surveys, and the like. Consumer 105 uses conversion agency server 130 to convert the non-negotiable credits from associate server 150 into negotiable funds provided by e-commerce server 120 or financial institution 140. In one embodiment, conversion agency 130 can include multiple reward accounts of consumer 105.

For example, consumer 105 earns five hundred credits from participating in an online game of chance hosted by associate server 150. Consumer 105 can choose to use conversion agency 130 to convert any or all of these credits to a monetary equivalent. Conversion agency 130 withdraws the necessary amount from conversion agency account 144 contained within the account data store 142 of financial institution 140 and transfers it to an account specified by consumer 105. In another example, consumer 105 uses conversion agency 130 to complete a purchase at e-commerce server 120. Again, conversion agency 130 withdraws the necessary amount from conversion agency account 144 contained within the account data store 142 of financial institution 140 and transfers it to the account of e-commerce server 120.

E-commerce server 120 can be any Web site that supports online purchases of goods or services. In one embodiment, e-commerce server 120 can include a distinct payment option for conversion agency 130. This distinct payment option could process the conversion of credits through their Web site. Alternatively, the distinct payment option could launch an application to process the conversion of credit that is separate from their Web site. In another embodiment, associate server 150 can act as e-commerce server 120.

Financial institution server 140 can be any of a variety of entities including, but not limited to, a bank, a credit card

US 8,511,550 B1

5

company, an investment firm, and the like. In one embodiment, financial institution server **140** can reside in the same country as consumer **105** and/or associate server **150**. In another embodiment, financial institution server **140** can reside in a country other than that of consumer **105** and/or associate server **150**.

FIG. **2** is a schematic diagram of successive GUIs that illustrate the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system **200** in accordance with an embodiment of the inventive arrangements disclosed herein.

GUI **210** can be a checkout window from any e-commerce site. GUI **210** includes payment button **215**. Payment button **215** can represent a payment option that includes the conversion of non-negotiable credits to purchase the items in the shopping cart. Selection of payment button **215** by a user can produce GUI **220**.

GUI **220** can be a display window from a conversion agency. GUI **220** includes display box **222** and button **225**. GUI **220** can be rendered by any of a variety of means including, but not limited to, a Web browser, a JAVA applet, a PERL script, and the like. In one embodiment, GUI **220** can be contained within the e-commerce site. GUI **220** can display the balance of non-negotiable credits from one or more reward programs. GUI **220** contains a means by which the user selects the type of non-negotiable credits to convert including, but not limited to, a set of radio buttons, a set of checkboxes, a highlighting mechanism, and the like. Display box **222** can display the monetary value of the selected non-negotiable credits. The value displayed in display box **222** can be based on preset conversion factors. Button **225** can represent the initiation of the process by which the selected non-negotiable credits are converted to negotiable funds. Selection of button **225** by a user can produce GUI **230**.

GUI **230** can be a display window from a conversion agency. GUI **230** includes yes button **232** and cancel button **233**. GUI **230** can be rendered by any of a variety of means including, but not limited to, a Web browser, a JAVA applet, a PERL script, and the like. In one embodiment, GUI **230** can be contained within the e-commerce site. GUI **230** can display a summary message of the transaction initiated by GUI **220**. GUI **230** can include a means to continue the transaction, yes button **232**, and a means to cancel the transaction, cancel button **233**. Selection of cancel button **233** by a user cancels the transaction and can return the user to GUI **220**. Selection of yes button **232** by a user completes the transaction initiated in GUI **220** and can produce GUI **240**.

GUI **240** can be a display window from the same said e-commerce site. GUI **240** can contain a message acknowledging the successful conversion of the user's non-negotiable credits into negotiable funds for the purchase of the items in the shopping cart.

FIG. **3** is a flow chart of a method **300** for the Web based conversion of non-negotiable credits associated with an entity to entity independent funds system in accordance with an embodiment of the inventive arrangements disclosed herein.

Method **300** can begin in step **305**, where a consumer logs onto a rewards Web site. In step **310**, the rewards Web site utilizes the user information provided in step **305** to access the consumer's account information and display the amount of non-negotiable credits in the consumer's account. The consumer elects to redeem some quantity of non-negotiable credits in step **315**. If supported by the rewards Web site, step **320** can occur in which the consumer can select the form of negotiable funds to convert the non-negotiable credits. In step **325**, a ratio is determined for the conversion of the non-negotiable credits to the selected type of negotiable funds.

6

This ratio can be determined by any of a variety of means including, but not limited to, an algorithm internal to the rewards Web site, an algorithm contained in a system that is remote and/or independent of the rewards Web site, and the like. An electronic commerce transaction is initiated in step **330** to establish the converted amount of negotiable funds in a user account. The quantity of converted non-negotiable credits is subtracted from the user's account in step **335**. In step **340**, the rewards Web site presents the consumer with an access means for the negotiable funds. Lastly, the consumer terminates the session by logging off the rewards Web site in step **345**.

The present disclosure may be realized in hardware, software, or a combination of hardware and software. The present disclosure may be realized in a centralized fashion in one computer system or in a distributed fashion where different elements are spread across several interconnected computer systems. Any kind of computer system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general purpose computer system with a computer program that, when being loaded and executed, controls the computer system such that it carries out the methods described herein.

The present disclosure also may be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods. Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following: a) conversion to another language, code or notation; b) reproduction in a different material form.

This disclosure may be embodied in other forms without departing from the spirit or essential attributes thereof. Accordingly, reference should be made to the following claims, rather than to the foregoing specification, as indicating the scope of the disclosure.

What is claimed is:

1. A method comprising:

a computer serving a set of one or more Web pages for a loyalty program of an entity to one or more remotely located client machines, wherein the Web pages are able to be rendered within a client-side browser as a graphical user interface on the one or more client machines, wherein upon being rendered within the client-side browser said graphical user interface shows a quantity of non-negotiable credits, wherein said non-negotiable credits are loyalty points of the loyalty program possessed by a member, wherein upon being rendered within the client-side browser the graphical user interface comprises a conversion option to convert at least a subset of the shown non-negotiable credits into a quantity entity independent funds, wherein said entity independent funds are different loyalty points of a different loyalty program of a commerce partner, wherein said entity independent funds are possessed by the member, wherein an agreement exists between the entity and the commerce partner, wherein the agreement permits members to convert the non-negotiable credits to entity independent funds in accordance with a fixed credits-to-funds conversion ratio, wherein the agreement specifies that the entity is to compensate the commerce partner in an agreed upon amount of cash or credit for conversions of non-negotiable credits to entity inde-

US 8,511,550 B1

7

pendent funds, wherein said agreed upon amount is a multiple of a quantity of converted non-negotiable credits, wherein the entity independent funds are redeemable per the different loyalty program for commerce partner goods or for commerce partner services, wherein the commerce partner is not said entity, wherein in absence of being converted the non-negotiable credits are not accepted as payment for commerce partner goods or for commerce partner services;

the computer responsive to receiving a message indicating a selection of the conversion option, processing the selection to effectuate changes in the served set of Web pages; and

responsive to the processing, the computer serving one or more Web pages or Web page updates that include the effectuated changes to the one or more remotely located client machines, wherein upon being rendered within the client-side browser the graphical user interface is updated with the effectuated changes, wherein the updated graphical user interface shows a reduced quantity of non-negotiable credits possessed by the member in the loyalty program, said reduced quantity resulting at least in part from the subset of non-negotiable credits being converted into the quantity of entity independent funds in accordance with the fixed credits-to-funds conversion ratio.

**2**. The method of claim **1**, wherein the updated graphical user interface shows a quantity of entity independent funds resulting from converting the subset of non-negotiable credits into the quantity of entity independent funds in accordance with the fixed credits-to-funds conversion ratio.

**3**. The method of claim **1**, wherein the updated graphical user interface shows a quantity of available entity independent funds possessed by the member for use as payment for the goods or services provided by the commerce partner, said quantity of available entity independent funds including an amount resulting from the conversion operation.

**4**. The method of claim **1**, wherein the entity charges the member a fee for converting the non-negotiable credits to the entity independent funds, wherein the fee is specified in terms-of-use of the loyalty program.

**5**. The method of claim **1**, wherein the entity imposes a lower threshold on the quantity of non-negotiable credits able to be converted via conversion option the Web pages, wherein the lower threshold is greater than one hundred non-negotiable credits.

**6**. The method of claim **1**, wherein the loyalty program of the entity is an airline, hotel, or credit card loyalty program, wherein the different loyalty program of the commerce partner is an airline, hotel, or credit card loyalty program.

**7**. The method of claim **1**, wherein the computer serves the set of one or more Web pages, processes the selection, and serves the one or more Web pages or Web page updates that include the effectuated changes within a single user-interactive Web session.

**8**. The method of claim **1**, wherein the entity has contractual agreements with a plurality of different commerce partners establishing different agreed upon conversion ratios and different compensation amounts owed by the entity to the different commerce partners for exchanging non-negotiable credits of the loyalty program for funds of loyalty programs of the different commerce partners, wherein said Web pages when rendered within the graphical user interface show the different agreed upon conversion ratios to the member.

**9**. A method comprising:

a computer serving a set of one or more Web pages for a different loyalty program of an commerce partner to one

8

or more remotely located client machines, wherein the Web pages are able to be rendered within a client-side browser as a graphical user interface on the one or more client machines, wherein upon being rendered within the client-side browser said graphical user interface shows a quantity of entity independent funds, wherein said entity independent funds are different loyalty points of the different loyalty program possessed by a member, wherein upon being rendered within the client-side browser the graphical user interface comprises

a conversion option to convert at least a subset of non-negotiable credits into a quantity of the entity independent funds, wherein said non-negotiable credits are loyalty points of a loyalty program of an entity, wherein said non-negotiable credits are possessed by the member, wherein an agreement exists between the entity and the commerce partner, wherein the agreement permits members to convert the non-negotiable credits to the entity independent funds in accordance with a fixed credits-to-funds conversion ratio, wherein the agreement specifies that the entity is to compensate the commerce partner in an agreed upon amount of cash or credit for conversions of non-negotiable credits to entity independent funds, wherein said agreed upon amount is a multiple of a quantity of converted non-negotiable credits, wherein the entity independent funds are redeemable per the different loyalty program for commerce partner goods or for commerce partner services, wherein the commerce partner is not said entity, wherein in absence of being converted the non-negotiable credits are not accepted as payment for commerce partner goods or for commerce partner services;

the computer responsive to receiving a message indicating a selection of the conversion option, processing the selection to effectuate changes in the served set of Web pages; and

responsive to the processing, the computer serving one or more Web pages or Web page updates that include the effectuated changes to the one or more remotely located client machines, wherein upon being rendered within the client-side browser the graphical user interface is updated with the effectuated changes, wherein the updated graphical user interface shows an increased quantity of entity independent funds possessed by the member, said increased quantity resulting at least in part from the subset of non-negotiable credits being converted into the quantity of entity independent funds in accordance with the fixed credits-to-funds conversion ratio.

**10**. The method of claim **9**, wherein the updated graphical user interface shows a quantity of non-negotiable credits expended as a result of converting the subset of non-negotiable credits into the quantity of entity independent funds in accordance with the fixed credits-to-funds conversion ratio.

**11**. The method of claim **9**, wherein the updated graphical user interface shows a quantity of available non-negotiable credits, said quantity of available non-negotiable credits representing an amount remaining after converting the subset of non-negotiable credits in accordance with the fixed credits-to-funds conversion ratio.

**12**. The method of claim **9**, wherein the commerce partner charges the member a fee for converting the non-negotiable credits to the entity independent funds, wherein the fee is specified in terms-of-use of the different loyalty program.

**13**. The method of claim **9**, wherein the commerce partner imposes a lower threshold on the quantity of non-negotiable

US 8,511,550 B1

9

credits able to be converted via conversion option the Web pages, wherein the lower threshold is greater than one hundred non-negotiable credits.

**14**. The method of claim **9**, wherein the loyalty program of the entity is an airline, hotel, or credit card loyalty program, and wherein the different loyalty program of the commerce partner is an airline, hotel, or credit card loyalty program.

**15**. The method of claim **9**, wherein the computer serves the set of one or more Web pages, processes the selection, and serves the one or more Web pages or Web page updates that include the effectuated changes within a single user-interactive Web session.

**16**. The method of claim **9**, wherein the commerce partner has contractual agreements with a plurality of different entities establishing different agreed upon conversion ratios and different compensation amounts owed by the different entities to the commerce partner for exchanging non-negotiable credits of the different entities for entity independent funds of the commerce partner, wherein said Web pages when rendered within the graphical user interface show the different agreed upon conversion ratios to the member.

**17**. A method comprising:

a computer, comprising hardware, presenting a graphical user interface (GUI) on a display to a service agent and/or a machine manipulated by the service agent, wherein the service agent is a human agent authorized to act on behalf of an entity or a commerce partner, said graphical user interface showing a quantity of non-negotiable credits, wherein said non-negotiable credits are loyalty points of a loyalty program of the entity, wherein said shown quantity of non-negotiable credits are possessed by a member, wherein said shown quantity of non-negotiable credits were previously earned through previous interactions involving the loyalty program, the graphical user interface comprising a conversion option to convert at least a subset of the shown non-negotiable credits into a quantity entity independent funds, wherein said entity independent funds are different loyalty points of a different loyalty program of the commerce partner, wherein said entity independent funds are possessed by the member, wherein an agreement exists between the entity and the commerce partner, wherein the agreement permits the service agent to convert the non-negotiable credits to the entity independent funds in accordance

10

with a fixed credits-to-funds conversion ratio, wherein the agreement specifies that the entity is to compensate the commerce partner in an agreed upon amount of cash or credit for conversions of non-negotiable credits to entity independent funds, wherein said agreed upon amount is a multiple of a quantity of converted non-negotiable credits, wherein the entity independent funds are redeemable per the different loyalty program for commerce partner goods or for commerce partner services, wherein the commerce partner is not said entity, wherein in absence of being converted the non-negotiable credits are not accepted as payment for commerce partner goods or for commerce partner services;

the computer receiving a selection of the conversion option; and

responsive to the received selection being processed, the computer presenting within the graphical user interface a reduced quantity of non-negotiable credits possessed by the member, said reduced quantity resulting at least in part from converting the subset of non-negotiable credits into the quantity of entity independent funds in accordance with the fixed credits-to-funds conversion ratio.

**18**. The method of claim **17**, wherein the computer charges the member a fee for converting the non-negotiable credits to the entity independent funds, wherein the fee is specified in terms-of-use of the loyalty program or is specified in terms-of-use of the different loyalty program.

**19**. The method of claim **17**, wherein the loyalty program is an airline, hotel, or credit card loyalty program, wherein the different loyalty program is an airline, hotel, or credit card loyalty program, wherein the computer presents the graphical user interface, receives the selection of the conversion option, and presents the reduced quantity of non-negotiable funds a single user-interactive session involving the computer and the service agent.

**20**. The method of claim **17**, wherein the service agent is an employee of an airline, a hotel, a credit card company, or of a company providing customer service for the loyalty program or for the different loyalty program, wherein the loyalty program is an airline, hotel, or credit card loyalty program, and wherein the different loyalty program is an airline, hotel, or credit card loyalty program.

* * * * *

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

No 13-CV-6561 (JFB) (AKT)

SILVER LINE BUILDING PRODUCTS LLC,

Plaintiff,

VERSUS

J-CHANNEL INDUSTRIES CORPORATION,

Defendant.

MEMORANDUM AND ORDER
March 24, 2014

JOSEPH F. BIANCO, District Judge:

On November 26, 2013, Silver Line Building Products LLC ("Silver Line" or "plaintiff") commenced this action against J-Channel Industries Corporation ("J-Channel" or "defendant"), seeking a declaratory judgment that windows manufactured, sold, and marketed by Silver Line do not infringe on United States Reissue Patent No. 40,041 ("the '041 patent"). This is the second action filed concerning the alleged infringement of the '041 reissue patent by Silver Line windows. Approximately six weeks before Silver Line commenced this action against J-Channel, on October 9, 2013, J-Channel filed suit against Silver Line's parent company, Andersen Corporation ("Andersen"), in the Eastern District of Tennessee, alleging that Silver Line windows infringe on the '041 patent (the "Tennessee Action"). On December 9, 2013, J-Channel filed in the Tennessee Action an amended complaint, which replaced Andersen with Silver Line as

a defendant. On December 23, 2013, Silver Line moved in the Eastern District of Tennessee to transfer the Tennessee Action to this district. That motion remains pending.

Presently before this Court is J-Channel's motion to dismiss, stay, or transfer this action to the Eastern District of Tennessee. For the following reasons, the Court grants J-Channel's motion to stay this action while Silver Line's motion to transfer the Tennessee Action remains pending in the Eastern District of Tennessee. First, the Court determines that the Tennessee Action is the first-filed action under the Federal Circuit's first-to-file rule, which "generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012). As explained *infra*, it is clear that the Tennessee Action was filed first, and both the Tennessee Action and this action involve the same patent and the same allegedly

1

Case 2:13-cv-00655-WCB   Document 117-3   Filed 08/15/14   Page 60 of 67 PageID #:  2090

Case 2:13-cv-00655-WCB   Document 117-3   Filed 08/15/14   Page 60 of 67 PageID #:  2090
Case 2:13-cv-01782-GBD   Document 13-1   Filed 04/14/14   Page 2 of 9 PageID #: 434

infringing products. In such circumstances, it is inconsequential that Silver Line did not become a party to the Tennessee Action until after it commenced this action. Second, having determined that the Tennessee Action is the first-filed action, the Court considers the applicability of any exception to the general rule favoring adjudication in the forum of the first-filed action. Here, in particular, Silver Line asserts that the balance of convenience factors favors this forum over the Eastern District of Tennessee. Because the Tennessee Action is the first-filed action, the Court concludes that the Eastern District of Tennessee is the more appropriate forum to determine whether an exception to the first-to-file rule applies. Accordingly, the Court stays this action pending a decision on Silver Line's pending motion to transfer venue in the Eastern District of Tennessee.

I. BACKGROUND

A. The Tennessee Action

On October 9, 2013, J-Channel filed suit in the Eastern District of Tennessee against Andersen and Home Depot U.S.A., Inc. ("Home Depot") for infringement of the '041 patent. (*See* Compl., *J-Channel Indus. Corp. v. Home Depot, Inc.*, No. 13-CV-606 (E.D. Tenn. Oct. 9, 2013) ("Tenn. Compl.").)[1]) Andersen is the parent company of Silver Line, having acquired Silver Line in 2006. (Decl. of Timothy E. Grochocinski ¶ 10, Jan. 15, 2014.) J-Channel alleged that it was the assignee of the '041 reissue patent (Tenn. Compl. ¶ 12), and that Andersen and

Home Depot infringed at least one claim of the '041 reissue patent by manufacturing and selling the "Silver Line by Andersen 3000 Series Double-Hung Window" and the "American Craftsman by Andersen 70 Double Hung Fin Vinyl Window" (*id.* ¶¶ 14–15).

J-Channel has filed similar lawsuits in the Eastern District of Tennessee against other defendants for infringement of the '041 reissue patent. Including the Tennessee Action, there are currently twenty-two pending cases in the Eastern District of Tennessee alleging infringement of the '041 reissue patent.[2] On October 17, 2013, Magistrate Judge C. Clifford Shirley, Jr. of the Eastern District of Tennessee found that these twenty-two cases are related because all allege infringement of the '041 reissue patent, and ordered that all twenty-two cases be assigned to a single district court judge and magistrate judge. (*See* Order, ECF No. 6, *J-Channel Indus. Corp. v. Home Depot U.S.A., Inc.*, No. 13-CV-606 (E.D. Tenn. Oct. 17, 2013).)

On November 26, 2013, Andersen moved to dismiss the complaint in the Tennessee Action. Andersen asserted that Silver Line, not Andersen, manufactures, markets, and sells the Silver Line 3000 Series and American Craftsman 70 Series Windows. (*See* Mot. & Mem. of Law, ECF Nos. 15–16, *J-Channel Indus. Corp. v. Home Depot U.S.A., Inc.*, No. 13-CV-606 (E.D. Tenn. Nov. 26, 2013).) On December 9, 2013, after Andersen filed its motion to dismiss, J-

---

[1] The Court takes judicial notice of the Tennessee Action. *See, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *Vaughn v. Consumer Home Mortg. Co., Inc.*, 470 F. Supp. 2d 248, 256 n.8 (E.D.N.Y. 2007) ("It is . . . well established that courts

may take judicial notice of court records"), *aff'd*, 297 F. App'x 23 (2d Cir. 2008).

[2] Nos. 13-CV-471, 13-CV-472, 13-CV-473, 13-CV-474, 13-CV-600, 13-CV-601, 13-CV-602, 13-CV-603, 13-CV-604, 13-CV-468, 13-CV-605, 13-CV-606, 13-CV-607, 13-CV-609, 13-CV-610, 13-CV-611, 13-CV-613, 13-CV-614, 13-CV-615, 13-CV-616, 13-CV-617, 13-CV-619.

Channel filed an amended complaint against Silver Line and Home Depot for infringement of the '041 reissue patent.

### B. The Instant Action

On November 26, 2013—the same day that Andersen moved to dismiss the complaint in the Tennessee Action—Silver Line filed suit against J-Channel in this Court. Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Silver Line seeks a declaration that its windows, including the Silver Line 3000 Series Double-Hung Window and the American Craftsman 70 Double Hung Fin Vinyl Window, do not infringe any claim of the '041 reissue patent, and that the '041 reissue patent is invalid and unenforceable. (Compl. ¶ 1.)

On January 15, 2014, J-Channel filed a motion to dismiss, stay, or transfer this action to the Eastern District of Tennessee. Silver Line opposed the motion on February 14, 2014, and J-Channel replied on February 28, 2014. The Court heard oral argument on J-Channel's motion on March 12, 2014. The Court has fully considered the submissions of the parties.

## II. DISCUSSION

### A. Legal Standard

The Federal Circuit has explained that "[t]he 'first-to-file' rule is a doctrine of federal comity, intended to avoid conflicting decisions and promote judicial efficiency, that generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial*, 681 F.3d at 1299. Specifically, "[w]hen two actions that sufficiently overlap are filed in different federal district courts, one for infringement and the other for declaratory relief, the

declaratory judgment action, if filed later, generally is to be stayed, dismissed, or transferred to the forum of the infringement action." *Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013). "Resolution of whether the second-filed action should proceed presents a question sufficiently tied to patent law that the question is governed by [the Federal Circuit's] law." *Id.* The Federal Circuit adopted the first-to-file rule for patent cases in *Genentech, Inc. v. Eli Lilly and Co.*, a decision in which the Federal Circuit recognized that the question of whether the second-filed suit should yield to the first-filed suit "raises the issue of national uniformity in patent cases, and invokes the special obligation of the Federal Circuit to avoid creating opportunities for dispositive differences among the regional circuits." 998 F.2d 931, 937 (Fed. Cir. 1993), *overruled on other grounds*, *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). "The filing date of an action derives from the filing of the complaint." *Merial*, 681 F.3d at 1299.

Although "the forum of the first-filed case is favored," *Genentech*, 998 F.2d at 937, "exceptions may be made if justified by 'considerations of judicial and litigant economy, and the just and effective disposition of disputes.'" *Futurewei Techs.*, 737 F.3d at 708 (quoting *Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005)). These exceptions "are not rare, and are made when justice or expediency requires, as in any issue of choice of forum." *Genentech*, 998 F.2d at 937. More recently, the Federal Circuit has held that a district court's decision to depart from the general rule favoring the first-filed action must take into account "the convenience factors under 28 U.S.C. § 1404(a)." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008). Such factors include, but are not limited to, "the convenience and availability of witnesses, the absence of jurisdiction over

all necessary or desirable parties, and the possibility of consolidation with related litigation." *Id.*; *see Genentech*, 998 F.2d at 938. Other convenience factors traditionally considered under 28 U.S.C. § 1404(a) include the plaintiff's choice of forum, the location of relevant documents and relative ease of access to sources of proof, the convenience of the parties, the locus of operative facts, the relative means of the parties, and the forum's familiarity with the governing law. *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012).

B. Application

1. First-Filed Action

First, J-Channel and Silver Line dispute whether the Tennessee Action or this action is the first-filed action for purposes of the first-to-file rule. Of course, neither party disputes the obvious: the Tennessee Action was filed first. However, the parties disagree over whether the Tennessee Action qualifies as the first-filed action where Silver Line did not become a party to the Tennessee Action until after this action was filed. To resolve this dispute, the Court must decide whether the first-to-file rule applies only when there are identical parties in concurrent actions. If identical parties are required, as Silver Line contends, then this action would be the first-filed because this Court was the first court to acquire jurisdiction over both J-Channel and Silver Line. As noted *supra*, J-Channel added Silver Line as a defendant to the Tennessee Action after this action was filed. However. if identical parties are not required, as J-Channel maintains, then this Court must assess whether this action and the Tennessee Action otherwise sufficiently overlap, such

that the Tennessee Action, which was filed first, would be considered the first-filed action for purposes of the first-to-file rule.

"The Federal Circuit has not expressly stated a view as to whether, in patent cases, the first-to-file rule applies only where the concurrent actions at issue involve identical parties." *Shire U.S., Inc. v. Johnson Matthey, Inc.*, 543 F. Supp. 2d 404, 408 (E.D. Pa. 2008); *see Horton Archery, LLC v. Am. Hunting Innovations, LLC*, No. 09-CV-1604, 2010 WL 395572, at *4 (N.D. Ohio Jan. 27, 2010) (noting lack of direct Federal Circuit authority). Nonetheless, the Federal Circuit has recently indicated, albeit implicitly, that the first-to-file rule does not require identical parties. As noted *supra*, in its most recent explanation of the first-to-file rule, the Federal Circuit held that the first-to-file rule applies "[w]hen two actions that *sufficiently overlap* are filed in different federal district courts, one for infringement and the other for declaratory relief." *Futurewei Techs.*, 737 F.3d at 708 (emphasis added). The Federal Circuit did not state that identical parties are required for the first-to-file rule to apply. Similarly, the Federal Circuit has held that the first-to-file rule "generally favors pursuing only the first-filed action when multiple lawsuits involving *the same claims* are filed in different jurisdictions." *Merial*, 681 F.3d at 1299 (emphasis added). Again, the Federal Circuit did not hold that the rule requires identical parties in the concurrent actions.[3]

Moreover, to the extent that the Federal Circuit has been ambiguous on the matter, district courts confronted with this issue have consistently "found no requirement that the parties in the concurrent actions be the same

---

[3] The Federal Circuit has also noted recently that the first-to-file rule applies "when a complaint involving the same parties and issues has already been filed in another district," *In re Foundations Worldwide, Inc.*,

542 F. App'x 998, 999 (Fed. Cir. 2013); however, that decision does not hold that the first-to-file rule applies *only* when the parties to the two actions are identical.

in order for the first-to-file rule to apply." *Shire U.S.*, 543 F. Supp. 2d at 408; *see, e.g.*, *Proctor & Gamble Co. v. Team Techs., Inc.*, No. 12-CV-552, 2012 WL 5903126, at *2 (S.D. Ohio Nov. 26, 2012); *Interactive Fitness Holdings, LLC, v. Icon Health & Fitness, Inc.*, No. 10-CV-04628-LHK, 2011 WL 1302633, at *3 (N.D. Cal. Apr. 5, 2011); *Horton Archery*, 2010 WL 395572, at *4–5. Instead, those decisions examine whether two concurrent actions "involve the same patent and the same allegedly infringing product," and then determine which of those two actions was filed first. *Shire U.S.*, 543 F. Supp. 2d at 409.

For example, in *Shire*, Johnson Matthey, Inc. and Johnson Matthey PLC (collectively, "Johnson Matthey") had filed a complaint against Noven Pharmaceuticals, Inc. in the Eastern District of Texas, claiming patent infringement. 543 F. Supp. 2d at 406. Shire U.S., Inc. and Shire Pharmaceuticals Ireland Limited (collectively, "Shire") subsequently filed suit against Johnson Matthey in the Eastern District of Pennsylvania, seeking a declaration that Shire did not infringe on the patent at issue in the Texas action. *Id.* Thereafter, Johnson Matthey amended its complaint in the Texas action to add Shire as a defendant. *Id.* The Eastern District of Pennsylvania held that the Texas action was the first-filed, even though Shire was not originally a party to the Texas action, because both the Texas action and the Pennsylvania action involved "the same patent and the same allegedly infringing product," and the Texas action was filed before the Pennsylvania action. *Id.* at 409.

The Court finds the reasoning in *Shire* to be persuasive, particularly in light of the more recent Federal Circuit cases that have emphasized whether two concurrent actions "sufficiently overlap," *Futurewei Techs.*, 737 F.3d at 708, or "involve[e] the same claims," *Merial*, 681 F.3d at 1299. Moreover, as the *Shire* decision noted, "[a] rigid requirement that there be identical parties in the actions at issue would be at odds with the [first-to-file] rule's flexible nature, which the Federal Circuit has emphasized." *Shire U.S.*, 543 F. Supp. 2d at 409 (citing *Genentech*, 998 F.2d at 937–38). Finally, the approach taken in *Shire* and by other district courts in patent cases is consistent with the application of the first-to-file rule in many non-patent cases. *See, e.g.*, *Meeropol v. Nizer*, 505 F.2d 232, 235 (2d Cir. 1974) (noting that the first-to-file rule "is applicable even where the parties in the two actions are not identical"); *Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F. Supp. 2d 235, 244 (E.D.N.Y. 2012) ("Importantly, application of the [first-to-file] rule does not require *identical* parties in the cases, but merely requires substantial overlap." (emphasis in original) (internal citations and quotation marks omitted)); *accord Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (noting that the first-to-file rule requires "substantial overlap" but "does not . . . require that cases be identical").[4]

---

[4] Silver Line cites a Ninth Circuit case for the proposition that the parties in the two actions must be identical for the first-to-file rule to apply. *See Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628 n.13 (9th Cir. 1991) ("Of course, if the issues or parties involved in the two suits were not the same, adherence to the first-to-file rule would be reversible error for it would constitute a misapplication of the law." (emphasis removed)). (*See* Pl.'s Opp. at 4.) However, in a subsequent, unpublished opinion, the Ninth Circuit stated both that the two actions must involve "the same parties and the issues," but also that "[t]he parties and issues do not need to be exactly identical." *Audio Entm't Network, Inc. v. Am. Tel. & Tel. Co.*, 205 F.3d 1350 (Table), 1999 WL 1269329, at *1 (9th Cir. 1999).

Applying the foregoing principles to the case at bar, the Court concludes that the Tennessee Action is the first-filed action. Even before Silver Line became a party to the Tennessee Action, the Tennessee Action and this action involved the same patent and the same allegedly infringing products. *See, e.g.*, *Shire U.S.*, 543 F. Supp. 2d at 409. Moreover, even though Silver Line was not a party to the Tennessee Action at the outset, its parent corporation was. In these circumstances, the Court concludes that the two actions sufficiently overlapped even before the addition of Silver Line as a party to the Tennessee Action. *See Futurewei Techs.*, 737 F.3d at 708. Because the complaint in the Tennessee Action was filed over six weeks before the filing of the complaint in this action, the Tennessee Action is the first-filed action under Federal Circuit law.[5, 6]

### 2. Convenience Factors

Having determined that the Tennessee Action is the first-filed action, the Court turns to whether an exception to the first-to-file rule applies. *See, e.g.*, *Futurewei Techs.*, 737 F.3d at 708. In this regard, Silver Line contends that the balance of convenience factors identified by the Federal Circuit favors this forum over the Eastern District of Tennessee.

The Court notes that several convenience factors actually favor the Eastern District of

Tennessee over this district. Most significantly in this Court's view, there are twenty-one other cases pending in the Eastern District of Tennessee concerning infringement of the '041 reissue patent, all of which are before one district court judge and one magistrate judge. *See, e.g.*, *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013) ("[W]e have held that a district court's experience with a patent in prior litigation and the co-pendency of cases involving the same patent are permissible considerations in ruling on a motion to transfer venue." (citing *In re Vistaprint, Ltd.*, 628 F.3d 1342, 1346–47 & n. 3 (Fed. Cir. 2010))). Moreover, travel to this district would burden two potential witnesses identified by J-Channel: Kendall Sayers and Leland Sayers. Kendall Sayers, the owner of the '041 reissue patent through his company JPat LLC, lives in the Eastern District of Tennessee and declares that it would be a significant burden on himself and his family to travel to this district. (Decl. of Kendall Sayers ¶¶ 2, 8, Jan. 14, 2014.) Leland Sayers, the inventor of the '041 reissue patent and Kendall Sayers's father, lives in Florida but routinely travels to the Eastern District of Tennessee to visit family, and he declares that he does not know if he would be able to travel to this district.[7] (Decl. of Leland Sayers ¶¶ 2, 5–6.) All witnesses identified by Silver Line are located in New Jersey (*see* Decl. of Andy Karr ¶¶ 11, 15, 18–22, Feb. 13, 2014), and, therefore, those witnesses would bear

---

[5] In other words, because the first-to-file rule does not require identical parties to both actions, even if Silver Line had never been added as a party to the Tennessee Action, this Court would have held that the first-to-file rule applied, and would have recognized the Tennessee Action as the first-filed. The fact that Silver Line was, in fact, subsequently added to the Tennessee Action is thus inconsequential.

[6] Because the Court decides that the Tennessee Action is the first-filed on the grounds that it sufficiently overlaps with the instant action, the Court need not reach J-Channel's alternative argument that its addition of Silver Line as a defendant in the Tennessee

Action should relate back to the filing of the original complaint.

[7] Florida is more than 100 miles from this district and the Eastern District of Tennessee (*see* Decl. of Timothy E. Grochocinski ¶ 4 & Ex. 5, Jan. 15, 2014), and Rules 45(b)(2) and 45(c)(3)(A)(ii) of the Federal Rules of Civil Procedure prohibit a subpoena from directing a witness to travel more than 100 miles. Accordingly, neither this court nor the Eastern District of Tennessee could compel Leland Sayers to testify at trial.

the burden of traveling to a different judicial district whether litigation occurs in this district or in the Eastern District of Tennessee. Thus, the convenience of witnesses appears to favor the Eastern District of Tennessee as a forum. *See, e.g.,* *Neil Bros. Ltd. v. World Wide Lines, Inc.,* 425 F. Supp. 2d 325, 330 (E.D.N.Y. 2006) (holding that the convenience of witnesses favored transfer from New York to Tennessee, where transfer would relieve certain witnesses from any travel, and other witnesses would have to travel whether litigation occurred in New York or Tennessee). Other factors, such as the location of relevant documents, the locus of operative facts,[8] and each forum's familiarity with governing law, are more neutral. *See, e.g.,* *EasyWeb Innovations,* 888 F. Supp. 2d at 352 (location of documents is largely neutral "given the technological age in which we live, with the widespread use of, among other things, electronic document production"), 354 (locus of operative facts is a neutral factor where patent-in-suit was developed in one district, and the allegedly infringing product was designed, developed, and produced in the other district); *Neil Bros.,* 425 F. Supp. 2d at 333 ("Where, as here, the law to be applied is federal patent law, the factor is neutral.").

However, the Eastern District of Tennessee, and not this Court, is the appropriate forum to balance all relevant convenience factors and determine whether they warrant departure from the first-to-file rule's presumption favoring the forum of the first-filed action. "The first-to-file rule has generally been interpreted to dictate not only which forum is appropriate, but also which

forum should *decide* which forum is appropriate." *EMC Corp. v. Parallel Iron, LLC,* 914 F. Supp. 2d 125, 129 (D. Mass. 2012) [hereinafter *Parallel Iron*] (applying Federal Circuit law) (emphasis in original); *see, e.g.,* *Cellectis S.A. v. Precision Biosciences, Inc.,* 881 F. Supp. 2d 609, 613 (D. Del. 2012) (concluding that first-filed forum should "determine whether exceptions to the first-filed rule apply"); *EMC Corp. v. Bright Response, LLC,* No. C-12-2841-EMC, 2012 WL 4097707, at *5 (N.D. Cal. Sept. 17, 2012) [hereinafter *Bright Response*] (applying Federal Circuit law, concluding that "resolution of whether any exceptions should trump the rule is best determined by the [court in which the first action was filed]"); *Mycone Dental Supply Co., Inc. v. Creative Nail Design, Inc.,* Civil Action No. 11-4380 (JBS/KMW), 2012 WL 1495496, at *1 (D.N.J. Apr. 26, 2012) (in patent case, concluding that "[t]he same considerations of comity and efficiency that animate the First-filed Rule also dictate that the court in which the matter was first-filed should be the forum to determine which court is the more appropriate forum to ultimately adjudicate the merits of this matter"); *Drew Techs., Inc. v. Robert Bosch, L.L.C.,* No. 11-15068, 2012 WL 314049, at *6 (E.D. Mich. Jan. 31, 2012) ("[T]he determination of the appropriate venue for this dispute should not be made in this court. Rather, that decision should be left to the Central District of California as the first-filed court."); *Genentech, Inc. v. GlaxoSmithKline LLC,* No. 10-CV-04255-JF, 2010 WL 4923954, at *4 (N.D. Cal. Dec. 1, 2010) [hereinafter *GlaxoSmithKline*] (holding that "the court with jurisdiction over the first-filed action should weigh the

---

[8] The '041 reissue patent was developed in Knoxville, Tennessee. (Decl. of Leland Sayers ¶¶ 3–4, Jan. 14, 2014.) The allegedly infringing windows were designed and developed in Silver Line's North Brunswick, New Jersey facility; the windows at issue are manufactured in New Jersey and Ohio; and the

windows are sold in the Northeast and Mid-Atlantic, New York being the biggest market. (Decl. of Andy Karr ¶¶ 9–10, 12, 16, Feb. 13, 2014.)

convenience factors in the first instance").[9] Many courts follow the same approach in non-patent cases. *See, e.g.*, *Parallel Iron*, 914 F. Supp. 2d at 129 ("Courts in nearly every circuit have held that the court in which the second action was filed should defer to courts in the first-filed action.") (collecting cases); *Bank of Am., N.A. v. Sorensen*, No. 12-CV-1026 (TS), 2013 WL 5295677, at *2 (D. Utah Sept. 19, 2013) ("Other courts have stayed second-filed declaratory judgment actions and declined to consider contentions that it would be more convenient to litigate a case in a second-filed forum pending ruling on those issues in the first-filed forum."); *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 54 n.2 (S.D.N.Y. 2001) ("The court in which the first-filed case was brought decides whether the first-filed rule or an exception to the first-filed rule applies."); *see also Congregation Shearith Israel v. Congregation Jeshuat Israel*, --- F. Supp. 2d ----, No. 12-CV-8406 (MGC), 2014 WL 349496, at *2 (S.D.N.Y. Jan. 31, 2014) (noting Southern District of New York's "bright-line rule" that the first-filed forum decides whether exception to first-to-file rule applies).

This principle of deferring to the first-filed forum comports "with the basic principles of promoting judicial efficiency and avoiding duplicative litigation that underlie the first-to-file doctrine." *Parallel Iron*, 914 F. Supp. 2d at 130. As the District of Massachusetts has noted, if the second-filed court were to determine that an exception to the first-to-file rule applied, "it would have no authority to reach out and

grab" the first-filed action. *Id.*; *see, e.g.*, *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 720 (2d Cir. 2010) (noting that § 1404(a) does not "allow for an action to be transferred by another district court before whom the action is not then pending"); *Nat'l Equip. Rental, Ltd. v. Fowler*, 287 F.2d 43, 46–47 (2d Cir. 1961) ("The administration of justice would be chaotic indeed if one district court could order another to divest itself of jurisdiction and to transfer a case properly before it."). Instead, the first-filed court would have to decide for itself whether to transfer the first-filed action to the second-filed court, which would require "an entirely duplicative round of briefing by the parties and analysis by the court." *Parallel Iron*, 914 F. Supp. 2d at 130; *see also GlaxoSmithKline*, 2010 WL 4923954, at *4 ("[J]ust as the administration of justice would be chaotic indeed if one district court could order another pursuant to § 1404(a) to divest itself of jurisdiction and to transfer a case properly before it, the same risk is present where the court in a second-filed action considers the convenience factors in connection with a motion to dismiss pursuant to the first-to-file rule." (internal quotation marks, brackets, and citations omitted)).

Turning to the instant case, the Court has determined *supra* that the Tennessee Action is the first-filed action. Accordingly, the Court defers to the Eastern District of Tennessee for a determination of whether the convenience factors under 28 U.S.C. § 1404(a) warrant departure from the first-to-file rule. Significantly, the Court notes that a

---

[9] As noted *supra*, the Federal Circuit held in *Micron* that a court considering exceptions to the first-to-file rule must weigh the convenience factors under 28 U.S.C. § 1404(a). *See* 518 F.3d at 904. "However, *Micron* says nothing about which court should make that determination. Because *Micron*'s holding was directed to the court hearing the first-filed action, the Federal Circuit did not consider the instant situation,

in which the court in the second-filed action is asked to weigh the convenience factors." *GlaxoSmithKline*, 2010 WL 4923954, at *4; *see Parallel Iron*, 914 F. Supp. 2d at 129 ("This Court believes that the Federal Circuit's decision [in *Micron*] is best understood as controlling how a first-filed court should apply the first-to-file rule, not which court is best positioned to conduct that analysis.").

motion to transfer "is already fully briefed and pending before the [first-filed court]; for this Court to issue a ruling would risk inconsistent results, exactly the outcome to be avoided by the rule in the first place." *Bright Response*, 2012 WL 4097707, at *3. Because the Court defers to the Eastern District of Tennessee, the Court stays this action pending the Eastern District of Tennessee's decision on Silver Line's motion to transfer the Tennessee Action. *See, e.g.*, *Parallel Iron*, 914 F. Supp. 2d at 130 (staying second-filed action pending decision by first-filed court on any challenges to venue); *Cellectis S.A.*, 881 F. Supp. 2d at 613 (same); *Bright Response*, 2012 WL 4097707, at *5 (same); *Mycone Dental Supply Co., Inc.*, 2012 WL 1495496, at *2 (same); *GlaxoSmithKline*, 2010 WL 4923954, at *4 (same).

### IV. CONCLUSION

For the reasons set forth herein, the Court grants J-Channels' motion to stay this action. Specifically, the Court stays this action pending resolution of Silver Line's motion to transfer the Tennessee Action to this district, which is pending in the Eastern District of Tennessee.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 24, 2014
        Central Islip, NY

* * *

Silver Line is represented by Annie Huang, Becky Thorson, and Ronald J. Schutz, Robins, Kaplan, Miller & Ciresi, 601 Lexington Avenue, Suite 3400, New York, NY 10022. J-Channel is represented by Timothy Grochocinski and Joseph P. Oldaker, InnovaLaw, PC, 1900 Ravinia Place, Orland Park, IL 60462, and Gregory O. Koerner, Koerner Law Firm, 111 John Street, Suite 230, New York, NY 10038.